John J. Robertelli, Esq.
Gene Y. Kang, Esq.
Barry Levy, Esq. (to be admitted *pro hac vice*)
Max Gershenoff, Esq. (to be admitted *pro hac vice*)
RIVKIN RADLER LLP
21 Main Street, Suite 158
Hackensack, New Jersey 07601
(201) 287-2460
*Counsel for Plaintiffs Government Employees Insurance
Co., GEICO Indemnity Co., GEICO General Insurance
Company and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| GOVERNMENT EMPLOYEES INSURANCE CO., GEICO INDEMNITY CO., GEICO GENERAL INSURANCE COMPANY, and GEICO CASUALTY CO., | Docket No.: _____(     ) |
| Plaintiffs, | **Plaintiffs Demand a Trial by Jury** |
| -against- | |
| HAMILTON HEALTHCARE P.C., BARRY FASS, M.D., DAVID E. SMITH, M.D., STEPHAN KOSMORSKY, D.O., NOLA T. MAHONEY, D.O., JOHN J. MAHONEY, D.O., ANTHONY F. PIERRO, D.C., STEPHEN M. LYCHOCK, D.C., ALEXANDER J. KISHYK, D.C., GARDEN STATE MAGNETIC IMAGING, L.L.C., REHAN ZUBERI, NAZISH KHAN a/k/a NASH KHAN, TARIQ DIN, and FAIZAH ZUBERI, M.D., | **COMPLAINT** |
| Defendants. | |

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Complaint against the Defendants, hereby allege as follows:

## NATURE OF ACTION

1.      This action seeks to recover more than $3,300,000.00 that the Defendants

wrongfully obtained from GEICO by submitting, and causing to be submitted:

(i)      thousands of fraudulent no-fault insurance charges through Hamilton Healthcare
         P.C. for purported initial and follow-up examinations, electrodiagnostic testing,
         pain management injections, percutaneous electrical nerve stimulation sessions
         ("PENS sessions"), chiropractic services, and physical therapy services; and

(ii)     hundreds of fraudulent no-fault insurance charges through Garden State Magnetic
         Imaging, L.L.C. for purported radiology services, including purported magnetic
         resonance imaging ("MRI") studies and x-rays.

(the purported examinations, electrodiagnostic testing, pain management injections, PENS

sessions, chiropractic services, physical therapy services, and radiology services collectively are

referred to hereinafter as the "Fraudulent Services").

2.      The Fraudulent Services purportedly were provided to individuals ("Insureds")

who claimed to have been involved in automobile accidents and were eligible for insurance

coverage under GEICO no-fault insurance policies.

3.      In addition, GEICO seeks a declaration that it is not obligated to pay more than

$300,000.00 in pending fraudulent claims seeking payment for the Fraudulent Services that the

Defendants have submitted or caused to be submitted because:

(i)      the Defendants were not in compliance with all relevant laws and regulations
         governing healthcare practice in New Jersey and, as a result, were not eligible to
         receive no-fault insurance reimbursement in the first instance;

(ii)     the Fraudulent Services were not provided in compliance with all relevant laws
         and regulations governing healthcare practice in New Jersey and, as a result, were
         not eligible for no-fault insurance reimbursement in the first instance;

(iii)    the Fraudulent Services purportedly provided through Hamilton Healthcare P.C.
         were not medically necessary, and were provided – to the extent that they were
         provided at all – pursuant to pre-determined fraudulent protocols designed solely
         to financially enrich the Defendants, rather than to treat or otherwise benefit the
         Insureds who purportedly were subjected to them;

2

(iv)     in many cases, the Fraudulent Services purportedly provided through Hamilton Healthcare P.C. never were provided in the first instance; and

(v)      the billing codes used for the Fraudulent Services purportedly provided through Hamilton Healthcare P.C. misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

4.       The Defendants fall into the following categories:

(i)      Defendant Hamilton Healthcare, P.C., ("Hamilton") is a New Jersey medical professional corporation through which many of the Fraudulent Services purportedly were provided and were billed to insurance companies, including GEICO.

(ii)     Defendant Barry Fass, M.D. ("Fass") is a physician licensed to practice medicine in New Jersey, owned and controlled Hamilton, and purported to perform many of the Fraudulent Services at Hamilton.

(iii)    Defendants David E. Smith, M.D. ("Smith"), Stephen Kosmorsky, D.O. ("Kosmorsky"), Nola T. Mahoney, D.O. ("N. Mahoney"), and John J. Mahoney, D.O. ("J. Mahoney") are physicians licensed to practice medicine in New Jersey, were employed by or associated with Hamilton and Fass, and purported to perform many of the Fraudulent Services at Hamilton.

(iv)     Defendants Anthony F. Pierro, D.C. ("Pierro"), Stephen M. Lychock, D.C. ("Lychock"), and Alexander J. Kishyk, D.C. ("Kishyk") are chiropractors licensed to practice chiropractic in New Jersey, were employed by or associated with Hamilton and Fass, and purported to perform many of the Fraudulent Services at Hamilton.

(v)      Defendant Garden State Magnetic Imaging, L.L.C. ("GSMI") is a New Jersey limited liability company that was fraudulently licensed as a New Jersey "ambulatory care facility", as that term is defined under N.J.A.C. 8:43A-1.3, through which many of the Fraudulent Services purportedly were performed and were billed to insurance companies, including GEICO.

(vi)     Defendants Rehan Zuberi ("Zuberi"), Nazish Khan a/k/a Nash Khan ("Khan"), Tariq Din ("Din"), and Faizah Zuberi, M.D. ("F. Zuberi") are individuals who owned, controlled, and were associated with GSMI, and caused fraudulent billing for the Fraudulent Services to be submitted through GSMI to insurance companies, including GEICO.

5.       As discussed below, the Defendants at all relevant times have known that:

(i)      the Defendants were not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey and, as a result, were not eligible to receive no-fault insurance reimbursement in the first instance;

(ii)      the Fraudulent Services were not provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey and, as a result, were not eligible for no-fault insurance reimbursement in the first instance;

(iii)      the Fraudulent Services purportedly provided through Hamilton Healthcare P.C. were not medically necessary, and were provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)      in many cases, the Fraudulent Services purportedly provided through Hamilton Healthcare P.C. never were provided in the first instance; and

(v)      the billing codes used for the Fraudulent Services purportedly provided through Hamilton Healthcare P.C. misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

6.      As such, the Defendants do not now have – and never had – any right to be compensated for the Fraudulent Services that were billed to GEICO through Hamilton and GSMI.

7.      The charts annexed hereto as Exhibits "1" and "2" set forth a representative sample of the fraudulent claims that have been identified to date that the Defendants have submitted, or caused to be submitted, to GEICO.

8.      The Defendants' interrelated fraudulent schemes began as early as 2006 and have continued uninterrupted since that time. As a result of the Defendants' interrelated schemes, GEICO has incurred damages of more than $3,300,000.00.

## THE PARTIES

### I.      Plaintiffs

9.      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. are Maryland corporations with their

principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New Jersey.

## II.   <u>Defendants</u>

10.   Defendant Hamilton is a New Jersey professional corporation with its principal place of business in New Jersey. Hamilton was incorporated in New Jersey on or about October 16, 2002, was owned by Fass, and was used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other insurers.

11.   Defendant Fass resides in and is a citizen of New Jersey. Fass was licensed to practice medicine in New Jersey on or about March 31, 1997, owned and controlled Hamilton, and purported to perform many of the Fraudulent Services at Hamilton.

12.   Defendant Smith resides in and is a citizen of New Jersey. Smith was licensed to practice medicine in New Jersey on or about February 26, 2007, was employed by or associated with Fass and Hamilton, and purported to perform many of the Fraudulent Services at Hamilton.

13.   Defendant Kosmorsky resides in and is a citizen of Pennsylvania. Kosmorsky was licensed to practice medicine in New Jersey on or about July 1, 1983, was employed by or associated with Fass and Hamilton, and purported to perform many of the Fraudulent Services at Hamilton.

14.   Defendant N. Mahoney resides in and is a citizen of New Jersey. N. Mahoney was licensed to practice medicine in New Jersey on or about July 1, 1987, was employed by or associated with Fass and Hamilton, and purported to perform many of the Fraudulent Services at Hamilton.

15.   Defendant J. Mahoney resides in and is a citizen of Pennsylvania. J. Mahoney was licensed to practice medicine in New Jersey on or about June 2, 1987, was employed by or

associated with Fass and Hamilton, and purported to perform many of the Fraudulent Services at Hamilton.

16.     Defendant Pierro resides in and is a citizen of New Jersey. Pierro was licensed to practice chiropractic in New Jersey on or about October 5, 1995, was employed by or associated with Fass and Hamilton, and purported to perform many of the Fraudulent Services at Hamilton.

17.     Defendant Lychock resides in and is a citizen of New Jersey. Lychock was licensed to practice chiropractic in New Jersey on or about January 8, 2001, was employed by or associated with Fass and Hamilton, and purported to perform many of the Fraudulent Services at Hamilton.

18.     Defendant Kishyk resides in and is a citizen of New Jersey. Kishyk was licensed to practice chiropractic in New Jersey on or about November 1, 1989, was employed by or associated with Fass and Hamilton, and purported to perform many of the Fraudulent Services at Hamilton.

19.     Defendant GSMI is a New Jersey limited liability company with its principal place of business in New Jersey, and formerly was fraudulently licensed as a New Jersey "ambulatory care facility", as that term is defined under N.J.A.C. 8:43A-1.3.

20.     GSMI was organized in New Jersey on or about November 12, 2008, nominally was owned on paper by F. Zuberi and Din, and nominally had F. Zuberi and Din as its sole members. In actuality, however, GSMI secretly and unlawfully was owned, operated, and managed by Zuberi, in conjunction with F. Zuberi, Din, and Khan. GSMI was used by the Defendants as a vehicle to submit fraudulent billing to GEICO and other insurers.

21.     Defendant Zuberi resides in New Jersey and is a citizen of the Islamic Republic of Pakistan.

22.     Zuberi secretly and unlawfully owned, operated, and managed GSMI, and used GSMI as a vehicle to submit fraudulent claims for the Fraudulent Services to GEICO and other insurers.

23.     In 1998, Zuberi was convicted of second degree theft by deception in violation of N.J.S.A. 2C-20-4, 2C:2-6 and 2C:2-7, as well as second degree financial facilitation of criminal activity in violation of N.J.S.A. 2C:21-25b, 2C:2-6 and 2C:2-7, in connection with his participation in a scheme to defraud New Jersey Medicaid of millions of dollars.

24.     As a result of his conviction, Zuberi was sentenced to six years in prison and was debarred from the Medicaid program.

25.     On or about June 19, 2014, Zuberi was arrested and charged with first-degree racketeering, among other crimes, in connection with his role as owner, operator, and manager of numerous fraudulently-licensed ambulatory care facilities in New Jersey, including GSMI, that purported to provide radiology services to Insureds.

26.     Specifically, Zuberi was charged with leading a criminal enterprise consisting of – among other things – numerous  fraudulently-licensed ambulatory care facilities that provided hundreds of thousands of dollars in illegal kickbacks to healthcare services providers in exchange for patient referrals for radiology services.

27.     On May 11, 2015, Zuberi pleaded guilty to first-degree financial facilitation of criminal activity and second-degree conspiracy to commit commercial bribery in connection with the fraudulent scheme at the ambulatory care facilities he secretly and unlawfully owned and controlled, including GSMI.

28.     Defendant Din resides in and is a citizen of New Jersey.     Together with Zuberi, Khan, and F. Zuberi, Din owned, operated, and managed GSMI, and     used  GSMI  as  a vehicle to submit fraudulent claims for the Fraudulent Services to GEICO and other insurers.

29.     In September 2016, Din pleaded guilty to second-degree charges of conspiracy, money laundering, commercial bribery, and misconduct of a corporate official for paying hundreds of thousands of dollars to physicians and other professionals in exchange for referrals to his ambulatory care facilities.

30.     Defendant Khan resides in and is a citizen of Pennsylvania. Together with Zuberi, Din, and F. Zuberi, Khan owned, operated, and managed GSMI, and used GSMI as a vehicle to submit fraudulent claims for the Fraudulent Services to GEICO and other insurers.

31.     Defendant F. Zuberi resides in and is a citizen of New Jersey. Together with Zuberi, Khan, and Din, F. Zuberi owned, operated, and managed GSMI, and     used  GSMI as a vehicle to submit fraudulent claims for the Fraudulent Services to GEICO and other insurers.

32.     F. Zuberi is Zuberi's sister.

## JURISDICTION AND VENUE

33.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the total matter in controversy, exclusive of interest and costs, exceeds the jurisdictional threshold of $75,000.00, and is between citizens of different states.

34.     This Court also has original jurisdiction pursuant to 28 U.S.C. § 1331 over claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act).

35.     In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

36.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the District of New Jersey is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

### I.     An Overview of the Pertinent Law Governing No-Fault Insurance Reimbursement

### A.     The New Jersey No-Fault Laws

37.     New Jersey has a comprehensive statutory system designed to ensure that motor vehicle accident victims are compensated for their injuries.  The statutory system is embodied within the Compulsory Insurance Law (N.J.S.A. 39:6B-1 to 3) and the Automobile Reparation Reform Act (N.J.S.A. 39:6A-1 et seq.)(collectively referred to as the "No Fault Laws"), which require automobile insurers to provide Personal Injury Protection Benefits ("PIP Benefits") to Insureds.

38.     Under the No Fault Laws, an Insured can assign his or her right to PIP Benefits to healthcare services providers in exchange for those services. Pursuant to a duly executed assignment, a healthcare services provider may submit claims directly to an insurance company in order to receive payment for medically necessary services, using the required claim forms, including the Healthcare Financing Administration insurance claim form (known as the "HCFA-1500 form").

### B.     No-Fault Reimbursement and Compliance With New Jersey Law Governing Healthcare Practice

39.     In order for a healthcare services provider to be eligible to receive PIP Benefits, it must comply with all relevant laws and regulations governing healthcare practice in New Jersey.

40.     Thus, a healthcare services provider is not entitled to receive PIP Benefits where it has failed to comply with all applicable statutory and regulatory requirements governing

healthcare practice in New Jersey, <u>whether or not the underlying services were medically necessary</u>. <u>See</u>, <u>e.g.</u>, <u>Liberty Mut. Ins. Co. v. Healthcare Integrated Servs.</u>, 2009 N.J. Super. Unpub. LEXIS 2416 at * 4 - * 5 (App. Div. 2009)("This court has held that a provider of such services is not entitled to reimbursement for services covered by PIP unless the provider and the services are in compliance with relevant laws and regulations."); <u>Varano, Damian & Finkel, L.L.C. v. Allstate Ins. Co.</u>, 366 N.J. Super. 1, 6 (App. Div. 2004)(healthcare services provider operated in violation of pertinent regulatory standards "is not eligible to receive PIP benefits."); <u>Allstate Ins. Co. v. Orthopedic Evaluations, Inc.</u>, 300 N.J. Super. 510, 515-519 (App. Div. 1997)(healthcare services provider's lack of compliance with pertinent regulatory standards rendered it ineligible to collect PIP Benefits, whether or not the underlying services were medically necessary); <u>Allstate Ins. Co. v. LGberg</u>, 376 N.J. Super. 623, 632 (Law Div. 2004)("A medical services provider's failure to comply with the standards promulgated by the Board of Medical Examiners make it ineligible to receive PIP reimbursement."); <u>Allstate Ins. Co. v. Schick</u>, 328 N.J. Super. 611, 620 (1999)("[A]n insurer may properly deny PIP benefits under the No Fault Law based upon a healthcare provider's failure to comply with the administrative regulations governing the practice of healthcare in this State.")

41.    Moreover, in order for a specific healthcare service to be eligible for PIP reimbursement, the service itself must be provided in compliance with all relevant laws and regulations governing healthcare practice in New Jersey. <u>See</u>, <u>e.g.</u>, <u>Healthcare Integrated Servs.</u>, <u>supra</u>; <u>Orthopedic Evaluations, Inc.</u>, <u>supra</u>.

42.    By extension, insurers such as GEICO are not obligated to make any payments of PIP Benefits to healthcare services providers that are not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

43.     Furthermore, insurers such as GEICO are not obligated to make any payments of PIP Benefits for healthcare services that are not rendered in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey.

**C.     Pertinent New Jersey Law Regarding the Payment or Receipt of Compensation in Exchange for Patient Referrals**

44.     Pursuant to N.J.A.C. 13:35-6.17, physicians are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

45.     Among other things, N.J.A.C. 13:35-6.17(c)(1) specifies that:

A licensee shall not, directly or indirectly, give to or receive from any licensed or unlicensed source a gift of more than nominal (negligible) value, or any fee, commission, rebate or bonus or other compensation however denominated, which a reasonable person would recognize as having been given or received in appreciation for or to promote conduct by a licensee including: purchasing a medical product, ordering or promoting the sale or lease of a device or appliance or other prescribed item, prescribing any type of item or product for patient use or making or receiving a referral to or from another for professional services. For example, a licensee who refers a patient to a healthcare service (such as a cardiac rehabilitation service or a provider of durable medical equipment or a provider of testing services) shall not accept from nor give to the healthcare service a fee directly or indirectly in connection with the referral, whether denominated as a referral or prescription fee or consulting or supervision fee or space leasing in which to render the services (other than as permitted in (h) below), or by any other name … .

(Emphasis added).

46.     N.J.A.C. 13:35-6.17(c)(1)(ii) specifies that "[t]his section shall be construed broadly to effectuate its remedial intent."

47.     Similarly, pursuant to N.J.A.C. 13:44-E-2.6, chiropractors are prohibited from paying or receiving compensation, either directly or indirectly, in exchange for patient referrals.

48.     Pursuant to N.J.A.C. 8:43A-3.2, ambulatory care facilities are required to comply with applicable state laws and regulations, including the laws and regulations prohibiting the payment of kickbacks in exchange for patient referrals.

49.     Therefore, ambulatory care facilities that pay or receive illegal kickbacks in exchange for patient referrals are not eligible to receive PIP Benefits.

50.     Therefore, physicians, chiropractors, medical practices, chiropractic practices, and ambulatory care facilities that pay or receive compensation in exchange for patient referrals are not eligible to receive PIP Benefits.

**D.     Pertinent New Jersey Law Regarding Ownership and Licensing of Ambulatory Care Facilities**

51.     N.J.A.C. 8:43A-1.3 provides that:

"Ambulatory care facility" means a health care facility or a distinct part of a health care facility in which preventive, diagnostic, and treatment services are provided to persons who come to the facility to receive services and depart from the facility on the same day"

52.     Pursuant to N.J.S.A. § 26:2H-12, a health care service or health care facility such as GSMI that intends to provide MRI services or CAT scans must obtain an ambulatory care facility license from the New Jersey Department of Health and Senior Services ("DHSS").

53.     As part of the licensing process, an applicant for an ambulatory care facility license is legally required to disclose the ownership of the facility and the property on which it is located to DHSS. See N.J.A.C. 8:43A-3.3(a).

54.     In addition, N.J.A.C. 8:43A-3.3(b) provides that:

No facility shall be owned, managed, or operated by any person convicted of a crime relating adversely to the person's capability of owning, managing, or operating the facility.

55.     Therefore, ambulatory care facilities that secretly and illegally are owned or controlled by persons who have been convicted of crimes relating adversely to their capability of owning, managing, or operating the facilities are not eligible to receive PIP Benefits.

E. **No-Fault Reimbursement, Medical Necessity, and the New Jersey No-Fault Care Paths**

56.     Pursuant to N.J.S.A. 39:6A-4, an insurer such as GEICO is only required to pay PIP Benefits for reasonable, necessary, and appropriate treatment. Concomitantly, a healthcare services provider is only eligible to receive PIP Benefits for medically necessary services.

57.     Pursuant to N.J.S.A. 39:6A-2(m):

"Medically necessary" means that the treatment is consistent with the symptoms or diagnosis, and treatment of the injury

(i)      is not primarily for the convenience of the injured person or provider;

(ii)     is the most appropriate standard or level of service which is in accordance with standards of good practice and standard professional treatment protocols, as such protocols may be recognized or designated by the Commissioner of Banking and Insurance, in consultation with the Commissioner of Health and Senior Services or with a professional licensing or certifying board in the Division of Consumer Affairs in the Department of Law and Public Safety, or by a nationally recognized professional organization; and

(iii)    does not involve unnecessary diagnostic testing.

58.     Pursuant to the No-Fault Laws, the New Jersey Commissioner of Banking and Insurance (the "Commissioner") has designated specific care paths (the "Care Paths") as the standard course of medically necessary treatment for certain types of neck and back soft tissue injuries that commonly are sustained in automobile accidents. See N.J.A.C. 11:3-4.6.

59.     Specifically, the Commissioner has promulgated Care Paths for the following types of injuries:

(i)      cervical spine strains, sprains, and contusions;

(ii)     cervical herniated disks or radiculopathies;

(iii)    thoracic spine strains, sprains, and contusions;

(iv)     thoracic herniated disks or radiculopathies;

(v)      lumbar-sacral spine strains, sprains, and contusions; and

13

(vi)     lumbar-sacral herniated disks or radiculopathies.

60.     The Care Paths generally provide for an initial, four-week course of conservative treatment including chiropractic services, physical therapy, medication, and exercise.

61.     Should a healthcare services provider wish to provide additional treatment to an Insured beyond the initial four weeks of conservative treatment, the Care Paths generally require the provider to demonstrate at the four week mark, the eight week mark, and the 13 week mark that continued treatment is warranted based on the Insured's individual circumstances. See New Jersey Department of Banking and Insurance Comments, 30 N.J.R. 4401(a).

62.     The guidelines established by the Commissioner in the Care Paths are designed to avoid the continuation of treatment and therapy, week after week, over many months and years, without any observable improvement. See 30 N.J.R. 4401(a).

**F.     The Fee Schedule and Current Procedural Terminology Codes**

63.     New Jersey has established a medical fee schedule (the "Fee Schedule") that is applicable to claims for PIP Benefits.

64.     The No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

65.     When a healthcare services provider submits a claim for PIP Benefits using the current procedural terminology ("CPT") codes set forth in the Fee Schedule, it represents that: (i) the service described by the specific CPT code that is used was performed in a competent manner in accordance with applicable regulations; (ii) the service described by the specific CPT code that is used was reasonable and medically necessary; and (iii) the service and the attendant fee were not excessive.

66.     The No-Fault Laws provide that the Fee Schedule shall be interpreted in accordance with the Medicare Claims Processing Manual ("MCPM"), the National Correct Coding Initiative ("NCCI") Policy Manual, and the American Medical Association's CPT Assistant. See N.J.A.C. 11:3-29.4.

67.     Additionally, no-fault providers and insurers are directed to use the NCCI "Edits" in determining whether or not CPT codes must be bundled or can be billed separately, i.e., unbundled. The NCCI Edits define when two CPT codes should not be reported together either in all situations or most situations.

68.     The MCPM, NCCI Policy Manual, NCCI Edits, and CPT Assistant are all incorporated by reference into the New Jersey no-fault insurance regulations. See N.J.A.C. 11:3-29.4.

69.     With respect to unbundling, N.J.A.C. 11:3-29.4 provides that:

Artificially separating or partitioning what is inherently one total procedure into subparts that are integral to the whole for the purpose of increasing medical fees is prohibited.

70.     Chapter 1 of the NCCI Policy manual provides that:

Procedures should be reported with the most comprehensive CPT code that describes the services performed. Physicians must not unbundle the services described by a HCPCS/CPT code.

71.     Chapter 12 of the MCPM provides that:

The narrative for many CPT codes includes a parenthetical statement that the procedure represents a 'separate procedure.' The inclusion of this statement indicates that the procedure, while possible to perform separately, is generally included in a more comprehensive procedure, and the service is not to be billed when a related, more comprehensive, service is performed.

**G.     The New Jersey Insurance Fraud Prevention Act**

72.     New Jersey has a strong public policy against insurance fraud. This policy is manifested in a series of statutes, including the Insurance Fraud Prevention Act, ("IFPA")

N.J.S.A. 17:33A-1 et seq. A healthcare services provider violates the IFPA if, among other things, it:

> Presents or causes to be presented any written or oral statement as part of, or in support of or opposition to a claim for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> Prepares or makes any written or oral statement that is intended to be presented to any insurance company or any insurance claimant in connection with, or in support of or in opposition to any claims for payment or other benefit pursuant to an insurance policy, knowing that the statement contains any false or misleading information concerning any fact or thing material to the claim; or

> Conceals or knowing fails to disclose the occurrence of an event which affects a person's initial or continued right or entitlement to (a) any insurance benefits or payment or (b) the amount of any benefit or payment to which the person is entitled.

See N.J.S.A. 17:33A-4.

73.    A healthcare services provider also violates the IFPA if it either: (i) "knowingly assists, conspires with or urges any person or practitioner to violate any of provisions of this act"; or (ii) "knowingly benefits, directly or indirectly, from the proceeds derived from a violation of this act." Id.

74.    Violators of the IFPA are liable to the insurer for restitution, attorney's fees, and the reasonable costs of the insurer's investigation. See N.J.S.A 17:33A-7(a).

75.    A person that engages in a pattern of fraudulent behavior under the IFPA is liable to the insurer for treble damages. See N.J.S.A. 17:33A-7(b).

76.    The IFPA defines a pattern as five or more "related violations". See N.J.S.A. 17:33A-3. Violations are related if they involve either the same victim, or same or similar actions on the part of the person or practitioner charged with violating the IFPA. See N.J.S.A.17:33A-3.

## II.   The Defendants' Interrelated Fraudulent Schemes

77.    In the claims identified in Exhibits "1" and "2", virtually all of the Insureds whom the Defendants purported to treat were involved in minor, low-speed, low-impact "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

78.    Concomitantly, almost none of the Insureds whom the Defendants purported to treat suffered from any significant injuries or health problems as a result of the minor accidents they experienced or purported to experience.

79.    Even so, the Defendants purported to subject virtually every Insured in the claims identified in Exhibits "1" and "2" to a medically unnecessary course of "treatment" that was provided – to the extent that it was provided at all – pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that they could submit to insurers, including GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to it.

80.    The Defendants purported to provide their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms, presentment, or – in most cases – the total absence of any actual medical problems arising from any actual automobile accidents.

81.    Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

82.    No legitimate physician, chiropractor, physical therapist, ambulatory care facility, ambulatory care facility owner, or other healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. The

17

Defendants permitted the fraudulent treatment and billing protocol described below to proceed under their auspices because they sought to profit from their fraudulent scheme.

**A.    GSMI's Illegal Corporate Structure**

83.    At all relevant times, GSMI purported to be an ambulatory care facility that provided radiology services to Insureds.

84.    Therefore, pursuant to New Jersey law, Zuberi could not lawfully own, manage, or operate GSMI, because his 1998 criminal conviction for his participation in the New Jersey Medicaid fraud scheme related adversely to his capability of owning, managing, or operating an ambulatory care facility such as GSMI. See N.J.A.C. 8:43A-3.3(b).

85.    Zuberi knew that he could not lawfully own, manage, or operate any ambulatory care facilities in New Jersey, including GSMI, because his criminal conviction in 1998 for his participation in the New Jersey Medicaid fraud scheme related adversely to his capability of owning, managing, or operating such facilities. See N.J.A.C. 8:43A-3.3(b).

86.    Accordingly, beginning in or about late 2008, Zuberi, F. Zuberi, Khan, and Din embarked on a secret scheme whereby – in exchange for compensation from Zuberi – F. Zuberi, Khan, and Din agreed to falsely represent in corporate filings and DHSS licensing applications that only F. Zuberi and Din owned and controlled GSMI, while in actuality permitting Zuberi and Khan to co-own, manage, and operate GSMI.

87.    At all relevant times, Zuberi unlawfully co-owned, managed, and operated GSMI.

88.    Even so, on November 12, 2008, GSMI, Zuberi, F. Zuberi, Khan, and Din filed, or caused to be filed, a certificate of formation for GSMI with the New Jersey Department of the Treasury which fraudulently concealed Zuberi's secret and unlawful ownership interest in and control over GSMI.

89.     Then, in or about late 2008, GSMI, Zuberi, F. Zuberi, Khan, and Din filed, or caused to be filed, an ambulatory care facility licensing application with the DHSS which falsely represented that F. Zuberi owned GSMI, and fraudulently concealed – among other things – Zuberi's secret and unlawful ownership interest in and control over GSMI.

90.     Thereafter, to further facilitate Zuberi's illegal ownership interests in and control over GSMI, and simultaneously conceal Zuberi's illegal ownership interests in and control over GSMI, Zuberi, F. Zuberi, Khan, and Din caused GSMI to enter into a series of "management", "marketing", and "billing" agreements with Zuberi and entities owned and controlled by Zuberi including, upon information and belief, Diagnostic Imaging Affiliates, L.L.C. ("DIA"), Medical Diagnostic Resources, L.L.C. ("Medical Diagnostic"), and Diagnostic Imaging Group of Edison, L.L.C. ("DIGE").

91.     These agreements called for exorbitant payments from GSMI to Zuberi and his entities for the alleged performance of certain designated services including management, marketing, billing, and collections, regardless of: (i) the volume of the GSMI's business; (ii) the income generated by GSMI; or (iii) the actual, fair-market value of the underlying services.

92.     While these agreements ostensibly were created to permit Zuberi's entities to provide "management," "billing," and "marketing," services to GSMI, they actually were used solely as a tool to permit Zuberi to: (i) illegally control the day-to-day operations, exercise supervisory authority over, and own GSMI; and (ii) to siphon away the profits that were generated by the billings submitted to GEICO and other insurers through GSMI.

93.     On or about June 14, 2014, Zuberi and several of his associates were arrested and charged in connection with, among other things, the Defendants' fraudulent scheme.

94.     In a release announcing the arrests, acting New Jersey Attorney General John J. Hoffman stated, among other things, that after Zuberi was released from prison following his criminal convictions in 1998, he colluded with numerous of his family members and close associates to serve as nominal or "paper" owners of numerous fraudulently organized and licensed ambulatory care facilities, and to submit more than 30 fraudulent licensing applications to DHSS that, among other things, misrepresented and concealed Zuberi's illegal ownership interests in the ambulatory care facilities.

95.     One of Zuberi's associates who was arrested with him on or about June 14, 2014 was an individual named Rohit Gupta ("Gupta").

96.     On June 9, 2015, Gupta pleaded guilty to conspiracy to commit healthcare fraud in connection with, among other things, the Defendants' fraudulent scheme.

97.     Thereafter, in a July 2016 affidavit, Gupta swore – among other things – that:

(i)     He had a long personal and business relationship with Zuberi, and provided billing services for many of Zuberi's ambulatory care facilities.

(ii)    Zuberi's ambulatory care facilities, including GSMI, were "misleadingly incorporated under the names of various members of Zuberi's family in order to conceal Zuberi's actual ownership interest in them, because Zuberi previously had been convicted of various crimes and – as the result of his convictions – he could not legally own or operate imaging centers in New Jersey."

(iii)   "Zuberi actually participated in the operation and management of all of" his ambulatory care facilities, including GSMI.

(iv)    "Zuberi used purported 'management' and 'billing' companies to control the day-to-day operations of" his ambulatory care facilities, including GSMI, "and to simultaneously conceal his unlawful ownership interest in them." These "management" and "billing" companies – including DIA, Medical Diagnostic, and DIGE – "received payments far in excess of the reasonable cost of their services. These exorbitant payments to the 'management' and 'billing' companies actually were the method by which Zuberi siphoned the profits from [his ambulatory care facilities, including GSMI] to himself."

98.     Because GSMI was – at all relevant times – unlawfully co-owned, operated, and managed by Zuberi, it never was eligible to collect PIP Benefits from GEICO and other insurers.

99.     Even so, in each of the claims identified in Exhibit "1", GSMI, Zuberi, Khan, Din, and F. Zuberi falsely represented that GSMI was in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore was eligible to collect PIP Benefits, when in fact it was not.

100.    What is more, in each of the claims identified in Exhibit "1", GSMI, Zuberi, Khan, Din, and F. Zuberi fraudulently concealed the fact that Zuberi unlawfully owned, managed, and operated GSMI, thereby rendering GSMI ineligible for PIP reimbursement.

## B.      The Illegal Kickbacks

101.    GSMI, Zuberi, Khan, Din, and F. Zuberi's ability to bill GEICO and other New Jersey automobile insurers for the Fraudulent Services depended on GSMI's ability to gain access to Insureds.

102.    Accordingly, GSMI, Zuberi, Khan, Din, and F. Zuberi entered into a secret scheme with Hamilton and Fass, whereby GSMI, Zuberi, Khan, Din, and F. Zuberi agreed to pay kickbacks to Hamilton and Fass in exchange for a large number of patient referrals to GSMI.

103.    The amount of kickbacks that GSMI, Zuberi, Khan, Din, and F. Zuberi paid to Hamilton and Fass was based on the volume of Insureds that Hamilton and Fass referred to GSMI.

104.    In exchange for kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi, Hamilton and Fass routinely referred Insureds to GSMI, or instructed their employees at Hamilton to refer Insureds to GSMI, regardless of the Insureds' individual symptoms, presentment, or – in most cases – the total absence of any medical problems arising from any automobile accident.

105.    For example, in his July 2016 affidavit, Gupta swore – among other things – that "[V]irtually all of the revenues for [Zuberi's ambulatory care facilities, including GSMI] were generated through kickbacks that Zuberi provided to the [facilities'] physician and chiropractor referral sources in exchange for patient referrals."

106.    Pursuant to the kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi, Hamilton and Fass – either directly or though their employees – referred more than 50 percent of their patients to GSMI.

107.    The referrals from Hamilton, Fass, and their employees to GSMI constituted more than 40 percent of GSMI's overall business.

108.    For example, pursuant to the kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi, Hamilton and Fass caused  the following Insureds – among many others – to be referred to GSMI on or about the following dates:

(i)      JB, on or about January 23, 2013;

(ii)     CM, on or about March 8, 2013;

(iii)    IH, on or about July 17, 2013;

(iv)     CA, on or about July 29, 2013;

(v)      SA, on or about October 7, 2013;

(vi)     CB, on or about November 20, 2013;

(vii)    AP, on or about December 23, 2013;

(viii)   AP, on or about January 23, 2014;

(ix)     GA, on or about March 5, 2014;

(x)      MH, on or about March 12, 2014;

(xi)     AR, on or about May 6, 2014;

(xii)     LA, on or about May 7, 2014;

(xiii)    GA, on or about May 27, 2014;

(xiv)    NB, on or about August 18, 2014;

(xv)     JS, on or about August 18, 2014;

(xvi)    ES, on or about August 18, 2014;

(xvii)   RP, on or about October 1, 2014;

(xviii)  MC, on or about October 8, 2014;

(xix)    JP, on or about October 21, 2014;

(xx)     MA, on or about November 25, 2014;

(xxi)    SH, on or about December 29, 2014;

(xxii)   PC, on or about January 28, 2015;

(xxiii)  SB, on or about February 10, 2015;

(xxiv)  HM, on or about February 17, 2015;

(xxv)   JS, on or about March 9, 2015;

(xxvi)  AM, on or about May 5, 2015;

(xxvii) DS, on or about August 3, 2015;

(xxviii)SH, on or about August 4, 2015;

(xxix)  AC, on or about August 11, 2015; and

(xxx)   BA, on or about August 14, 2015.

109.    These are only representative examples. All of the claims for radiology services that are identified in Exhibit "1" were the product of illegal kickbacks that GSMI, Zuberi, Khan, Din, and F. Zuberi paid to Hamilton and Fass.

110.    In keeping with the fact that Hamilton and Fass' referrals to GSMI were generated by illegal kickbacks, rather than by medical necessity, Hamilton, Fass, and the physicians and chiropractors who were employed by or associated with Hamilton and Fass frequently failed to incorporate the putative "results" of GSMI's radiology services into the Insureds' treatment plans, or take any action based on the supposed "results" of the radiology services.

111.    For example:

(i)    On October 13, 2012, an Insured named JB was involved in an automobile accident. On October 23, 2012, JB began treating at Hamilton. Between October 23, 2012 and January 23, 2013, Hamilton, Fass, Lychock, and Pierro purported to provide JB with chiropractic manipulation, electrical stimulation treatments, and massage therapy several times each week. Then, on January 23, 2013, Fass referred JB from Hamilton to GSMI for MRI studies, ostensibly to "rule out disc disease", but actually in exchange for kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi. On February 15, 2013, a physician named Robert Traflet, M.D. purported to provide JB with MRI studies at GSMI, and purported to diagnose JB with a variety of disc diseases and related conditions, including multiple bulging discs and facet hypertrophy. However, and in keeping with the fact that Fass's referral from Hamilton to GSMI was the product of the kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi, rather than medical necessity, neither Fass nor any other healthcare provider associated with Hamilton ever took any action based on the putative results of the MRI studies. Instead, Hamilton, Fass, Lychock, and Pierro continued to provide the same chiropractic manipulation, electrical stimulation treatments, and massage therapy to JB as they had before Fass referred JB to GSMI for the MRI, without any significant alteration or modification of the course of "treatment". What is more, none of Hamilton, Fass, Lychock, and Pierro's subsequent treatment notes even referenced the MRI results, much less addressed them in any manner.

(ii)    On March 23, 2013, an Insured named EV was involved in an automobile accident. On March 27, 2013, EV began treating at Hamilton. Between March 27, 2013 and May 28, 2013, Hamilton, Fass, Lychock, and Pierro purported to provide EV with chiropractic manipulation, electrical stimulation treatments, and massage therapy several times each week. Then, on May 28, 2013, Fass referred EV from Hamilton to GSMI for MRI studies, ostensibly to "rule out disc disease", but actually in exchange for kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi. On June 22, 2013, a physician named Lisa Marie Sheppard, M.D. purported to provide EV with MRI studies at GSMI, and purported to diagnose EV with a disc diseases, including bulging discs and fused vertebrae. However,

and in keeping with the fact that Fass's referral from Hamilton to GSMI was the product of the kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi, rather than medical necessity, neither Fass nor any other healthcare provider associated with Hamilton ever took any action based on the putative results of the MRI studies. Instead, Hamilton, Fass, Lychock, and Pierro continued to provide the same chiropractic manipulation, electrical stimulation treatments, and massage therapy to EV as they had before Fass referred EV to GSMI for the MRI, without any significant alteration or modification of the course of "treatment".

(iii)    On October 31, 2013, an Insured named WM was involved in an automobile accident. On November 5, 2013, WM began treating at Hamilton. Between November 5, 2013 and December 3, 2013, Hamilton, Fass, Lychock, and Pierro purported to provide WM with chiropractic manipulation, electrical stimulation treatments, and massage therapy several times each week. Then, on December 3, 2013, Fass referred WM from Hamilton to GSMI for MRI studies, ostensibly to "rule out disc disease", but actually in exchange for kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi. On December 16, 2013, a physician named Kathleen Caldwell, M.D. purported to provide WM with MRI studies at GSMI, and purported to diagnose WM with a variety of disc diseases, including multiple bulging discs and a herniated disc. However, and in keeping with the fact that Fass's referral from Hamilton to GSMI was the product of the kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi, rather than medical necessity, neither Fass nor any other healthcare provider associated with Hamilton ever took any action based on the putative results of the MRI studies. Instead, Hamilton, Fass, Lychock, and Pierro continued to provide the same chiropractic manipulation, electrical stimulation treatments, and massage therapy to WM as they had before Fass referred WM to GSMI for the MRI, without any significant alteration or modification of the course of "treatment".

(iv)    On December 15, 2013, an Insured named ZC was involved in an automobile accident. On January 3, 2014, ZC began treating at Hamilton. Between January 3, 2014 and January 27, 2014, Hamilton, Fass, Lychock, and Pierro purported to provide ZC with chiropractic manipulation, electrical stimulation treatments, and massage therapy. Then, on January 27, 2014, Fass referred ZC from Hamilton to GSMI for MRI studies, ostensibly to "rule out disc disease", but actually in exchange for kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi. On October 20, 2014, a physician named Kathleen Caldwell, M.D. purported to provide ZC with MRI studies at GSMI, and purported to diagnose ZC with disc diseases including bulging discs. However, and in keeping with the fact that Fass's referral from Hamilton to GSMI was the product of the kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi, rather than medical necessity, neither Fass nor any other healthcare provider associated with Hamilton ever took any action based on the putative results of the MRI studies. Instead, Hamilton, Fass, Lychock, and Pierro continued to provide the same chiropractic manipulation, electrical stimulation treatments, and massage therapy to ZC as they had before

Fass referred ZC to GSMI for the MRI, without any significant alteration or modification of the course of "treatment".

(v)    On June 28, 2014, an Insured named ES was involved in an automobile accident. On July 8, 2014, ES began treating at Hamilton. Between July 8, 2014 and August 18, 2014, Hamilton, Fass, Kishyk, and Pierro purported to provide ES with chiropractic manipulation, electrical stimulation treatments, and massage therapy several times each week. Then, on August 18, 2014, Fass referred ES from Hamilton to GSMI for MRI studies, ostensibly to "rule out disc disease", but actually in exchange for kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi. On August 26, 2014, a physician named Kathleen Caldwell, M.D. purported to provide ES with MRI studies at GSMI, and purported to diagnose ES with a variety of disc diseases, including multiple bulging discs and stenosis. However, and in keeping with the fact that Fass's referral from Hamilton to GSMI was the product of the kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi, rather than medical necessity, neither Fass nor any other healthcare provider associated with Hamilton ever took any action based on the putative results of the MRI studies. Instead, Hamilton, Fass, Kishyk, Lychock, and Pierro continued to provide the same chiropractic manipulation, electrical stimulation treatments, and massage therapy to ES as they had before Fass referred ES to GSMI for the MRI, without any significant alteration or modification of the course of "treatment". What is more, none of Hamilton, Fass, Kishyk, Lychock, and Pierro's subsequent treatment notes even referenced the MRI results, much less addressed them in any manner.

(vi)    On June 28, 2014, an Insured named JS was involved in an automobile accident. On July 8, 2014, JS began treating at Hamilton. Between July 8, 2014 and August 18, 2014, Hamilton, Fass, Kishyk, Lychock, and Pierro purported to provide JS with chiropractic manipulation, electrical stimulation treatments, and massage therapy several times each week. Then, on August 18, 2014, Fass referred JS from Hamilton to GSMI for MRI studies, ostensibly to "rule out disc disease", but actually in exchange for kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi. On August 26, 2014, a physician named Lisa Marie Sheppard, M.D. purported to provide JS with MRI studies at GSMI, and purported to diagnose JS with a variety of disc diseases, including herniated discs, bulging discs, and foraminal stenosis. However, and in keeping with the fact that Fass's referral from Hamilton to GSMI was the product of the kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi, rather than medical necessity, neither Fass nor any other healthcare provider associated with Hamilton ever took any action based on the putative results of the MRI studies. Instead, Hamilton, Fass, Kishyk, Lychock, and Pierro continued to provide the same chiropractic manipulation, electrical stimulation treatments, and massage therapy to JS as they had before Fass referred JS to GSMI for the MRI, without any significant alteration or modification of the course of "treatment".

26

(vii)   On September 4, 2014, an Insured named MC was involved in an automobile accident. On September 18, 2014, MC began treating at Hamilton. Between September 18, 2014 and October 8, 2014, Hamilton, Fass, Lychock, and Pierro purported to provide MC with chiropractic manipulation, electrical stimulation treatments, and massage therapy. Then, on October 8, 2014, Fass referred MC from Hamilton to GSMI for MRI studies, ostensibly to "rule out disc disease", but actually in exchange for kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi. On October 20, 2014, a physician named Lisa Marie Sheppard, M.D. purported to provide MC with MRI studies at GSMI, and purported to diagnose MC with a variety of disc diseases, including bulging discs and herniated discs. However, and in keeping with the fact that Fass's referral from Hamilton to GSMI was the product of the kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi, rather than medical necessity, neither Fass nor any other healthcare provider associated with Hamilton ever took any action based on the putative results of the MRI studies. Instead, Hamilton, Fass, Lychock, Kishyk, and Pierro continued to provide the same chiropractic manipulation, electrical stimulation treatments, and massage therapy to MC as they had before Fass referred MC to GSMI for the MRI, without any significant alteration or modification of the course of "treatment".

(viii)  On November 5, 2014, an Insured named LW was involved in an automobile accident. On November 28, 2014, LW began treating at Hamilton. Between November 28, 2014 and December 15, 2014, Hamilton, Fass, Kishyk, Lychock, and Pierro purported to provide LW with chiropractic manipulation, electrical stimulation treatments, and massage therapy several times each week. Then, on December 15, 2014, Fass referred LW from Hamilton to GSMI for MRI studies, ostensibly to "rule out disc disease", but actually in exchange for kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi. On December 22, 2014, a physician named Kathleen Caldwell, M.D. purported to provide LW with MRI studies at GSMI, and purported to diagnose LW with disc diseases, including bulging discs. However, and in keeping with the fact that Fass's referral from Hamilton to GSMI was the product of the kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi, rather than medical necessity, neither Fass nor any other healthcare provider associated with Hamilton ever took any action based on the putative results of the MRI studies. Instead, Hamilton, Fass, Kishyk, Lychock, and Pierro continued to provide the same chiropractic manipulation, electrical stimulation treatments, and massage therapy to LW as they had before Fass referred LW to GSMI for the MRI, without any significant alteration or modification of the course of "treatment".

(ix)    On February 3, 2015, an Insured named AS was involved in an automobile accident. On February 5, 2015, AS began treating at Hamilton. Between February 5, 2015 and March 18, 2015, Hamilton, Fass, Kishyk, Lychock, and Pierro purported to provide AS with chiropractic manipulation, electrical stimulation treatments, and massage therapy several times each week. Then, on March 18, 2015, Fass referred AS from Hamilton to GSMI for MRI studies, ostensibly to

"rule out disc disease", but actually in exchange for kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi. On March 24, 2015, a physician named Kathleen Caldwell, M.D. purported to provide AS with MRI studies at GSMI, and purported to diagnose AS with a variety of disc diseases, including multiple bulging and herniated discs. However, and in keeping with the fact that Fass's referral from Hamilton to GSMI was the product of the kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi, rather than medical necessity, neither Fass nor any other healthcare provider associated with Hamilton ever took any action based on the putative results of the MRI studies. Instead, Hamilton, Fass, Kishyk, Lychock, and Pierro continued to provide the same chiropractic manipulation, electrical stimulation treatments, and massage therapy to AS as they had before Fass referred AS to GSMI for the MRI, without any significant alteration or modification of the course of "treatment".

(x)     On July 3, 2015, an Insured named RL was involved in an automobile accident. On July 22, 2015, RL began treating at Hamilton. Between July 22, 2015 and August 3, 2015, Hamilton, Fass, Kishyk, Lychock, and Pierro purported to provide RL with chiropractic manipulation, electrical stimulation treatments, and massage therapy several times each week. Then, on August 3, 2015, Fass referred RL from Hamilton to GSMI for MRI studies, ostensibly to "rule out disc disease", but actually in exchange for kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi. On August 8, 2015, a physician named Kathleen Caldwell, M.D. purported to provide RL with MRI studies at GSMI, and purported to diagnose RL with a variety of disc diseases, including multiple herniated discs. However, and in keeping with the fact that Fass's referral from Hamilton to GSMI was the product of the kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi, rather than medical necessity, neither Fass nor any other healthcare provider associated with Hamilton ever took any action based on the putative results of the MRI studies. Instead, Hamilton, Fass, Kishyk, Lychock, and Pierro continued to provide the same chiropractic manipulation, electrical stimulation treatments, and massage therapy to RL as they had before Fass referred RL to GSMI for the MRI, without any significant alteration or modification of the course of "treatment".

112.    These are only representative examples. In most of the claims identified in Exhibits "1" and "2", Hamilton, Fass, and the physicians and chiropractors who were employed by or associated with Hamilton and Fass, failed to incorporate the putative "results" of GSMI's radiology services into the Insureds' treatment plans, or take any action based on the supposed "results" of the radiology services.

113.    Hamilton, Fass, and the physicians and chiropractors who were employed by or associated with Hamilton and Fass frequently failed to incorporate the putative "results" of

GSMI's radiology services into the Insureds' treatment plans, or to take any action based on the supposed "results" of the radiology services, because the referrals to GSMI were generated by kickbacks, rather than by medical necessity.

114. GSMI, Zuberi, Khan, Din, and F. Zuberi effectuated the kickbacks to their referral sources, including Hamilton and Fass, by routing the kickbacks through shell corporations and phony "charities", and by providing the kickbacks in the form of gift cards for luxury retailers.

115. For example, in the release announcing the June 14, 2014 arrest of Zuberi and various of his associates, acting New Jersey Attorney General John J. Hoffman stated, among other things, that – at Zuberi's direction – Zuberi and his associates paid more than $300,000.00 in illegal kickbacks to healthcare services providers in exchange for patient referrals to Zuberi's ambulatory care facilities for expensive radiology services.

116. According to the release, the kickbacks were paid using checks from "shell" corporations created by Zuberi's criminal enterprise, as well as gift cards/certificates.

117. Moreover, on or about October 16, 2014, seven physicians and chiropractors who allegedly referred patients to various of the ambulatory care facilities that Zuberi secretly and unlawfully owned and controlled – including, upon information and belief, GSMI – were arrested.

118. In a release announcing the arrests, acting New Jersey Attorney General John J. Hoffman indicated, among other things, that:

(i) Between 2008 and 2013, in exchange for more than $200,000.00 in kickbacks from a Zuberi-controlled entity, the physicians and chiropractors made more than 20,000 referrals to ambulatory care facilities that Zuberi secretly and unlawfully owned and controlled.

(ii) Zuberi and his criminal enterprise went to considerable lengths to conceal the illegal kickbacks, by – among other things – routing the kickbacks through shell corporations, phony "charities", by disguising the kickbacks as ostensibly-

29

legitimate fees to "rent" space from the physicians and chiropractors, and by providing the kickbacks in the form of gift cards for luxury retailers.

119.    The unlawful kickback relationships that GSMI, Zuberi, Khan, Din, and F. Zuberi established with Hamilton and Fass were essential to the success of the Defendants' fraudulent scheme.

120.    GSMI, Zuberi, Khan, Din, and F. Zuberi derived significant financial benefit from the relationships because without the access to the Insureds provided by Hamilton and Fass, GSMI, Zuberi, Khan, Din, and F. Zuberi would not have had the ability to bill automobile insurers, including GEICO, or generate income from insurance claim payments.

121.    Hamilton and Fass likewise benefitted from their unlawful kickback relationships with GSMI, Zuberi, Khan, Din, and F. Zuberi, because of the direct financial benefit conferred by the kickbacks themselves.

122.    On May 11, 2015, Zuberi pleaded guilty to first-degree financial facilitation of criminal activity and second-degree conspiracy to commit commercial bribery in connection with, among other things, the Defendants' fraudulent scheme.

123.    The plea agreement calls for Zuberi to receive a 10-year prison sentence with a four-year parole non-eligibility period.

124.    As set forth above, Din was – together with Zuberi, F. Zuberi, and Khan – one of the co-owners of GSMI.

125.    As set forth above, in September 2016 Din pleaded guilty to second-degree charges of conspiracy, money laundering, commercial bribery, and misconduct of a corporate official for paying hundreds of thousands of dollars to physicians and other professionals in exchange for referrals to his ambulatory care facilities including, upon information and belief, GSMI.

126.    Because GSMI – at all relevant times – paid illegal kickbacks in exchange for patient referrals, it never was eligible to collect PIP Benefits from GEICO and other insurers.

127.    Because Hamilton and Fass – at all relevant times – received illegal kickbacks in exchange for patient referrals, they never were eligible to collect PIP Benefits from GEICO and other insurers.

128.    Even so, in each of the claims identified in Exhibit "1", GSMI, Zuberi, Khan, Din, F. Zuberi falsely represented that GSMI was in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore was eligible to collect PIP Benefits, when in fact it was not.

129.    What is more, in each of the claims identified in Exhibit "1", GSMI, Zuberi, Khan, Din, and F. Zuberi fraudulently concealed the fact that they paid kickbacks in exchange for patient referrals, thereby rendering GSMI ineligible for PIP reimbursement.

130.    Similarly, in each of the claims identified in Exhibit "2", Hamilton and Fass falsely represented that Hamilton was in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore was eligible to collect PIP Benefits, when in fact it was not.

131.    Moreover, in each of the claims identified in Exhibit "2", Hamilton and Fass fraudulently concealed the fact that they received kickbacks in exchange for patient referrals, thereby rendering them ineligible for PIP reimbursement.

C.    **The Fraudulent Charges for Initial Examinations at Hamilton**

132.    As an initial step in the Defendants' fraudulent scheme: (i) Hamilton and either Fass, Kosmorsky, Smith, or J. Mahoney purported to provide virtually every Insured in the claims identified in Exhibit "2" with an initial medical examination; and (ii) Hamilton and either

31

Kishyk, Lychock, or Pierro purported to provide virtually every Insured in the claims identified in Exhibit "2" with an initial chiropractic examination.

133.    As set forth in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro then billed the initial examinations through Hamilton to GEICO under: (i) CPT code 99203, virtually always resulting in charges of $125.00 for each examination they purported to provide; or (ii) CPT code 99204, virtually always resulting in charges of $200.00 for each examination they purported to provide.

134.    The charges for the examinations were fraudulent because they falsely represented that Hamilton was in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore was eligible to collect PIP Benefits, when in fact it was not.

135.    Rather, as set forth above, Hamilton was not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore was not eligible to collect PIP Benefits, because it received illegal kickbacks in exchange for patient referrals to GSMI.

136.    What is more, and as set forth below, Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro's charges for the initial examinations identified in Exhibit "2" were fraudulent in that they misrepresented the nature, extent, and reimbursable amount of the initial examinations.

**1.      Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

137.    Pursuant to the American Medical Association's CPT Assistant, which is incorporated by reference into the Fee Schedule, the use of CPT code 99204 to bill for an initial

patient examination typically requires that the patient present with problems of moderate to high severity.

138.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99204 to bill for an initial patient examination.

139.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99204 to bill for an initial patient examination:

(i)      Office visit for initial evaluation of a 63-year-old male with chest pain on exertion. (Cardiology/Internal Medicine)

(ii)     Initial office visit of a 50-year-old female with progressive solid food dysphagia. (Gastroenterology)

(iii)    Initial office evaluation of a 70-year-old patient with recent onset of episodic confusion. (Internal Medicine)

(iv)    Initial office visit for 34-year-old patient with primary infertility, including counseling. (Obstetrics/Gynecology)

(v)     Initial office visit for 7-year-old female with juvenile diabetes mellitus, new to area, past history of hospitalization times three. (Pediatrics)

(vi)    Initial office evaluation of 70-year-old female with polyarthralgia. (Rheumatology)

(vii)   Initial office evaluation of a 50-year-old male with an aortic aneurysm with respect to recommendation for surgery. (Thoracic Surgery)

140.    Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99204 to bill for an initial patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

141.    Pursuant to the CPT Assistant, the use of CPT code 99203 to bill for an initial patient examination typical requires that the Insured present with problems of moderate severity.

142.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately severe, and thereby justify the use of CPT code 99203 to bill for an initial patient examination.

143.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99203 to bill for an initial patient examination:

(i)     Office visit for initial evaluation of a 48-year-old man with recurrent low back pain radiating to the leg. (General Surgery)

(ii)    Initial office evaluation of 49-year-old male with nasal obstruction. Detailed exam with topical anesthesia. (Plastic Surgery)

(iii)   Initial office evaluation for diagnosis and management of painless gross hematuria in new patient, without cystoscopy. (Internal Medicine)

(iv)    Initial office visit for evaluation of 13-year-old female with progressive scoliosis. (Physical Medicine and Rehabilitation)

(v)     Initial office visit with couple for counseling concerning voluntary vasectomy for sterility. Spent 30 minutes discussing procedure, risks and benefits, and answering questions. (Urology)

144.    Thus, pursuant to the CPT Assistant, the moderately severe presenting problems that could support the use of CPT code 99203 to bill for an initial patient examination typically are either chronic and relatively serious problems, acute problems requiring immediate invasive treatment, or issues that legitimately require physician counseling.

145.    By contrast, to the extent that the Insureds in the claims identified in Exhibit "2" had any presenting problems at all as the result of their minor automobile accidents, the problems virtually always were low severity soft tissue injuries such as sprains and strains.

34

146.    For instance, and as set forth above, virtually all of the Insureds in the claims identified in Exhibit "2" who purportedly received treatment at Hamilton were involved in minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

147.    In keeping with the fact that virtually all of the Insureds in the claims identified in Exhibits "2" were involved in only minor accidents, in most of the claims identified in Exhibit "2" the Insureds did not seek treatment at any hospital as the result of their minor accidents.

148.    To the extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

149.    Furthermore, in most cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

150.    Concomitantly, virtually none of the Insureds who purportedly received treatment at Hamilton suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

151.    Even so, in the claims for initial examinations identified in Exhibit "1", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro routinely billed for their putative initial examinations using CPT codes 99203 and 99204, and thereby falsely represented that the Insureds presented with problems of moderate severity or moderate to high severity.

152.    For example:

(i)    On October 13, 2012, an Insured named JB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a

low-speed, low-impact collision, that no one was injured in the accident, and that no one requested medical treatment at the scene of the accident. Nonetheless, two days later, JB traveled on his own to Robert Wood CJ University Hospital, where he was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. To the extent that JB experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial medical examination of JB by Fass at Hamilton on October 23, 2012, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that JB presented with problems of moderate to high severity. Thereafter, following a purported initial chiropractic examination of JB by Lychock on October, 25, 2012, Hamilton, Fass, and Lychock billed GEICO for the initial examination using CPT code 99204, and thereby once again falsely represented that JB presented with problems of moderate to high severity.

(ii)     On December 18, 2012, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that no one was injured in the accident, and that no one sought medical treatment at the scene of the accident. In keeping with the fact that AG was not injured in the minor accident, AG did not go to the hospital following the accident. To the extent that AG experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial chiropractic examination of AG by Pierro at Hamilton on January 8, 2013, Hamilton, Fass, and Pierro billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that AG presented with problems of moderate to high severity. Thereafter, following a purported initial medical examination of AG by Fass on January 14, 2013, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby once again falsely represented that AG presented with problems of moderate to high severity.

(iii)    On January 21, 2013, an Insured named KG was involved in an automobile accident. The contemporaneous police report indicated that the accident occurred when a smaller vehicle rear-ended a bus KG was traveling on, causing only a small dent to the bus's rear bumper, and that no one was injured in the accident. Nonetheless, the next day KG traveled on her own to Robert Wood CJ University Hospital, where she was briefly observed on an outpatient basis and discharged with a minor soft tissue injury diagnosis. In keeping with the fact that KG was not seriously injured in the minor accident, she returned to work and did not seek any further treatment for a month, at which point she presented at Hamilton for treatment. To the extent that KG experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial chiropractic examination of KG by Pierro at Hamilton on February 22, 2013, Hamilton, Fass, and Pierro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that KG presented with problems of moderate severity. Thereafter, following a purported

36

initial medical examination of KG by Fass on March 8, 2013, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that KG presented with problems of moderate to high severity.

(iv)    On November 22, 2013, an Insured named AP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision that caused only minor damage to AP's vehicle, that AP's vehicle was drivable following the accident, that AP drove his vehicle away from the scene of the accident, and no one was injured in the accident or complained of any pain at the scene of the accident. Nonetheless, AP traveled on his own to Robert Wood CJ University Hospital the next day, where he was briefly evaluated on an outpatient basis and discharged with a minor neck strain diagnosis. To the extent that AP experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial chiropractic examination of AP by Lychock at Hamilton on December 2, 2013, Hamilton, Fass, and Lychock billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that AP presented with problems of moderate severity. Thereafter, following a purported initial medical examination of AP by Kosmorsky on December 3, 2013, Hamilton, Fass, and Kosmorsky billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that AP presented with problems of moderate to high severity.

(v)     On December 19, 2013, an Insured named DO was involved in an automobile accident. The contemporaneous police report indicated that DO's vehicle was drivable following the accident, that DO drove his vehicle away from the scene of the accident, and that no one was injured in the accident or complained of any pain. In keeping with the fact that DO was not injured in the minor accident, DO did not go to the hospital following the accident. To the extent that DO experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial medical examination of DO by Fass at Hamilton on December 30, 2013, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that DO presented with problems of moderate to high severity. Thereafter, following a purported initial chiropractic examination of DO by Pierro on January 6, 2014, Hamilton, Fass, and Pierro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that DO presented with problems of moderate severity..

(vi)    On January 24, 2014 an Insured named RS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that RS's vehicle was drivable following the accident, that RS drove his vehicle away from the scene of the accident, and that no one was injured in the accident or complained of any pain. In keeping with the fact that RS was not injured in the minor accident, the police report stated that RS "stated he was not injured, and refused medical treatment." Nonetheless, RS

traveled on his own to Capital Health Regional Medical Center, where he was briefly evaluated on an outpatient basis and discharged with a minor back strain diagnosis. To the extent that RS experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial chiropractic examination of RS by Pierro at Hamilton on January 28, 2014, Hamilton, Fass, and Pierro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that RS presented with problems of moderate severity. Thereafter, following a purported initial medical examination of RS by Fass on February 7, 2014, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that RS presented with problems of moderate to high severity.

(vii)   On February 14, 2014, an Insured named YD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that YD's vehicle was drivable following the accident, that YD drove her vehicle away from the scene of the accident, and no one was injured in the accident or complained of any pain. In keeping with the fact that YD was not seriously injured in the minor accident, YD went to work following the accident. Nonetheless, later that day YD traveled on her own to Robert Wood CJ University Hospital, where she was briefly evaluated on an outpatient basis and discharged with a minor neck strain diagnosis. To the extent that YD experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial medical examination of YD by Fass at Hamilton on March 19, 2014, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that YD presented with problems of moderate to high severity. Thereafter, following a purported initial chiropractic examination of YD by Lychock on March 28, 2014, Hamilton, Fass, and Lychock billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that YD presented with problems of moderate severity.

(viii)   On April 11, 2014, an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that no one was injured in the accident or complained of any pain at the scene of the accident. Nonetheless, later that day JM traveled on her own to Robert Wood CJ University Hospital, where she was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. To the extent that JM experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial medical examination of JM by Fass at Hamilton on April 15, 2014, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that JM presented with problems of moderate to high severity. Thereafter, following a purported initial chiropractic examination of JM by Pierro on April 17, 2014, Hamilton, Fass, and Pierro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that JM presented with problems of moderate severity.

(ix)     On April 18, 2014, an Insured named GA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and no one was injured as a result of the accident.  In keeping with the fact that GA was not injured in the minor accident, GA did not visit any hospital as the result of the accident, or seek any treatment at all for the minor accident until almost a month later, on May 13, 2014, when he first presented at Hamilton. To the extent that GA experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial medical examination of GA by Fass at Hamilton on May 13, 2014, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that GA presented with problems of moderate to high severity. Thereafter, following a purported initial chiropractic examination of GA by Lychock on May 14, 2014, Hamilton, Fass, and Lychock billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that GA presented with problems of moderate severity.

(x)     On June 4, 2014, an Insured named DO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that DO's vehicle was drivable following the accident, that DO drove her vehicle away from the scene of the accident, and that no one was injured in the accident or complained of any pain at the scene of the accident. In keeping with the fact that DO was not injured in the minor accident, DO did not go to the hospital following the accident. To the extent that DO experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial chiropractic examination of DO by Pierro at Hamilton on June 9, 2014, Hamilton, Fass, and Pierro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that DO presented with problems of moderate severity. Thereafter, following a purported initial medical examination of DO by Fass on June 12, 2014, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that DO presented with problems of moderate to high severity.

(xi)     On November 9, 2014, an Insured named RC was involved in an automobile accident. The contemporaneous police report indicated that no one was injured in the accident or complained of any pain. In keeping with the fact that RC was not injured in the minor accident, RC did not go to the hospital following the accident. To the extent that RC experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial medical examination of RC by Fass at Hamilton on November 13, 2014, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that RC presented with problems of moderate to high severity. Thereafter, following a purported initial chiropractic examination of RC by Lychock on November 14, 2014, Hamilton, Fass, and

Lychock billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that RC presented with problems of moderate severity.

(xii)   On January 16, 2015 an Insured named AH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision that occurred while both vehicles were backing out of parking spaces, that AH's vehicle was drivable following the accident, and that no one was injured in the accident or complained of any pain. Nonetheless, AH traveled on her own to Capital Health Regional Medical Center, where she was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. To the extent that AH experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial medical examination of AH by Fass at Hamilton on February 3, 2015, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that AH presented with problems of moderate to high severity. Thereafter, following a purported initial chiropractic examination of AH by Pierro on February 5, 2015, Hamilton, Fass, and Pierro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that AH presented with problems of moderate severity.

(xiii)   On February 3, 2015 an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that AS was not injured in the minor accident, AS refused medical treatment and did not go to the hospital following the accident. To the extent that AS experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial chiropractic examination of AS by Pierro at Hamilton on February 5, 2015, Hamilton, Fass, and Pierro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that AS presented with problems of moderate severity. Thereafter, following a purported initial medical examination of AS by Fass on February 11, 2015, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that AS presented with problems of moderate to high severity.

(xiv)   On February 17, 2015, an Insured named PS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that PS's vehicle was drivable following the accident, that PS drove his vehicle away from the scene of the accident, and that no one was injured in the accident. In keeping with the fact that PS was not injured in the minor accident, PS did not go to the hospital following the accident. To the extent that PS experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial medical examination of PS by Fass at Hamilton on February 24, 2015, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and

40

thereby falsely represented that PS presented with problems of moderate to high severity. Thereafter, following a purported initial chiropractic examination of PS by Pierro on February 27, 2015, Hamilton, Fass, and Pierro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that PS presented with problems of moderate severity.

(xv)    On June 14, 2015, an Insured named TK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that TK's vehicle was drivable following the accident, and no one was injured as a result of the accident. In keeping with the fact that TK was not injured in the minor accident, TK did not visit any hospital as the result of the accident. To the extent that TK experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial medical examination of TK by Fass at Hamilton on June 22, 2015, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that TK presented with problems of moderate to high severity.

(xvi)   On July 9, 2015 an Insured named BA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that BA's vehicle was drivable following the accident, that BA drove his vehicle away from the scene of the accident, and that that no one was injured in the accident. Nonetheless, BA traveled on his own to Robert Wood CJ University Hospital, where he was briefly evaluated on an outpatient basis and discharged with a minor neck/back strain diagnosis. To the extent that BA experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial medical examination of BA by Fass at Hamilton on July 31, 2015, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that BA presented with problems of moderate to high severity. Thereafter, following a purported initial chiropractic examination of BA by Pierro on August 3, 2015, Hamilton, Fass, and Pierro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that BA presented with problems of moderate severity.

(xvii)  On September 10, 2015, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that MS's vehicle was drivable following the accident, that MS drove his vehicle away from the scene of the accident, and that MS was not injured in the accident. In keeping with the fact that MS was not injured in the minor accident, MS did not go to the hospital following the accident. To the extent that MS experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial chiropractic examination of MS by Kishyk at Hamilton on September 22, 2015, Hamilton, Fass, and Kishyk billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that MS

presented with problems of moderate severity. Thereafter, following a purported initial medical examination of MS by Fass on September 23, 2015, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that MS presented with problems of moderate to high severity.

(xviii)   On October 11, 2015, an Insured named NR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that NR's vehicle was drivable following the accident, that NR drove his vehicle away from the scene of the accident, and that no one was injured in the accident or complained of any pain at the scene of the accident. In keeping with the fact that NR was not injured in the minor accident, NR did not seek treatment at any hospital following the accident. To the extent that NR experienced any health problems at all as the result of his minor accident, they were of low severity. Even so, following a purported initial chiropractic examination of NR by Lychock at Hamilton on October 14, 2015, Hamilton, Fass, and Lychock billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that NR presented with problems of moderate severity. Thereafter, following a purported initial medical examination of NR by Fass at Hamilton on October 16, 2015, Hamilton and Fass billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that NR presented with problems of moderate to high severity.

(xix)   On January 12, 2016, an Insured named PF was involved in an automobile accident. The contemporaneous police report indicated that no one was injured in the accident. In keeping with the fact that PF was not injured in the minor accident, PF did not go to the hospital following the accident. To the extent that PF experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial chiropractic examination of PF by Pierro at Hamilton on January 14, 2016, Hamilton, Fass, and Pierro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that PF presented with problems of moderate severity. Thereafter, following a purported initial medical examination of PF by Smith on January 20, 2016, Hamilton, Fass, and Smith billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that PF presented with problems of moderate to high severity.

(xx)   On March 11, 2016 an Insured named EF was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that EF's vehicle was drivable following the accident, that EF drove her vehicle away from the scene of the accident, and that no one was injured in the accident. Nonetheless, later that day EF traveled on her own to Helene Fuld Medical Center, where she was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. To the extent that EF experienced any health problems at all as the result of her minor accident, they were of low severity. Even so, following a purported initial medical examination of EF by Fass at Hamilton on March 23, 2016, Hamilton and Fass billed GEICO

for the initial examination using CPT code 99204, and thereby falsely represented that EF presented with problems of moderate to high severity. Thereafter, following a purported initial chiropractic examination of EF by Pierro on March 28, 2016, Hamilton, Fass, and Pierro billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that EF presented with problems of moderate severity.

153.    These are only representative examples. In all of the claims for initial medical examinations billed under CPT code 99204 that are identified in Exhibit "2", Hamilton, Fass, and either Kosmorsky, Smith, or J. Mahoney falsely represented that the Insureds presented with problems of moderate to high severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all.

154.    Similarly, in all of the claims for initial chiropractic examinations billed under CPT code 99203 that are identified in Exhibit "2", Hamilton, Fass, and either Kishyk, Lychock, or Pierro falsely represented that the Insureds presented with problems of moderate severity, when in fact the Insureds' problems were low-severity soft tissue injuries such as sprains and strains, to the extent that they had any presenting problems at all.

155.    In the claims for initial examinations identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to create a false basis for their charges for the examinations under CPT codes 99203 and 99204, because examinations billable under CPT codes 99203 and 99204 are reimbursable at higher rates than examinations involving presenting problems of low severity, or no severity.

156.    In the claims for initial examinations identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro also routinely falsely represented that the Insureds presented with problems of moderate or moderate to high severity in order to

create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including follow-up examinations, electrodiagnostic testing, pain management injections, PENS sessions, chiropractic, physical therapy, and radiology services

**2.      Misrepresentations Regarding the Amount of Time Spent on the Initial Examinations**

157.    What is more, in every claim for initial examinations identified in Exhibit "2", Hamilton, Fass,  Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro misrepresented the amount of time that was spent on the initial examinations.

158.    Pursuant to the Fee Schedule, the use of CPT code 99203 to bill for an initial examination represents that the physician or chiropractor who conducted the examination spent at least 30 minutes of face-to-face time with the patient or the patient's family.

159.    Pursuant to the Fee Schedule, the use of CPT code 99204 to bill for an initial examination represents that the physician or chiropractor who conducted the examination spent at least 45 minutes of face-to-face time with the patient or the patient's family.

160.    As set forth in Exhibit "2", Hamilton, Fass,  Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro virtually always billed for their putative initial examinations using CPT codes 99203 or 99204, and thereby represented that the physicians or chiropractors who conducted the examinations spent either 30 or 45 minutes of face-to-face time with the Insureds or their families during the examinations.

161.    In fact, in the initial examinations identified in Exhibit "2", neither Fass, Mahoney, Pierro, Lychock nor any other physician or chiropractor associated with Hamilton ever spent 30 minutes of face-to-face time with the Insureds or their families when conducting the examinations, much less 45 minutes.

162.    Rather, in the initial examinations identified in Exhibit "2", the examinations rarely involved more than 10-15 minutes of face-to-face time between the Insureds and the examining physician or chiropractor, to the extent that they were provided at all.

163.    For instance, and in keeping with the fact that the initial examinations allegedly provided through Hamilton did not entail more than 10-15 minutes of face-to-face time with the Insureds or their families, Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro used template forms in purporting to conduct the initial examinations.

164.    The template forms that Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro used in purporting to conduct the initial examinations set forth a very limited range of examination parameters.

165.    The only face-to-face time between the examining physicians/chiropractors and the Insureds that was reflected in the limited range of examination parameters consisted of brief patient interviews and limited examinations of the Insureds' musculoskeletal systems.

166.    These brief interviews and limited examinations did not require Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, Pierro, or any other physician or chiropractor associated with Hamiltonto spend more than 10-15 minutes of face-to-face time with the Insureds or their families.

167.    In the claims for initial examinations identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro falsely represented that the examinations involved at least 30 minutes of face-to-face time with the Insureds or their families (when billed under CPT code 99203), and in many cases 45 minutes (when billed under CPT code 99204), in order to create a false basis for their charges under CPT codes 99203 and 99204,

45

because examinations billable under CPT codes 99203 and 99204 are reimbursable at a higher rate than examinations that require less time to perform.

**3.      Misrepresentations Regarding "Comprehensive" Patient Histories**

168.    What is more, in every claim for the initial medical examinations identified in Exhibit "2" that were billed through Hamilton to GEICO under CPT code 99204, Hamilton, Fass,  Kosmorsky, Smith, and J. Mahoney falsely represented that they took "comprehensive" patient histories during the putative examinations.

169.    Pursuant to the Fee Schedule, the use of CPT code 99204 to bill for an initial patient examination represents that the physician who performed the examination took a "comprehensive" patient history.

170.    Pursuant to the CPT Assistant, a patient history does not qualify as "comprehensive" unless the physician has conducted a "complete" review of the patient's systems.

171.    Pursuant to the CPT Assistant, a physician has not conducted a "complete" review of a patient's systems unless the physician has documented a review of the systems directly related to the history of the patient's present illness, as well as at least 10 other organ systems.

172.    The CPT Assistant recognizes the following organ systems with respect to a review of systems:

(i)      constitutional symptoms (e.g., fever, weight loss);

(ii)     eyes;

(iii)    ears, nose, mouth, throat;

(iv)     cardiovascular;

(v)      respiratory;

(vi)      gastrointestinal;

(vii)     genitourinary;

(viii)    musculoskeletal;

(ix)      integumentary (skin and/or breast);

(x)       neurological;

(xi)      psychiatric;

(xii)     endocrine;

(xiii)    hematologic/lymphatic; and

(xiv)    allergic/immunologic.

173.    Though Hamilton,  Fass,  Kosmorsky, Smith, and J. Mahoney billed for their putative initial medical examinations in the claims identified in Exhibit "2" under CPT codes 99204, and thereby represented that they took "comprehensive" histories of the Insureds during the examinations, neither Fass, Kosmorsky, Smith, J. Mahoney, nor any other physician associated with Hamilton, ever documented a review of 10 organ systems unrelated to the history of the Insureds' present illnesses.

174.    Rather, to the extent that Hamilton,  Fass,  Kosmorsky, Smith, and J. Mahoney documented any review of the Insureds' systems at all in the claims identified in Exhibit "2", the documentation was contained in their basic, cursory initial examination forms.

175.    To the extent that Hamilton,  Fass,  Kosmorsky, Smith, and J. Mahoney's basic, cursory initial examination forms contained any documentation at all regarding any review of the Insureds' systems, the documentation was limited to – at most – a partial review of the Insureds' musculoskeletal systems.

176.    Pursuant to the CPT Assistant, a patient history also does not qualify as "comprehensive" unless the physician has taken a "complete" past, family, and social history from the patient.

177.    Pursuant to the CPT Assistant, a physician has not taken a "complete" past, family, and social history from the patient unless the physician has documented:

(i)     at least one specific item with respect to the patient's past history – e.g., the patient's past experiences with illnesses, operations, injuries, and treatments;

(ii)    at least one specific item with respect to the patient's family history – e.g., a review of medical events in the patient's family, including diseases which may be hereditary or place the patient at risk; and

(iii)   at least one specific item with respect to the patient's social history – e.g., an age-appropriate review of past and current activities.

178.    Though Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney billed for their putative initial medical examinations in the claims identified in Exhibit "2" under CPT code 99204, and thereby represented that they took "comprehensive" histories of the Insureds, neither Fass, Kosmorsky, Smith, J. Mahoney, nor any other physician associated with Hamilton, ever documented any information with respect to the Insureds' family histories.

179.    For example:

(i)     On January 21, 2013, Fass purported to provide an initial examination to an Insured named ST. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of ST's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of ST's illnesses; or (ii) take a complete past, family, and social history from ST, inasmuch as he did not document any information with respect to ST's family history.

(ii)    On January 24, 2013, Kosmorsky purported to provide an initial examination to an Insured named WJ. Though Hamilton, Fass, and Kosmorsky then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Kosmorsky had taken a comprehensive patient history during the examination, Kosmorsky did not: (i) conduct a complete review

48

of WJ's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of WJ's illnesses; or (ii) take a complete past, family, and social history from WJ, inasmuch as he did not document any information with respect to WJ's family history.

(iii)    On February 22, 2013, Fass purported to provide an initial examination to an Insured named CM. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of CM's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of CM's illnesses; or (ii) take a complete past, family, and social history from CM, inasmuch as he did not document any information with respect to CM's family history.

(iv)    On March 18, 2013, Kosmorsky purported to provide an initial examination to an Insured named GC. Though Hamilton, Fass, and Kosmorsky then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Kosmorsky had taken a comprehensive patient history during the examination, Kosmorsky did not: (i) conduct a complete review of GC's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of GC's illnesses; or (ii) take a complete past, family, and social history from GC, inasmuch as he did not document any information with respect to GC's family history.

(v)    On April 17, 2013, Fass purported to provide an initial examination to an Insured named MO. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of MO's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of MO's illnesses; or (ii) take a complete past, family, and social history from MO, inasmuch as he did not document any information with respect to MO's family history.

(vi)    On July 22, 2013, J. Mahoney purported to provide an initial examination to an Insured named CM. Though Hamilton, Fass, and J. Mahoney then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that J. Mahoney had taken a comprehensive patient history during the examination, J. Mahoney did not: (i) conduct a complete review of CM's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of CM's illnesses; or (ii) take a complete past, family, and social history from CM, inasmuch as he did not document any information with respect to CM's family history.

(vii)   On August, 19, 2013, Fass purported to provide an initial examination to an Insured named SA. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of SA's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of SA's illnesses; or (ii) take a complete past, family, and social history from SA, inasmuch as he did not document any information with respect to SA's family history.

(viii)  On November 11, 2013, Fass purported to provide an initial examination to an Insured named SR. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of SR' systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of SR' illnesses; or (ii) take a complete past, family, and social history from SR, inasmuch as he did not document any information with respect to SR' family history.

(ix)    On December 3, 2013, Kosmorsky purported to provide an initial examination to an Insured named AP. Though Hamilton, Fass, and Kosmorsky then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Kosmorsky had taken a comprehensive patient history during the examination, Kosmorsky did not: (i) conduct a complete review of AP's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of AP's illnesses; or (ii) take a complete past, family, and social history from AP, inasmuch as he did not document any information with respect to AP's family history.

(x)     On February 9, 2014, Fass purported to provide an initial examination to an Insured named JR. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of JR's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of JR's illnesses; or (ii) take a complete past, family, and social history from JR, inasmuch as he did not document any information with respect to JR's family history.

(xi)    On March 19, 2014, Fass purported to provide an initial examination to an Insured named YD. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of YD's systems during the examination, inasmuch as he did not document a review of 10 organ systems

50

unrelated to the history of YD's illnesses; or (ii) take a complete past, family, and social history from YD, inasmuch as he did not document any information with respect to YD's family history.

(xii)     On August 21, 2014, Fass purported to provide an initial examination to an Insured named AP. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of AP's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of AP's illnesses; or (ii) take a complete past, family, and social history from AP, inasmuch as he did not document any information with respect to AP's family history.

(xiii)    On October 1, 2014, Fass purported to provide an initial examination to an Insured named RP. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of RP's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of RP's illnesses; or (ii) take a complete past, family, and social history from RP, inasmuch as he did not document any information with respect to RP's family history.

(xiv)     On November 17, 2014, Fass purported to provide an initial examination to an Insured named SC. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of SC's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of SC's illnesses; or (ii) take a complete past, family, and social history from SC, inasmuch as he did not document any information with respect to SC's family history.

(xv)      On February 3, 2015, Fass purported to provide an initial examination to an Insured named AH. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of AH's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of AH's illnesses; or (ii) take a complete past, family, and social history from AH, inasmuch as he did not document any information with respect to AH's family history.

(xvi)     On February 24, 2015, Fass purported to provide an initial examination to an Insured named PS. Though Hamilton and Fass then billed the putative

51

examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of PS's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of PS's illnesses; or (ii) take a complete past, family, and social history from PS, inasmuch as he did not document any information with respect to PS's family history.

(xvii)   On March 9, 2015, Fass purported to provide an initial examination to an Insured named VC. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of VC's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of VC's illnesses; or (ii) take a complete past, family, and social history from VC, inasmuch as he did not document any information with respect to VC's family history.

(xviii)  On April 24, 2015, Fass purported to provide an initial examination to an Insured named JP. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of JP's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of JP's illnesses; or (ii) take a complete past, family, and social history from JP, inasmuch as he did not document any information with respect to JP's family history.

(xix)   On April 29, 2015, Smith purported to provide an initial examination to an Insured named MR. Though Hamilton, Fass, and Smith then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Smith had taken a comprehensive patient history during the examination, Smith did not: (i) conduct a complete review of MR's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of MR's illnesses; or (ii) take a complete past, family, and social history from MR, inasmuch as he did not document any information with respect to MR's family history.

(xx)    On July 20, 2015, Fass purported to provide an initial examination to an Insured named VR. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of VR's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of VR's illnesses; or (ii) take a complete past, family, and

social history from VR, inasmuch as he did not document any information with respect to VR's family history.

(xxi) On October 16, 2015, Fass purported to provide an initial examination to an Insured named NR. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of NR's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of NR's illnesses; or (ii) take a complete past, family, and social history from NR, inasmuch as he did not document any information with respect to NR's family history.

(xxii) On December 2, 2015, Fass purported to provide an initial examination to an Insured named ED. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of ED's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of ED's illnesses; or (ii) take a complete past, family, and social history from ED, inasmuch as he did not document any information with respect to ED's family history.

(xxiii) On January 7, 2016, Fass purported to provide an initial examination to an Insured named LG. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of LG's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of LG's illnesses; or (ii) take a complete past, family, and social history from LG, inasmuch as he did not document any information with respect to LG's family history.

(xxiv) On April 29, 2015, Smith purported to provide an initial examination to an Insured named PF. Though Hamilton, Fass, and Smith then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Smith had taken a comprehensive patient history during the examination, Smith did not: (i) conduct a complete review of PF's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of PF's illnesses; or (ii) take a complete past, family, and social history from PF, inasmuch as he did not document any information with respect to PF's family history.

(xxv) On March 23, 2016, Fass purported to provide an initial examination to an Insured named EF. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby

falsely represented that Fass had taken a comprehensive patient history during the examination, Fass did not: (i) conduct a complete review of EF's systems during the examination, inasmuch as he did not document a review of 10 organ systems unrelated to the history of EF's illnesses; or (ii) take a complete past, family, and social history from EF, inasmuch as he did not document any information with respect to EF's family history.

180.    These are only representative examples. In all of the claims for initial medical examinations under CPT code 99204 in the claims identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney falsely represented that they took "comprehensive" patient histories, and that their putative examinations therefore were billable under CPT code 99204, because examinations that are billable under CPT code 99204 are reimbursable at higher rates than examinations that do not require "comprehensive" patient histories.

## 4.    Misrepresentations Regarding "Comprehensive" or "Detailed" Physical Examinations

181.    Pursuant to the Fee Schedule, the use of CPT code 99204 to bill for a patient examination represents that the physician or chiropractor who performed the examination conducted a "comprehensive" physical examination.

182.    Pursuant to the CPT Assistant, a physical examination does not qualify as "comprehensive" unless the examining physician or chiropractor either: (i) conducts a general examination of multiple patient organ systems; or (ii) conducts a complete examination of a single patient organ system.

183.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a general examination of multiple patient organ systems unless the physician or chiropractor has documented findings with respect to at least eight organ systems.

184.    The CPT Assistant recognizes the following organ systems:

(i)     constitutional symptoms (e.g., fever, weight loss);

(ii)    eyes;

(iii)    ears, nose, mouth, throat;

(iv)    cardiovascular;

(v)    respiratory;

(vi)    gastrointestinal;

(vii)    genitourinary;

(viii)    musculoskeletal;

(ix)    integumentary (skin and/or breast);

(x)    neurological;

(xi)    psychiatric;

(xii)    endocrine;

(xiii)    hematologic/lymphatic; and

(xiv)    allergic/immunologic.

185.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted a complete examination of a patient's musculoskeletal organ system unless the physician or chiropractor has documented findings with respect to:

(i)    at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)    the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)    examination of gait and station;

(vi)   examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)   inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and

(ix)   mental status, including orientation to time, place and person, as well as mood and affect.

186.   In the claims for initial medical examinations identified in Exhibit "2", when Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney billed for the initial examinations under CPT code 99204, they falsely represented that the physicians who purported to perform the examinations – almost always Fass, Kosmorsky, Smith, or J. Mahoney – performed "comprehensive" patient examinations on the Insureds they purported to treat during the initial examinations.

187.   In fact, with respect to the claims for initial medical examinations under CPT code 99204 that are identified in Exhibit "2", neither Fass, Kosmorsky, Smith, J. Mahoney, nor any other physician associated with Hamilton, ever conducted a general examination of multiple patient organ systems, or conducted a complete examination of a single patient organ system.

188.   For instance, in each of the claims for initial medical examinations under CPT code 99204 identified in Exhibit "2", neither Fass, Kosmorsky, Smith, J. Mahoney, nor any other physician associated with Hamilton, ever conducted any general examination of multiple patient organ systems, inasmuch as they did not document findings with respect to at least eight organ systems.

56

189.     Furthermore, although Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney often purported to provide a more in-depth examination of the Insureds' musculoskeletal systems in the claims for initial medical examinations identified in Exhibit "2", the musculoskeletal examinations did not qualify as "complete", because they failed to document:

(i)      at least three of the following: (a) standing or sitting blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; or (g) weight;

(ii)     the general appearance of the patient – e.g., development, nutrition, body habits, deformities, and attention to grooming;

(iii)    examination of the peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)     palpation of lymph nodes in neck, axillae, groin, and/or other location;

(v)      examination of gait and station;

(vi)     examination of joints, bones, muscles, and tendons in at least four of the following areas: (a) head and neck; (b) spine, ribs, and pelvis; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and/or (f) left lower extremity;

(vii)    inspection and palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café-au-lait spots, ulcers) in at least four of the following areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; (f) left lower extremity;

(viii)   coordination, deep tendon reflexes, and sensation; and/or

(ix)     mental status, including orientation to time, place and person, as well as mood and affect.

190.     For example:

(i)      On October 31, 2012, Fass purported to provide an initial medical examination to an Insured named MR. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had conducted a comprehensive patient examination during the examination, Fass did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete

musculoskeletal system examination or a complete examination of any other organ system.

(ii)     On November 20, 2012, Pierro purported to provide an initial medical examination to an Insured named LM. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Pierro had conducted a comprehensive patient examination during the examination, Pierro did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(iii)    On January 7, 2013, Fass purported to provide an initial medical examination to an Insured named JJ. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had conducted a comprehensive patient examination during the examination, Fass did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(iv)     On January 11, 2013, Smith purported to provide an initial medical examination to an Insured named JL. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Smith had conducted a comprehensive patient examination during the examination, Smith did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(v)      On January 11, 2013, Fass purported to provide an initial medical examination to an Insured named DR. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had conducted a comprehensive patient examination during the examination, Fass did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(vi)     On January 14, 2013, Fass purported to provide an initial medical examination to an Insured named AG. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had conducted a comprehensive patient examination during the examination, Fass did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete

musculoskeletal system examination or a complete examination of any other organ system.

(vii)    On January 18, 2013, Fass purported to provide an initial medical examination to an Insured named MZ. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had conducted a comprehensive patient examination during the examination, Fass did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(viii)    On January 24, 2013, Kosmorsky purported to provide an initial medical examination to an Insured named WJ. Though Hamilton, Fass, and Kosmorsky then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Kosmorsky had conducted a comprehensive patient examination during the examination, Kosmorsky did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(ix)    On January 28, 2013, Kosmorsky purported to provide an initial medical examination to an Insured named JR. Though Hamilton, Fass, and Kosmorsky then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Kosmorsky had conducted a comprehensive patient examination during the examination, Kosmorsky did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(x)    On February 21, 2013, Fass purported to provide an initial medical examination to an Insured named ST. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had conducted a comprehensive patient examination during the examination, Fass did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xi)    On March 18, 2013, Kosmorsky purported to provide an initial medical examination to an Insured named GC. Though Hamilton, Fass, and Kosmorsky then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Kosmorsky had conducted a comprehensive patient examination during the examination, Kosmorsky did not: (i) document findings with respect to at least eight organ systems during the

examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xii)     On April 17, 2013, Fass purported to provide an initial medical examination to an Insured named MO. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had conducted a comprehensive patient examination during the examination, Fass did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xiii)    On May 9, 2013, Fass purported to provide an initial medical examination to an Insured named VS. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had conducted a comprehensive patient examination during the examination, Fass did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xiv)     On July 22, 2013, J. Mahoney purported to provide an initial medical examination to an Insured named CM. Though Hamilton, Fass, and J. Mahoney then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that J. Mahoney had conducted a comprehensive patient examination during the examination, J. Mahoney did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xv)      On November 7, 2013, Fass purported to provide an initial medical examination to an Insured named WM. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had conducted a comprehensive patient examination during the examination, Fass did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xvi)     On December 3, 2013, Kosmorsky purported to provide an initial medical examination to an Insured named AP. Though Hamilton, Fass, and Kosmorsky then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Kosmorsky had conducted a comprehensive patient examination during the examination, Kosmorsky did not: (i) document findings with respect to at least eight organ systems during the

examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xvii)   On December 27, 2013, Fass purported to provide an initial medical examination to an Insured named JS. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had conducted a comprehensive patient examination during the examination, Fass did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xviii)  On February 11, 2014, Fass purported to provide an initial medical examination to an Insured named DM. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had conducted a comprehensive patient examination during the examination, Fass did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xix)   On May 7, 2014, Fass purported to provide an initial medical examination to an Insured named LA. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had conducted a comprehensive patient examination during the examination, Fass did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xx)    On May 13, 2014, Fass purported to provide an initial medical examination to an Insured named GA. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had conducted a comprehensive patient examination during the examination, Fass did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xxi)   On February 24, 2015, Fass purported to provide an initial medical examination to an Insured named PS. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had conducted a comprehensive patient examination during the examination, Fass did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete

musculoskeletal system examination or a complete examination of any other organ system.

(xxii) On April 29, 2015, Smith purported to provide an initial medical examination to an Insured named MR. Though Hamilton, Fass, and Smith then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Smith had conducted a comprehensive patient examination during the examination, Smith did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xxiii) On June 22, 2015, Fass purported to provide an initial medical examination to an Insured named TK. Though Hamilton and Fass then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Fass had conducted a comprehensive patient examination during the examination, Fass did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xxiv) On January 20, 2016, Smith purported to provide an initial medical examination to an Insured named PF. Though Hamilton, Fass, and Smith then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Smith had conducted a comprehensive patient examination during the examination, Smith did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

(xxv) On March 31, 2016, Smith purported to provide an initial medical examination to an Insured named SM. Though Hamilton, Fass, and Smith then billed the putative examination through Hamilton to GEICO under CPT code 99204, and thereby falsely represented that Smith had conducted a comprehensive patient examination during the examination, Smith did not: (i) document findings with respect to at least eight organ systems during the examination; or (ii) document a complete musculoskeletal system examination or a complete examination of any other organ system.

191. These are only representative examples. In all of the claims for initial medical examinations under CPT code 99204 that are identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney falsely represented that they had provided "comprehensive" physical examinations. In fact, they had not provided comprehensive physical examinations

because they had not documented findings with respect to at least eight of the Insureds' organ systems, nor had they documented "complete" examinations of any of the Insureds' organ systems.

192.    In the claims for initial medical examinations under CPT code 99204 that are identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney falsely represented that they had provided "comprehensive" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99204, because examinations billable under CPT code 99204 are reimbursable at higher rates than examinations that do not require the examining physician to provide "comprehensive" physical examinations.

193.    Furthermore, pursuant to the Fee Schedule, the use of CPT code  99203 to bill for an initial examination represents that the physician or chiropractor who performed the examination conducted a "detailed" physical examination.

194.    Pursuant to the CPT Assistant, a "detailed" physical examination requires – among other things – that the examining physician or chiropractor document an extended examination of the affected body areas and other symptomatic or related organ systems.

195.    To the extent that the Insureds in the claims identified in Exhibit "2" had any actual complaints at all as the result of their minor automobile accidents, the complaints were limited to minor musculoskeletal complaints.

196.    Pursuant to the CPT Assistant, in the context of patient examinations, a physician or chiropractor has not conducted an extended examination of a patient's musculoskeletal organ system unless the physician has documented findings with respect to the following:

(i)    measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)     general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)    examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and

(x)     examination of sensation.

197.    In the claims for initial chiropractic examinations identified in Exhibit "2", when Hamilton, Fass, Kishyk, Lychock, and Pierro billed for the initial examinations under CPT code 99203, they falsely represented that the chiropractors who purported to perform the examinations – almost always Kishyk, Lychock, or Pierro – performed "detailed" patient examinations on the Insureds they purported to treat during the initial examinations.

198.    In fact, with respect to the claims for initial chiropractic examinations under CPT code 99203 that are identified in Exhibits "2",  neither Kishyk, Lychock, Pierro, nor any other chiropractor associated with Hamilton, ever conducted an extended examination of the Insureds' musculoskeletal systems.

199.    For instance, in each of the claims under CPT code 99203 identified in Exhibit "2", neither Kishyk, Lychock, Pierro, nor any other chiropractor associated with Hamilton, ever

conducted an extended examination of the Insureds' musculoskeletal systems, inasmuch as they did not document findings with respect to the following:

(i)     measurement of any three of the following seven vital signs: (a) sitting or standing blood pressure; (b) supine blood pressure; (c) pulse rate and regularity; (d) respiration; (e) temperature; (f) height; (g) weight;

(ii)    general appearance of patient (e.g., development, nutrition, body habitus, deformities, attention to grooming);

(iii)   examination of peripheral vascular system by observation (e.g., swelling, varicosities) and palpation (e.g., pulses, temperature, edema, tenderness);

(iv)    palpation of lymph nodes in neck, axillae, groin and/or other location;

(v)     brief assessment of mental status;

(vi)    examination of gait and station;

(vii)   inspection and/or palpation of skin and subcutaneous tissue (e.g., scars, rashes, lesions, café au-lait spots, ulcers) in four of the following six areas: (a) head and neck; (b) trunk; (c) right upper extremity; (d) left upper extremity; (e) right lower extremity; and (f) left lower extremity;

(viii)  coordination;

(ix)    examination of deep tendon reflexes and/or nerve stretch test with notation of pathological reflexes; and/or

(x)     examination of sensation.

200.    For example:

(i)     On February 18, 2013, Lychock purported to provide an initial chiropractic examination to an Insured named CM. Hamilton, Fass, and Lychock then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Lychock had provided a "detailed" physical examination. However, Lychock did not document an extended examination of CM's musculoskeletal system, despite the fact that – to the extent that CM had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(ii)    On April 1, 2013, Pierro purported to provide an initial chiropractic examination to an Insured named EV. Hamilton, Fass, and Pierro then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented

that Pierro had provided a "detailed" physical examination. However, Pierro did not document an extended examination of EV's musculoskeletal system, despite the fact that – to the extent that EV had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(iii)    On April 19, 2013, Lychock purported to provide an initial chiropractic examination to an Insured named MO. Hamilton, Fass, and Lychock then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Lychock had provided a "detailed" physical examination. However, Lychock did not document an extended examination of MO's musculoskeletal system, despite the fact that – to the extent that MO had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(iv)    On November 7, 2013, Pierro purported to provide an initial chiropractic examination to an Insured named FD. Hamilton, Fass, and Pierro then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Pierro had provided a "detailed" physical examination. However, Pierro did not document an extended examination of FD's musculoskeletal system, despite the fact that – to the extent that FD had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(v)    On June 27, 2013, Pierro purported to provide an initial chiropractic examination to an Insured named PS. Hamilton, Fass, and Pierro then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Pierro had provided a "detailed" physical examination. However, Pierro did not document an extended examination of PS's musculoskeletal system, despite the fact that – to the extent that PS had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(vi)    On August 26, 2013, Lychock purported to provide an initial chiropractic examination to an Insured named AP. Hamilton, Fass, and Lychock then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Lychock had provided a "detailed" physical examination. However, Lychock did not document an extended examination of AP's musculoskeletal system, despite the fact that – to the extent that AP had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(vii)    On November 5, 2013, Pierro purported to provide an initial chiropractic examination to an Insured named WM. Hamilton, Fass, and Pierro then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Pierro had provided a "detailed" physical examination. However, Pierro did not document an extended examination of WM's musculoskeletal system, despite the fact that – to the extent that WM had any complaints at all as

the result of his automobile accident – they were limited to musculoskeletal complaints.

(viii)    On November 7, 2013, Pierro purported to provide an initial chiropractic examination to an Insured named CB. Hamilton, Fass, and Pierro then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Pierro had provided a "detailed" physical examination. However, Pierro did not document an extended examination of CB's musculoskeletal system, despite the fact that – to the extent that CB had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(ix)    On December 2, 2013, Lychock purported to provide an initial chiropractic examination to an Insured named AP. Hamilton, Fass, and Lychock then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Lychock had provided a "detailed" physical examination. However, Lychock did not document an extended examination of AP's musculoskeletal system, despite the fact that – to the extent that AP had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(x)    On January 3, 2014, Lychock purported to provide an initial chiropractic examination to an Insured named ZC. Hamilton, Fass, and Lychock then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Lychock had provided a "detailed" physical examination. However, Lychock did not document an extended examination of ZC's musculoskeletal system, despite the fact that – to the extent that ZC had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xi)    On February 19, 2014, Lychock purported to provide an initial chiropractic examination to an Insured named RH. Hamilton, Fass, and Lychock then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Lychock had provided a "detailed" physical examination. However, Lychock did not document an extended examination of RH's musculoskeletal system, despite the fact that – to the extent that RH had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xii)    On March 28, 2014, Lychock purported to provide an initial chiropractic examination to an Insured named YD. Hamilton, Fass, and Lychock then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Lychock had provided a "detailed" physical examination. However, Lychock did not document an extended examination of YD's musculoskeletal system, despite the fact that – to the extent that YD had any

complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xiii)   On May 14, 2014, Lychock purported to provide an initial chiropractic examination to an Insured named GA. Hamilton, Fass, and Lychock then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Lychock had provided a "detailed" physical examination. However, Lychock did not document an extended examination of GA's musculoskeletal system, despite the fact that – to the extent that GA had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xiv)   On July 3, 2014, Pierro purported to provide an initial chiropractic examination to an Insured named DZ. Hamilton, Fass, and Pierro then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Pierro had provided a "detailed" physical examination. However, Pierro did not document an extended examination of DZ's musculoskeletal system, despite the fact that – to the extent that DZ had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xv)   On July 8, 2014, Kishyk purported to provide an initial chiropractic examination to an Insured named ES. Hamilton, Fass, and Kishyk then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Kishyk had provided a "detailed" physical examination. However, Kishyk did not document an extended examination of ES's musculoskeletal system, despite the fact that – to the extent that ES had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xvi)   On October 14, 2014, Pierro purported to provide an initial chiropractic examination to an Insured named RP. Hamilton, Fass, and Pierro then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Pierro had provided a "detailed" physical examination. However, Pierro did not document an extended examination of RP's musculoskeletal system, despite the fact that – to the extent that RP had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xvii)   On February 5, 2015, Kishyk purported to provide an initial chiropractic examination to an Insured named AH. Hamilton, Fass, and Kishyk then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Kishyk had provided a "detailed" physical examination. However, Kishyk did not document an extended examination of AH's musculoskeletal system, despite the fact that – to the extent that AH had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xviii)   On February 5, 2015, Kishyk purported to provide an initial chiropractic examination to an Insured named HM. Hamilton, Fass, and Kishyk then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Kishyk had provided a "detailed" physical examination. However, Kishyk did not document an extended examination of HM's musculoskeletal system, despite the fact that – to the extent that HM had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xix)   On June 23, 2015, Kishyk purported to provide an initial chiropractic examination to an Insured named DS. Hamilton, Fass, and Kishyk then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Kishyk had provided a "detailed" physical examination. However, Kishyk did not document an extended examination of DS's musculoskeletal system, despite the fact that – to the extent that DS had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xx)   On July 23, 2015, Kishyk purported to provide an initial chiropractic examination to an Insured named VR. Hamilton, Fass, and Kishyk then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Kishyk had provided a "detailed" physical examination. However, Kishyk did not document an extended examination of VR's musculoskeletal system, despite the fact that – to the extent that VR had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

(xxi)   On July 30, 2015, Pierro purported to provide an initial chiropractic examination to an Insured named SM. Hamilton, Fass, and Pierro then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Pierro had provided a "detailed" physical examination. However, Pierro did not document an extended examination of SM's musculoskeletal system, despite the fact that – to the extent that SM had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxii)   On September 15, 2015, Kishyk purported to provide an initial chiropractic examination to an Insured named DS. Hamilton, Fass, and Kishyk then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Kishyk had provided a "detailed" physical examination. However, Kishyk did not document an extended examination of DS's musculoskeletal system, despite the fact that – to the extent that DS had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxiii)   On September 22, 2015, Kishyk purported to provide an initial chiropractic examination to an Insured named MS. Hamilton, Fass, and Kishyk then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Kishyk had provided a "detailed" physical examination.

However, Kishyk did not document an extended examination of MS's musculoskeletal system, despite the fact that – to the extent that MS had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxiv)   On November 30, 2015, Kishyk purported to provide an initial chiropractic examination to an Insured named MO. Hamilton, Fass, and Kishyk then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Kishyk had provided a "detailed" physical examination. However, Kishyk did not document an extended examination of MO's musculoskeletal system, despite the fact that – to the extent that MO had any complaints at all as the result of his automobile accident – they were limited to musculoskeletal complaints.

(xxv)   On December 29, 2015, Kishyk purported to provide an initial chiropractic examination to an Insured named AR. Hamilton, Fass, and Kishyk then billed the putative examination to GEICO under CPT code 99203, and thereby falsely represented that Kishyk had provided a "detailed" physical examination. However, Kishyk did not document an extended examination of AR's musculoskeletal system, despite the fact that – to the extent that AR had any complaints at all as the result of her automobile accident – they were limited to musculoskeletal complaints.

201.   These are only representative examples. In all of the claims for initial chiropractic examinations under CPT code 99203 that are identified in Exhibit "2", Hamilton, Fass, Kishyk, Lychock, and Pierro falsely represented that they had provided "detailed" physical examinations. In fact, they had not provided detailed physical examinations because they had not documented an extended examination of the Insureds' affected body areas and other symptomatic or related organ systems.

202.   In the claims for initial chiropractic examinations under CPT code 99203 that are identified in Exhibit "2", Hamilton, Fass, Kishyk, Lychock, and Pierro falsely represented that they had provided "detailed" physical examinations to the Insureds in order to create a false basis for their charges for the examinations under CPT code 99203, because examinations billable under CPT code 99203 are reimbursable at higher rates than examinations that do not require the examining chiropractor to provide "detailed" physical examinations.

70

5.      **Misrepresentations Regarding the Extent of Medical Decision-Making**

203.    Furthermore, pursuant to the Fee Schedule, when Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney billed for their initial medical examinations using CPT code 99204, they represented that the physician who purported to perform the examinations – virtually always Fass, Kosmorsky, Smith, or J. Mahoney – engaged in "moderately complex" medical decision-making.

204.    Similarly, pursuant to the Fee Schedule, when Hamilton, Fass, Kishyk, Lychock, and Pierro billed for their initial chiropractic examinations using CPT code 99203, they represented that the chiropractor who purported performed the examinations – virtually always Kishyk, Lychock, or Pierro – engaged in "low complexity" medical decision-making.

205.    Pursuant to the CPT Assistant, the complexity of medical decision-making is measured by: (i) the number of diagnoses and/or the number of management options to be considered; (ii) the amount and/or complexity of medical records, diagnostic tests, and other information that must be retrieved, reviewed, and analyzed; and (iii) the risk of significant complications, morbidity, mortality, as well as co-morbidities associated with the patient's presenting problems, the diagnostic procedures, and/or the possible management options.

206.    Though Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney routinely billed for their initial medical examinations under CPT code 99204, and thereby represented that the examinations involved "moderately complex" medical decision-making, and through Hamilton, Fass, Kishyk, Lychock, and Pierro routinely billed for their initial chiropractic examinations under CPT code 99203, and thereby represented that the examinations involved "low complexity" medical decision-making, in actuality the putative examinations did not involve any legitimate medical decision-making at all.

207.    First, in virtually every claim for initial examinations identified in Exhibit "2", the initial examinations did not involve the retrieval, review, or analysis of any significant amount of medical records, diagnostic tests, or other information.

208.    When the Insureds presented at Hamilton for the putative initial examinations, they did not arrive with any medical records. Furthermore, prior to the initial examinations, Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro neither requested any medical records from any other healthcare providers who had treated the Insureds, nor conducted any diagnostic tests.

209.    Second, in the claims for initial examinations identified in Exhibit "2",  there was no risk of significant complications or morbidity – much less mortality – from the Insureds' minor soft-tissue injury complaints, to the extent that they ever had any complaints arising from automobile accidents at all.

210.    Nor, by extension, was there any risk of significant complications, morbidity, or mortality from the diagnostic procedures or treatment options provided by Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro, to the extent that t Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro provided any such diagnostic procedures or treatment options in the first instance.

211.    In virtually all of the claims for initial examinations identified in Exhibit "2", any diagnostic procedures and "treatments" that Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro actually provided were limited to a series of medically unnecessary electrodiagnostic tests, PENS sessions, physical therapy services, chiropractic services, and/or pain management injections, none of which was health- or life-threatening if properly administered.

212. Third, in virtually all of the claims for initial examinations identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro did not consider any significant number of diagnoses or treatment options for Insureds during the putative initial examinations.

213. Rather, to the extent that the initial examinations were conducted in the first instance, Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro provided a nearly identical, pre-determined "diagnosis" for every Insured, and prescribed a virtually identical course of treatment for every Insured.

214. Specifically, in virtually all of the claims for initial examinations identified in Exhibit "2", during the initial examinations the Insureds did not report any continuing medical problems that legitimately could be traced to an underlying automobile accident.

215. Even so, Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro prepared initial examination reports in which they provided phony, boilerplate neck, back, and/or extremity sprain/strain and related "diagnoses" to virtually every Insured.

216. Then, based upon these phony "diagnoses", Hamilton, Fass, Kishyk, Lychock, and Pierro directed virtually every Insured in the claims identified in Exhibit "2" to report to Hamilton on an ongoing basis several times each week for medically unnecessary chiropractic and physical therapy "treatments", regardless of the Insureds' true circumstances or presentment.

217. Similarly, based upon these phony "diagnoses", Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney directed virtually every Insured in the claims identified in Exhibit "2" to report to Hamilton on an ongoing basis several times each week for medically unnecessary chiropractic and physical therapy "treatments", as well as for medically unnecessary follow-up examinations, regardless of the Insureds' true circumstances or presentment.

218.    In addition, in many of the claims for initial examinations identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney directed the Insureds to present at GSMI for medically unnecessary radiology services, pursuant to the illegal kickbacks that GSMI, Zuberi, Khan, Din, and F. Zuberi provided to Hamilton and Fass.

219.    For example:

(i)      On December 18, 2012, an Insured named AG was involved in a minor automobile accident. The contemporaneous police report indicated that AG was not injured and did not visit any hospital emergency room following the accident. On January 14, 2013, Fass purported to conduct an initial medical examination of AG at Hamilton. Fass did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Fass did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fass provided AG with the same, phony, boilerplate back and neck sprain/strain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AG's presenting problems, nor the treatment plan provided to AG by Fass and Hamilton, presented any risk of significant complications, morbidity, or mortality. To the contrary, AG did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Fass and Hamilton consisted of medically unnecessary chiropractic and physical therapy treatment, none of which posed the least bit of risk to AG. Even so, Fass and Hamilton billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Fass engaged in some legitimate, "moderately complex" medical decision-making during the purported examination.

(ii)     On January 21, 2013, an Insured named KG was involved in a minor automobile accident in which she was a passenger on a public bus. The contemporaneous police report indicated that KG was not injured in the accident. On March 8, 2013, Fass purported to conduct an initial medical examination of KG at Hamilton. Fass did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Fass did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fass provided KG with the same, phony, boilerplate back and neck sprain/strain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither KG's presenting problems, nor the treatment plan provided to KG by Fass and Hamilton, presented any risk of significant complications, morbidity, or mortality. To the contrary, KG did not need any treatment at all as the result of her minor accident, and the treatment plan provided by Fass and Hamilton consisted of medically unnecessary chiropractic and physical therapy treatment, none of which posed the least bit of risk to KG. Even so, Fass and Hamilton billed

74

GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Fass engaged in some legitimate, "moderately complex" medical decision-making during the purported examination.

(iii)   On March 12, 2013, an Insured named MO was involved in a minor automobile accident. The contemporaneous police report indicated that MO was not injured and did not visit any hospital emergency room following the accident. On April 17, 2013, Fass purported to conduct an initial medical examination of MO at Hamilton. Fass did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Fass did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fass provided MO with the same, phony, boilerplate back and neck sprain/strain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MO's presenting problems, nor the treatment plan provided to MO by Fass and Hamilton, presented any risk of significant complications, morbidity, or mortality. To the contrary, MO did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Fass and Hamilton consisted of medically unnecessary chiropractic and physical therapy treatment, none of which posed the least bit of risk to MO. Even so, Fass and Hamilton billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Fass engaged in some legitimate, "moderately complex" medical decision-making during the purported examination.

(iv)   On September 5, 2013, an Insured named KC was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that KC refused medical attention at the scene of the accident, that KC's vehicle was drivable following the accident, and that KC drove her vehicle away from the scene of the accident. Nonetheless, KC traveled on her own to Capital Health Regional Medical Center, where she was briefly evaluated on an outpatient basis and discharged with a minor neck strain diagnosis. On September 12, 2013, Pierro purported to conduct an initial examination of KC at Hamilton. Pierro did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Pierro did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Pierro provided KC with the same, phony, boilerplate back and neck sprain/strain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither KC's presenting problems, nor the treatment plan provided to KC by Pierro and Hamilton, presented any risk of significant complications, morbidity, or mortality. To the contrary, KC did not need any treatment at all as the result of her minor accident, and the treatment plan provided by Pierro and Hamilton consisted of medically unnecessary chiropractic and physical therapy treatment, none of which posed the least bit of risk to KC. Even so, Pierro and Hamilton billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Pierro engaged in some

legitimate, "low complexity" medical decision-making during the purported examination.

(v)    On November 22, 2013, an Insured named AP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision that caused only minor damage to AP's vehicle, that AP's vehicle was drivable following the accident, that AP drove his vehicle away from the scene of the accident, and no one was injured in the accident or complained of any pain at the scene of the accident. Nonetheless, AP traveled on his own to Robert Wood CJ University Hospital the next day, where he was briefly evaluated on an outpatient basis and discharged with a minor neck strain diagnosis. On December 3, 2013, Kosmorsky purported to conduct an initial examination of AP at Hamilton. Kosmorsky did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Kosmorsky did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Kosmorsky provided AP with the same, phony, boilerplate back and neck sprain/strain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AP's presenting problems, nor the treatment plan provided to AP by Kosmorsky and Hamilton, presented any risk of significant complications, morbidity, or mortality. To the contrary, AP did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Kosmorsky and Hamilton consisted of medically unnecessary chiropractic and physical therapy treatment, none of which posed the least bit of risk to AP. Even so, Kosmorsky and Hamilton billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Kosmorsky engaged in some legitimate ,"moderately complex" medical decision-making during the purported examination.

(vi)    On December 19, 2013, an Insured named DO was involved in a minor automobile accident. The contemporaneous police report indicated that DO was not injured and did not visit any hospital emergency room following the accident. On December 30, 2013, Fass purported to conduct an initial examination of DO at Hamilton. Fass did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Fass did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fass provided DO with the same, phony, boilerplate back and neck sprain/strain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DO's presenting problems, nor the treatment plan provided to DO by Fass and Hamilton, presented any risk of significant complications, morbidity, or mortality. To the contrary, DO did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Fass and Hamilton consisted of medically unnecessary chiropractic and physical therapy treatment, none of which posed the least bit of risk to DO. Even so, Fass and Hamilton billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented

76

that Fass engaged in some legitimate ,"moderately complex" medical decision-making during the purported examination.

(vii)     On January 24, 2014 an Insured named RS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that RS's vehicle was drivable following the accident, that RS drove his vehicle away from the scene of the accident, and that no one was injured in the accident or complained of any pain. In keeping with the fact that RS was not injured in the minor accident, the police report stated that RS "stated he was not injured, and refused medical treatment." Nonetheless, RS traveled on his own to Capital Health Regional Medical Center, where he was briefly evaluated on an outpatient basis and discharged with a minor back strain diagnosis. On January 28, 2014, Pierro purported to conduct an initial examination of RS at Hamilton. Pierro did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Pierro did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Pierro provided RS with the same, phony, boilerplate back and neck sprain/strain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither RS's presenting problems, nor the treatment plan provided to RS by Pierro and Hamilton, presented any risk of significant complications, morbidity, or mortality. To the contrary, RS did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Pierro and Hamilton consisted of medically unnecessary chiropractic and physical therapy treatment, none of which posed the least bit of risk to RS. Even so, Pierro and Hamilton billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Pierro engaged in some legitimate, "low complexity" medical decision-making during the purported examination.

(viii)     On February 14, 2014, an Insured named YD was involved in a minor automobile accident. The contemporaneous police report indicated that YD was not injured in the accident. On March 19, 2014, Fass purported to conduct an initial examination of YD at Hamilton. Fass did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Fass did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fass provided YD with the same, phony, boilerplate back and neck sprain/strain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither YD's presenting problems, nor the treatment plan provided to YD by Fass and Hamilton, presented any risk of significant complications, morbidity, or mortality. To the contrary, YD did not need any treatment at all as the result of her minor accident, and the treatment plan provided by Fass and Hamilton consisted of medically unnecessary chiropractic and physical therapy treatment, none of which posed the least bit of risk to YD Even so, Fass and Hamilton billed GEICO for the initial examination using CPT code 99204, and

thereby falsely represented that Fass engaged in some legitimate, "moderately complex" medical decision-making during the purported examination.

(ix)    On April 18, 2014, an Insured named GA was involved in a minor automobile accident. The contemporaneous police report indicated that GA was not injured and did not visit any hospital emergency room following the accident. On May 13, 2014, Fass purported to conduct an initial examination of GA at Hamilton. Fass did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Fass did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fass provided GA with the same, phony, boilerplate back and neck sprain/strain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither GA's presenting problems, nor the treatment plan provided to GA by Fass and Hamilton, presented any risk of significant complications, morbidity, or mortality. To the contrary, GA did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Fass and Hamilton consisted of medically unnecessary chiropractic and physical therapy treatment, none of which posed the least bit of risk to GA. Even so, Fass and Hamilton billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Fass engaged in some legitimate, "moderately complex" medical decision-making during the purported examination.

(x)    On June 4, 2014 an Insured named DO was involved in a minor automobile accident. The contemporaneous police report indicated that DO was not injured and did not visit any hospital emergency room following the accident. On June 12, 2014, Fass purported to conduct an initial examination of DO at Hamilton. Fass did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Fass did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fass provided PS with the same, phony, boilerplate neck sprain/strain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither DO's presenting problems, nor the treatment plan provided to DO by Fass and Hamilton, presented any risk of significant complications, morbidity, or mortality. To the contrary, DO did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Fass and Hamilton consisted of medically unnecessary chiropractic and physical therapy treatment, none of which posed the least bit of risk to DO. Even so, Fass and Hamilton billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Fass engaged in some legitimate, "moderately complex" medical decision-making during the purported examination.

(xi)    On February 3, 2015 an Insured named AS was involved in a minor automobile accident. The contemporaneous police report indicated that AS was not injured and did not visit any hospital emergency room following the accident. On

February 11, 2015, Fass purported to conduct an initial examination of AS at Hamilton. Fass did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Fass did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fass provided AS with the same, phony, boilerplate neck sprain/strain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither AS's presenting problems, nor the treatment plan provided to AS by Fass and Hamilton, presented any risk of significant complications, morbidity, or mortality. To the contrary, AS did not need any treatment at all as the result of her minor accident, and the treatment plan provided by Fass and Hamilton consisted of medically unnecessary chiropractic and physical therapy treatment, none of which posed the least bit of risk to AS. Even so, Fass and Hamilton billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Fass engaged in some legitimate, "moderately complex" medical decision-making during the purported examination.

(xii)   On February 17, 2015, an Insured named PS was involved in a minor automobile accident. The contemporaneous police report indicated that PS was not injured and did not visit any hospital emergency room following the accident. On February 24, 2015, Fass purported to conduct an initial examination of PS at Hamilton. Fass did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Fass did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fass provided PS with the same, phony, boilerplate back and neck sprain/strain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither PS's presenting problems, nor the treatment plan provided to PS by Fass and Hamilton, presented any risk of significant complications, morbidity, or mortality. To the contrary, PS did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Fass and Hamilton consisted of medically unnecessary chiropractic and physical therapy treatment, none of which posed the least bit of risk to PS. Even so, Fass and Hamilton billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Fass engaged in some legitimate, "moderately complex" medical decision-making during the purported examination.

(xiii)  On July 9, 2015 an Insured named BA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that BA's vehicle was drivable following the accident, that BA drove his vehicle away from the scene of the accident, and that that no one was injured in the accident. Nonetheless, BA traveled on his own to Robert Wood CJ University Hospital, where he was briefly evaluated on an outpatient basis and discharged with a minor neck/back strain diagnosis. On August 3, 2015, Pierro purported to conduct an initial examination of BA at Hamilton. Pierro did not retrieve, review, or analyze any significant amount of medical records, diagnostic

tests, or other information in connection with the initial examination. Moreover, Pierro did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Pierro provided BA with the same, phony, boilerplate back and neck sprain/strain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither BA's presenting problems, nor the treatment plan provided to BA by Pierro and Hamilton, presented any risk of significant complications, morbidity, or mortality. To the contrary, BA did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Pierro and Hamilton consisted of medically unnecessary chiropractic and physical therapy treatment, none of which posed the least bit of risk to BA. Even so, Pierro and Hamilton billed GEICO for the initial examination using CPT code 99203, and thereby falsely represented that Pierro engaged in some legitimate, "low complexity" medical decision-making during the purported examination.

(xiv)   On September 10, 2015, an Insured named MS was involved in a minor automobile accident. The contemporaneous police report indicated that MS was not injured and did not visit any hospital emergency room following the accident. On February 23, 2015, Fass purported to conduct an initial examination of MS at Hamilton. Fass did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Fass did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Fass provided MS with the same, phony, boilerplate back and neck sprain/strain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither MS's presenting problems, nor the treatment plan provided to MS by Fass and Hamilton, presented any risk of significant complications, morbidity, or mortality. To the contrary, MS did not need any treatment at all as the result of his minor accident, and the treatment plan provided by Fass and Hamilton consisted of medically unnecessary chiropractic and physical therapy treatment, none of which posed the least bit of risk to MS. Even so, Fass and Hamilton billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Fass engaged in some legitimate, "moderately complex" medical decision-making during the purported examination.

(xv)   On January 12, 2016, an Insured named PF was involved in an automobile accident. The contemporaneous police report indicated that no one was injured in the accident. In keeping with the fact that PF was not injured in the minor accident, PF did not go to the hospital following the accident. On January 20, 2016, Smith purported to conduct an initial examination of PF at Hamilton. Smith did not retrieve, review, or analyze any significant amount of medical records, diagnostic tests, or other information in connection with the initial examination. Moreover, Smith did not consider any significant number of diagnoses or management options in connection with the examination. Instead, Smith provided PF with the same, phony, boilerplate back and neck sprain/strain "diagnoses" that he provided to virtually every other Insured. Furthermore, neither PF's presenting

problems, nor the treatment plan provided to PF by Smith and Hamilton, presented any risk of significant complications, morbidity, or mortality. To the contrary, PF did not need any treatment at all as the result of her minor accident, and the treatment plan provided by Smith and Hamilton consisted of medically unnecessary chiropractic and physical therapy treatment, none of which posed the least bit of risk to PF. Even so, Smith and Hamilton billed GEICO for the initial examination using CPT code 99204, and thereby falsely represented that Smith engaged in some legitimate, "moderately complex" medical decision-making during the purported examination.

220.   In keeping with the fact that Hamilton and Fass's phony "diagnoses" and medically unnecessary treatment plans were pre-determined, and not tailored to the Insureds' individual circumstances and presentment, Hamilton and Fass frequently disregarded, and failed to address or treat, the Insureds' putative symptomatology when it did not fit into their pre-determined program of medically unnecessary electrodiagnostic tests, PENS sessions, physical therapy services, chiropractic services, and pain management injections.

221.   For example, to create the false impression that the Insureds' trivial automobile accidents had been serious, and thereby create a false justification for the medically unnecessary Fraudulent Services, Hamilton and Fass frequently generated initial examination reports which stated that the Insureds in the claims identified in Exhibit "2" suffered troubling symptoms such as dizziness, depression, anxiety, loss of memory, or chest pain as the result of their minor automobile accidents. However, Hamilton and Fass then failed addressed these putative symptoms in their boilerplate treatment plans, and failed to refer the Insureds who supposedly presented with these symptoms for diagnostic tests or to specialists to determine the cause of, or to treat, these symptoms.

222.   For example:

(i)   On March 27, 2013, Hamilton and Fass purported to provide an initial medical examination to an Insured named EV, who had been involved in an automobile accident on March 23, 2013. In their initial examination report, Fass and Hamilton reported that – as a result of the accident – EV suffered symptoms

including dizziness, depression, and fatigue. However, and in keeping with the fact that the purported initial examinations did not involve any genuine medical decision-making, Fass did not diagnose or otherwise address these disturbing, putative symptoms at the conclusion of the putative initial examination, and did not refer EV to any other healthcare services provider to diagnose or address these symptoms, despite the fact that – at that point – EV had not been treated for those symptoms by any other healthcare services providers. Instead, Fass provided the same, boilerplate sprain/strain "diagnoses" that he provided to virtually every other Insured in the claims identified in Exhibit "2". Then, Fass recommended the same, pre-determined chiropractic and physical therapy treatment plan that he recommended to virtually every other Insured in the claims identified in Exhibit "2".

(ii)     On May 22, 2013, Hamilton and Fass purported to provide an initial medical examination to an Insured named FD, who had been involved in an automobile accident on May 17, 2013. In their initial examination report, Kosmorsky and Hamilton reported that – as a result of the accident – FD suffered symptoms including memory loss, lightheadedness, chest pain, and anxiety. However, and in keeping with the fact that the purported initial examinations did not involve any genuine medical decision-making, Fass did not diagnose or otherwise address most of these disturbing, putative symptoms at the conclusion of the putative initial examination, and did not refer FD to any other healthcare services provider to diagnose or address these symptoms, despite the fact that – at that point – FD had not been treated for those symptoms by any other healthcare services providers. Though Fass did purport to diagnose FD with "post-concussive syndrome", he did not take any steps to address this purported "diagnosis". Instead, Fass recommended the same, pre-determined chiropractic and physical therapy treatment plan that he recommended to virtually every other Insured in the claims identified in Exhibit "2".

(iii)    On December 27, 2013, Hamilton and Fass purported to provide an initial medical examination to an Insured named JS, who had been involved in an automobile accident on December 25, 2013. In their initial examination report, Fass and Hamilton reported that – as a result of the accident – JS suffered symptoms including dizziness, nervousness, anxiety, and sexual dysfunction. However, and in keeping with the fact that the purported initial examinations did not involve any genuine medical decision-making, Fass did not diagnose or otherwise address these disturbing, putative symptoms at the conclusion of the putative initial examination, and did not refer JS to any other healthcare services provider to diagnose or address these symptoms, despite the fact that – at that point – JS had not been treated for those symptoms by any other healthcare services providers. Instead, Fass provided the same, boilerplate sprain/strain "diagnoses" that he provided to virtually every other Insured in the claims identified in Exhibit "2". Then, Fass recommended the same, pre-determined chiropractic and physical therapy treatment plan that he recommended to virtually every other Insured in the claims identified in Exhibit "2".

(iv)     On March 19, 2014, Hamilton and Fass purported to provide an initial medical examination to an Insured named YD who had been involved in an automobile accident on February 14, 2014. In their initial examination report, Fass and Hamilton reported that – as a result of the accident – YD suffered symptoms including dizziness, anxiety, depression, loss of memory, photosensitivity, and sexual dysfunction. However, and in keeping with the fact that the purported initial examinations did not involve any genuine medical decision-making, Fass did not diagnose or otherwise address these disturbing, putative symptoms at the conclusion of the putative initial examination, and did not refer YD to any other healthcare services provider to diagnose or address these symptoms, despite the fact that – at that point – YD had not been treated for those symptoms by any other healthcare services providers. Instead, Fass provided the same, boilerplate sprain/strain "diagnoses" that he provided to virtually every other Insured in the claims identified in Exhibit "2". Then, Fass recommended the same, pre-determined chiropractic and physical therapy treatment plan that he recommended to virtually every other Insured in the claims identified in Exhibit "2".

(v)      On July 29, 2015, Hamilton and Fass purported to provide an initial medical examination to an Insured named AC, who had been involved in an automobile accident on May 25, 2015. In their initial examination report, Fass and Hamilton reported that – as a result of the accident – DW suffered symptoms including memory loss. However, and in keeping with the fact that the purported initial examinations did not involve any genuine medical decision-making, Fass did not diagnose or otherwise address these disturbing, putative symptoms at the conclusion of the putative initial examination, and did not refer AC to any other healthcare services provider to diagnose or address these symptoms, despite the fact that – at that point – AC had not been treated for those symptoms by any other healthcare services providers. Instead, Fass provided the same, boilerplate sprain/strain "diagnoses" that he provided to virtually every other Insured in the claims identified in Exhibit "2". Then, Fass recommended the same, pre-determined chiropractic and physical therapy treatment plan that he recommended to virtually every other Insured in the claims identified in Exhibit "2".

(vi)     On June 24, 2015, Hamilton and Fass purported to provide an initial medical examination to an Insured named DW, who had been involved in an automobile accident on June 21, 2015. In their initial examination report, Fass and Hamilton reported that – as a result of the accident – DW suffered symptoms including chest pain and anxiety. However, and in keeping with the fact that the purported initial examinations did not involve any genuine medical decision-making, Fass did not diagnose or otherwise address these disturbing, putative symptoms at the conclusion of the putative initial examination, and did not refer DW to any other healthcare services provider to diagnose or address these symptoms, despite the fact that – at that point – DW had not been treated for those symptoms by any other healthcare services providers. Instead, Fass provided the same, boilerplate sprain/strain "diagnoses" that he provided to virtually every other Insured in the

claims identified in Exhibit "2". Then, Fass recommended the same, pre-determined chiropractic and physical therapy treatment plan that he recommended to virtually every other Insured in the claims identified in Exhibit "2".

(vii)    On July 29, 2015, Hamilton and Fass purported to provide an initial medical examination to an Insured named SM, who had been involved in an automobile accident on July 4, 2015. In their initial examination report, Fass and Hamilton reported that – as a result of the accident – SM suffered symptoms including dizziness, cold hands, cold sweats, anxiety, and chest pain. However, and in keeping with the fact that the purported initial examinations did not involve any genuine medical decision-making, Fass did not diagnose or otherwise address these disturbing, putative symptoms at the conclusion of the putative initial examination, and did not refer SM to any other healthcare services provider to diagnose or address these symptoms, despite the fact that – at that point – SM had not been treated for those symptoms by any other healthcare services providers. Instead, Fass provided the same, boilerplate sprain/strain "diagnoses" that he provided to virtually every other Insured in the claims identified in Exhibit "2". Then, Fass recommended the same, pre-determined chiropractic and physical therapy treatment plan that he recommended to virtually every other Insured in the claims identified in Exhibit "2". Then, on July 30, 2015, Pierro purported to provide an initial chiropractic examination to SM at Hamilton. Like Fass, Pierro noted in his initial examination report that SM suffered from symptoms including dizziness, cold hands, cold sweats, anxiety, and chest pain. Even so – and like Fass – Pierro did not diagnose or otherwise address these disturbing, putative symptoms at the conclusion of the putative initial examination, and did not refer SM to any other healthcare services provider to diagnose or address these symptoms. Instead, and like Fass, Pierro provided the same, boilerplate sprain/strain "diagnoses" that he provided to virtually every other Insured in the claims identified in Exhibit "2". Then, Pierro recommended the same, pre-determined chiropractic and physical therapy treatment plan that he recommended to virtually every other Insured in the claims identified in Exhibit "2".

(viii)    On July 31, 2015, Hamilton and Fass purported to provide an initial medical examination to an Insured named BA, who had been involved in an automobile accident on July 9, 2015. In their initial examination report, Fass and Hamilton reported that – as a result of the accident – BA suffered symptoms including dizziness, sexual dysfunction, and anxiety. However, and in keeping with the fact that the purported initial examinations did not involve any genuine medical decision-making, Fass did not diagnose or otherwise address these disturbing, putative symptoms at the conclusion of the putative initial examination, and did not refer BA to any other healthcare services provider to diagnose or address these symptoms, despite the fact that – at that point – BA had not been treated for those symptoms by any other healthcare services providers. Instead, Fass provided the same, boilerplate sprain/strain "diagnoses" that he provided to virtually every other Insured in the claims identified in Exhibit "2". Then, Fass recommended the same, pre-determined chiropractic and physical therapy

treatment plan that he recommended to virtually every other Insured in the claims identified in Exhibit "2".

(ix)   On September 8, 2015, Hamilton and Fass purported to provide an initial medical examination to an Insured named LS, who had been involved in an automobile accident on August 5, 2015. In their initial examination report, Fass and Hamilton reported that – as a result of the accident – LS suffered symptoms including memory deficits and tinnitus. However, and in keeping with the fact that the purported initial examinations did not involve any genuine medical decision-making, Fass did not diagnose or otherwise address these disturbing, putative symptoms at the conclusion of the putative initial examination, and did not refer LS to any other healthcare services provider to diagnose or address these symptoms, despite the fact that – at that point – LS had not been treated for those symptoms by any other healthcare services providers. Instead, Fass provided the same, boilerplate sprain/strain "diagnoses" that he provided to virtually every other Insured in the claims identified in Exhibit "2". Then, Fass recommended the same, pre-determined chiropractic and physical therapy treatment plan that he recommended to virtually every other Insured in the claims identified in Exhibit "2".

(x)   On March 23, 2016, Hamilton and Fass purported to provide an initial medical examination to an Insured named EF, who had been involved in an automobile accident on March 11, 2016. In their initial examination report, Fass and Hamilton reported that – as a result of the accident – EF suffered symptoms including ringing in her ear, anxiety, and cold sweats. However, and in keeping with the fact that the purported initial examinations did not involve any genuine medical decision-making, Fass did not diagnose or otherwise address these disturbing, putative symptoms at the conclusion of the putative initial examination, and did not refer EF to any other healthcare services provider to diagnose or address these symptoms, despite the fact that – at that point – EF had not been treated for those symptoms by any other healthcare services providers. Instead, Fass provided the same, boilerplate sprain/strain "diagnoses" that he provided to virtually every other Insured in the claims identified in Exhibit "2". Then, Fass recommended the same, pre-determined chiropractic and physical therapy treatment plan that he recommended to virtually every other Insured in the claims identified in Exhibit "2".

223.   In the claims for initial examinations identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro's phony "sprain/strain" "diagnoses" were predicated, in large part, on supposed deficits in the Insureds' range of motion.

224.   The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety. The body's hinged joints and ball-

85

and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

225.    The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion". Stated in a more illustrative way, range of motion is the amount that a joint will move from a straight position to its bent or hinged position.

226.    A range of motion test consists of a measurement of the joint's ability to move in comparison with an unimpaired or "ideal" joint.  In a range of motion test, the physician or chiropractor asks the patient to move his or her joints at various angles, or the physician or chiropractor moves the joints. The physician or chiropractor then evaluates the patient's range of motion either by sight or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

227.    Physical examinations performed on patients with soft-tissue trauma necessarily require range of motion tests, inasmuch as these tests provide a starting point for injury assessment and treatment planning. Unless a physician or chiropractor knows the extent of a given patient's joint impairment, there is no way to properly diagnose or treat the patient's injuries. Evaluation of range of motion is an essential component of the "hands-on" examination of a trauma patient.

228.    Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro purported to conduct range of motion testing during virtually every initial examination that Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro purported to perform and/or provide to Insureds.

229.    In actuality, however, Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro simply fabricated range of motion data for the Insureds and included it in the initial examination reports in order to create the appearance of serious injuries, where none actually existed.

230.    For instance, and in keeping with the fact that the "results" of the initial examinations were fabricated, and involved no actual medical decision-making whatsoever, the putative range of motion "data" that Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro purported to obtain during their phony initial examinations often were contravened by contemporaneous police reports and hospital records, which indicated that the Insureds did not suffer from the range of motion deficits that Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro purported to identify, or any range of motion deficits at all.

231.    What is more, in many cases the putative range of motion "data" that Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney, purported to obtain during their phony initial medical examinations actually were contravened by contemporaneous range of motion data that Hamilton, Kishyk, Lychock, and Pierro purported to obtain during their phony initial chiropractic examinations, and vice-versa.

232.    In such instances, the inconsistencies in the range of motion "findings" were not documented or addressed in any way, nor – by extension – did Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro alter their boilerplate "diagnoses" based on the inconsistencies in the findings.

233.    For example:

(i)    On January 21, 2013, an Insured named WJ was involved in an automobile accident, and presented the next day for treatment at Robert Wood CJ University

87

Hospital. The contemporaneous hospital records indicated that WJ complained of neck pain, but specifically denied any injury to her back. On January 24, 2013, Kosmorsky purported to provide WJ with an initial medical examination at Hamilton, and on February 11, 2013, Pierro purported to provide WJ with an initial chiropractic examination. Though WJ had not suffered any injury to her back in her minor accident, Kosmorsky and Pierro nonetheless purported to identify serious range of motion deficits in WJ's back, including lumbar flexion that was just 39-56 percent of normal, and lumbar extension that was just 50-67 percent of normal. Although Kosmorsky and Pierro reported range of motion data for WJ that were starkly at odds with the contemporaneous hospital records, neither Kosmorsky nor Pierro addressed or even commented upon their disparate "findings". This is because Hamilton, Kosmorsky, and Pierro created phony range of motion data for WJ in order to facilitate the pre-determined soft tissue injury "diagnoses" they generated at the conclusion of their ersatz initial examinations.

(ii)     On March 1, 2013, an Insured named MO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that MO's vehicle was drivable following the accident, that MO drove his vehicle away from the scene of the accident, and that MO refused medical attention at the scene of the accident. In keeping with the fact that MO was not seriously injured in the minor accident, MO did not seek treatment at any hospital following the accident. In fact, MO did not seek any treatment at all until more than a month after the accident, on April 17, 2013, when Fass purported to provide him with an initial medical examination at Hamilton. In his report of the examination, Fass purported to identify serious deficits in MO's range of motion, including cervical extension that was just 27 percent of normal, lumbar flexion that was just 56 percent of normal, and lumbar extension that was just 67 percent of normal. Just two days later, on April 19, 2013, Lychock purported to provide MO with an initial chiropractic examination. In the report of that examination, Lychock contended that MO's cervical flexion was 67 percent of normal, and indicated that MO had no complaints at all regarding his lumbar spine, and normal lumbar range of motion. This, despite the fact that just two days earlier Fass had reported much more serious deficits in MO's cervical range of motion, as well as serious lumbar range of motion deficits. Although Fass and Lychock reported dramatically different range of motion data for MO over the course of just two days, neither Fass nor Lychock addressed or even commented upon their disparate "findings". This is because Hamilton, Fass, and Lychock created phony range of motion data for MO in order to facilitate the pre-determined soft tissue injury "diagnoses" they generated at the conclusion of their ersatz initial examinations.

(iii)    On October 20, 2013, an Insured named CB was involved in an automobile accident. On November 5, 2013, Fass purported to provide CB with an initial medical examination at Hamilton. In his report of the examination, Fass purported to identify serious deficits in CB's range of motion, including cervical flexion that was just 50 percent of normal, cervical extension that was just 27 percent of

normal, cervical right lateral flexion that was just 33 percent of normal, cervical left lateral flexion that was just 44 percent of normal, lumbar flexion that was just 67 percent of normal, lumbar extension that was just 33 percent of normal, lumbar right rotation that was just 33 percent of normal, and lumbar left rotation that was just 33 percent of normal. Just two days later, on November 7, 2013, Pierro purported to provide an initial chiropractic examination to CB. In the report of that examination, Pierro purported to identify markedly different deficits in CB's range of motion, including cervical flexion that was 75 percent of normal, cervical extension that was 67 percent of normal, cervical right lateral flexion that was 67 percent of normal, cervical left lateral flexion that was 67 percent of normal, lumbar flexion that was just 44 percent of normal, lumbar extension that was 67 percent of normal, lumbar right rotation that was 67 percent of normal, and lumbar left rotation that was 67 percent of normal. Although Fass and Pierro reported dramatically different range of motion data for CB over the course of just two days, neither Fass nor Pierro addressed or even commented upon their disparate "findings". This is because Hamilton, Fass, and Pierro created phony range of motion data for CB in order to facilitate the pre-determined soft tissue injury "diagnoses" they generated at the conclusion of their ersatz initial examinations.

(iv)     On December 15, 2013, an Insured named ZC was involved in an automobile accident. On January 3, 2014, Lychock purported to provide ZC with an initial chiropractic examination at Hamilton. In his report of the examination, Lychock purported to identify serious deficits in ZC's range of motion, including cervical right lateral flexion that was 67 percent of normal, and cervical left lateral flexion that was 56 percent of normal. Just four days later, on January 7, 2015, Fass purported to provide an initial medical examination to ZC. In the report of that examination, Fass purported to identify markedly different deficits in ZC's range of motion, including cervical right lateral flexion that was just 22 percent of normal, and cervical left lateral flexion that was just 33 percent of normal. Although Fass and Lychock reported dramatically different range of motion data for ZC over the course of just four days, neither Fass nor Lychock addressed or even commented upon their disparate "findings". This is because Hamilton, Fass, and Lychock created phony range of motion data for ZC in order to facilitate the pre-determined soft tissue injury "diagnoses" they generated at the conclusion of their ersatz initial examinations.

(v)     On April 18, 2014, an Insured named GA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and no one was injured as a result of the accident.  In keeping with the fact that GA was not injured in the minor accident, GA did not visit any hospital as the result of the accident, or seek any treatment at all for the minor accident until almost a month later, on May 13, 2014, when he first presented at Hamilton. On May 13, 2014, Fass purported to provide GA with an initial medical examination at Hamilton. Though GA had not been injured in his accident, Fass nonetheless purported to identify serious deficits in GA's range of

motion during the initial examination, including cervical extension that was just 27 percent of normal, and lumbar extension that was just 33 percent of normal. Just one day later, on May 14, 2014, Lychock purported to provide an initial chiropractic examination to GA. In the report of that examination, Lychock purported to identify markedly different deficits in GA's range of motion, including cervical extension that was 60 percent of normal, and lumbar extension that was 67 percent of normal. Although Fass and Lychock reported dramatically different range of motion data for GA over the course of just one day, neither Fass nor Lychock addressed or even commented upon their disparate "findings". This is because Hamilton, Fass, and Lychock created phony range of motion data for GA in order to facilitate the pre-determined soft tissue injury "diagnoses" they generated at the conclusion of their ersatz initial examinations.

(vi)     On October 17, 2014, an Insured named MD was involved in an automobile accident, and thereafter sought treatment at Capital Health Regional Medical Center. Both the contemporaneous police report and the contemporaneous hospital records indicated that MD had minor soft tissue injuries to her knee and shin, but no injuries to her neck or back. In fact, the hospital records indicated that MD specifically denied any injuries to her neck or back, and that MD's contentions were borne out by the examination conducted by the hospital. On October 20, 2014, Fass purported to provide MD with an initial medical examination at Hamilton and, on October 22, 2014, Pierro purported to provide MD with an initial chiropractic examination. Though MD had not suffered any injury to her neck or back in her accident, Fass and Pierro nonetheless purported to identify serious deficits in MD's range of motion during the examinations, including cervical flexion that was just 50-58 percent of normal, cervical extension that was just 40-53 percent of normal, lumbar flexion that was just 55-67 percent of normal, and lumbar extension that was just 50-67 percent of normal. Although Fass and Pierro reported range of motion data for MD that were starkly at odds with both the contemporaneous police report and the hospital records, neither Fass nor Pierro addressed or even commented upon their disparate "findings". This is because Hamilton, Fass, and Pierro created phony range of motion data for MD in order to facilitate the pre-determined soft tissue injury "diagnoses" they generated at the conclusion of their ersatz initial examinations.

(vii)    On November 20, 2014, an Insured named SH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that SH's vehicle was drivable following the accident, that SH drove her vehicle away from the scene of the accident, and that – although SH complained of minor neck pain at the scene of the accident, she refused medical attention at the scene of the accident. Later that day, SH traveled on her own to Robert Wood CJ University Hospital, where she complained of mild pain in her neck and shoulder, and was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. The contemporaneous hospital records indicated that SH had normal range of motion in her neck, and no pain in her back. On November 28, 2014, Kishyk purported to

provide SH with an initial chiropractic examination at Hamilton. Though SH had not suffered any injury to her back in the minor accident, and though SH had full, normal range of motion in her neck, Kishyk nonetheless purported to identify serious range of motion deficits in SH's neck and back, including cervical flexion that was just 58 percent of normal, cervical extension that was just 60 percent of normal, lumbar flexion that was just 50 percent of normal, and lumbar extension that was just 50 percent of normal. Just three days later, Fass purported to provide SH with an initial medical examination. In his report of that examination, Fass purported to identify markedly different deficits in SH's range of motion, including cervical extension that was just 27 percent of normal, and lumbar extension that was just 67 percent of normal. Although Fass and Kishyk reported range of motion data for SH that were starkly at odds with both the contemporaneous hospital records and each other's own examination reports, neither Fass nor Kishyk addressed or even commented upon their disparate "findings". This is because Hamilton, Fass, and Kishyk created phony range of motion data for SH in order to facilitate the pre-determined soft tissue injury "diagnoses" they generated at the conclusion of their ersatz initial examinations.

(viii)   On January 16, 2015 an Insured named AH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision that occurred while both vehicles were backing out of parking spaces, that AH's vehicle was drivable following the accident, and that no one was injured in the accident or complained of any pain. Nonetheless, AH traveled on her own to Capital Health Regional Medical Center, where she was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. The contemporaneous hospital records indicated that – while AH had minor injuries to her lower back, she had no complaints to her upper back or neck, which were normal. On February 3, 2015, Fass purported to provide AH with an initial medical examination at Hamilton, and on February 5, 2015, Kishyk purported to provide AH with an initial chiropractic examination. Though AH had not suffered any injury to her neck or upper back in the minor accident, Fass and Kishyk nonetheless purported to identify serious deficits in AH's cervical range of motion during the examinations, including cervical extension that was just 40-47 percent of normal, and cervical right lateral flexion that was just 56 percent of normal. Although Fass and Kishyk reported range of motion data for AH that were starkly at odds with both the contemporaneous police report and the hospital records, neither Fass nor Kishyk addressed or even commented upon their disparate "findings". This is because Hamilton, Fass, and Kishyk created phony range of motion data for AH in order to facilitate the pre-determined soft tissue injury "diagnoses" they generated at the conclusion of their ersatz initial examinations.

(ix)   On February 24, 2015, an Insured named ST was involved in an automobile accident, and thereafter sought treatment at Virtua Memorial Hospital. The contemporaneous hospital records indicated that ST complained of chest pain as the result of her seatbelt, but that she specifically denied any back pain and that

she had full, normal range of motion in her neck and back. On March 20, 2015, Fass purported to provide ST with an initial medical examination at Hamilton, and on March 25, 2015, Pierro purported to provide ST with an initial chiropractic examination. Though ST had not suffered any injuries to her neck or back in the accident, and had full, normal range of motion in her neck and back following the accident, Fass and Pierro nonetheless purported to identify serious deficits in ST's range of motion during the examinations, including cervical flexion that was just 50-67 percent of normal, and cervical extension that was just 47 percent of normal. What is more, though Fass purported to identify serious deficits in ST's lumbar range of motion – including lumbar extension that was just 50 percent of normal – Pierro, just five days later, did not identify any deficits in ST's lumbar range of motion, and indicated that ST had no complaints regarding her lumbar spine. Although Fass and Pierro reported range of motion data for ST that were starkly at odds with both the contemporaneous hospital records and with each other's examination reports, neither Fass nor Pierro addressed or even commented upon their disparate "findings". This is because Hamilton, Fass, and Pierro created phony range of motion data for ST in order to facilitate the pre-determined soft tissue injury "diagnoses" they generated at the conclusion of their ersatz initial examinations.

(x)     On July 4, 2015, an Insured named SM was involved in an automobile accident. On July 29, 2015, Fass purported to provide SM with an initial medical examination at Hamilton. In his report of the examination, Fass purported to identify serious deficits in SM's range of motion, including cervical flexion that was just 42 percent of normal, cervical right lateral flexion that was just 11 percent of normal, and cervical left lateral flexion that was just 22 percent of normal. Just one day later, on July 30, 2015, Pierro purported to provide an initial chiropractic examination to SM. In the report of that examination, Pierro purported to identify markedly different deficits in SM's range of motion, including cervical flexion that was 75 percent of normal, cervical right lateral flexion that was 67 percent of normal, and cervical left lateral flexion that was 78 percent of normal. Although Fass and Pierro reported dramatically different range of motion data for SM over the course of just one day, neither Fass nor Pierro addressed or even commented upon their disparate "findings". This is because Hamilton, Fass, and Pierro created phony range of motion data for SM in order to facilitate the pre-determined soft tissue injury "diagnoses" they generated at the conclusion of their ersatz initial examinations.

(xi)    On September 10, 2015, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that MS's vehicle was drivable following the accident, that MS drove his vehicle away from the scene of the accident, and that MS was not injured in the accident. In keeping with the fact that MS was not injured in the minor accident, MS did not go to the hospital following the accident. On September 22, 2015, Kishyk purported to provide MS with an initial chiropractic examination at Hamilton. Though MS had not been injured in his

accident, Kishyk nonetheless purported to identify serious deficits in MS's range of motion during the initial examination, including cervical extension that was just 33 percent of normal, cervical right lateral flexion that was just 33 percent of normal, lumbar flexion that was just 50 percent of normal, lumbar extension that was 50 percent of normal, and lumbar right rotation that was just 50 percent of normal. Just one day later, on September 23, 2015, Fass purported to provide an initial medical examination to MS. In the report of that examination, Fass purported to identify markedly different deficits in MS's range of motion, including cervical extension that was 53 percent of normal, cervical right lateral flexion that was 44 percent of normal, lumbar flexion that was just 33 percent of normal, lumbar extension that was just 33 percent of normal, and lumbar right rotation that was just 33 percent of normal. Although Fass and Kishyk reported dramatically different range of motion data for MS over the course of just one day, neither Fass nor Kishyk addressed or even commented upon their disparate "findings". This is because Hamilton, Fass, and Kishyk created phony range of motion data for MS in order to facilitate the pre-determined soft tissue injury "diagnoses" they generated at the conclusion of their ersatz initial examinations.

(xii)   On October 11, 2015, an Insured named NR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that NR's vehicle was drivable following the accident, that NR drove his vehicle away from the scene of the accident, and that no one was injured in the accident or complained of any pain at the scene of the accident. In keeping with the fact that NR was not injured in the minor accident, NR did not seek treatment at any hospital following the accident. On October 14, 2015, Lychock purported to provide NR with an initial examination at Hamilton. Though NR had not been injured in the minor accident, Lychock nonetheless purported to identify serious deficits in NR's cervical range of motion during the initial examination, including cervical flexion that was just 50 percent of normal, cervical extension that was just 53 percent of normal, cervical right lateral flexion that was just 44 percent of normal, cervical left lateral flexion that was just 56 percent of normal, cervical right rotation that was just 38 percent of normal, and cervical left rotation that was just 50 percent of normal. At the same time, however, Lychock contended that NR had no complaints regarding his lumbar spine, and indicated that NR's lumbar range of motion was normal. Just two days later, on October 16, 2015, Fass purported to provide an initial medical examination to NR. In the report of that examination, Fass purported to identify serious deficits in NR's lumbar range of motion, including lumbar flexion that was just 44 percent of normal, lumbar extension that was just 33 percent of normal, lumbar right rotation that was just 50 percent of normal, and lumbar left rotation that was just 50 percent of normal. This, despite the fact that just two days earlier Lychock had reported that NR had no complaints regarding his lumbar spine, and had indicated that NR's lumbar range of motion was normal. Although Fass and Lychock reported dramatically different range of motion data for NR over the course of just two days, neither Fass nor Lychock addressed or even commented upon their disparate "findings". This is because Hamilton, Fass,

and Lychock created phony range of motion data for NR in order to facilitate the pre-determined soft tissue injury "diagnoses" they generated at the conclusion of their ersatz initial examinations.

(xiii)   On November 4, 2015, an Insured named JG was involved in an automobile accident. On November 11, 2015, Fass purported to provide JG with an initial medical examination at Hamilton. In his report of the examination, Fass purported to identify serious deficits in JG's lumbar range of motion, including lumbar flexion that was just 33 percent of normal, lumbar extension that was just 17 percent of normal, as well as lumbar right and left rotation that were just 33 percent of normal. Just five days later, on November 16, 2015, Lychock purported to provide JG with an initial chiropractic examination at Hamilton. In his report of the putative examination, Lychock contended that JG had no complaints regarding her lumbar spine, and indicated that JG's lumbar range of motion was normal. Although Fass and Lychock initial examination "results" were starkly at odds with each other, neither Fass nor Lychock addressed or even commented upon their disparate "findings". This is because Hamilton, Fass, and Lychock created phony range of motion data for JG in order to facilitate the pre-determined soft tissue injury "diagnoses" they generated at the conclusion of their ersatz initial examinations.

(xiv)   On November 12, 2015. an Insured named ED was involved in an automobile accident, and thereafter sought treatment at Capital Health Regional Medical Center, where he was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. The contemporaneous hospital records indicated that – while ED had minor injuries to his neck and extremities, he had no complaints of back pain, and specifically denied having any back injuries. On November 25, 2015, Pierro purported to provide ED with an initial chiropractic examination at Hamilton, and on December 2, 2015, Fass purported to provide ED with an initial medical examination. Though ED had not suffered any injury to his back in the minor accident, Fass and Pierro nonetheless purported to identify serious deficits in ED's lumbar range of motion during the examinations, including lumbar flexion that was just 44-50 percent of normal, and lumbar extension that was just 33-67 percent of normal. Although Fass and Pierro reported range of motion data for ED that were starkly at odds with the contemporaneous hospital records, neither Fass nor Pierro addressed or even commented upon their disparate "findings". This is because Hamilton, Fass, and Pierro created phony range of motion data for ED in order to facilitate the pre-determined soft tissue injury "diagnoses" they generated at the conclusion of their ersatz initial examinations.

(xv)   On November 18, 2015, an Insured named LG was involved in an automobile accident, and thereafter sought treatment at Capital Health Regional Medical Center. The contemporaneous hospital records indicated that LG complained of a headache, and was briefly observed on an outpatient basis and discharged with a minor headache diagnosis and a prescription for Motrin. The hospital records also

indicated that LG denied experiencing any back or neck pain or other problems as the result of the accident. On December 15, 2015, Fass purported to provide LG with an initial medical examination at Hamilton, and on December 21, 2015, Pierro purported to provide LG with an initial chiropractic examination. Though LG had not suffered any injuries to her neck or back in the accident, and had full, normal range of motion in her neck and back following the accident, Fass and Pierro nonetheless purported to identify serious deficits in LG's range of motion during the examinations, including cervical flexion that was just 50-75 percent of normal, cervical extension that was just 27-67 percent of normal, lumbar flexion that was just 50-55 percent of normal, and lumbar extension that was just 50-67 percent of normal. Although Fass and Pierro reported range of motion data for LG that were starkly at odds with the contemporaneous hospital records, neither Fass nor Pierro addressed or even commented upon their disparate "findings". This is because Hamilton, Fass, and Pierro created phony range of motion data for LG in order to facilitate the pre-determined soft tissue injury "diagnoses" they generated at the conclusion of their ersatz initial examinations.

234.    These are only representative examples. In the claims for initial examinations that are identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro routinely included fabricated range of motion "data" in their examination reports that were intended to give the false appearance of serious range of motion deficits, and thereby create a false justification for the laundry-list of Fraudulent Services that the Defendants purported to provide.

235.    There are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

236.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

237.    As set forth above, in the claims identified in Exhibit "2", virtually all of the Insureds whom Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro purported to treat were involved in relatively minor, "fender-bender" or other low-impact types of accidents, to the extent that they were involved in any actual accidents at all.

238.    It is extremely improbable that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "2" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

239.    It is even more improbable – to the point of impossibility – that this would occur over and over again.

240.    It likewise is improbable – to the point of impossibility – that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "2" would legitimately present for initial examinations with substantially identical symptoms, and legitimately receive substantially identical diagnoses, on the <u>exact same date</u> several days, weeks, or even months after their underlying automobile accident.

241.    Even so, in keeping with the fact that Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro's  "diagnoses" were phony, and in keeping with the fact that their putative initial examinations involved no actual medical decision-making at all, Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro frequently issued substantially identical "diagnoses", often on the same date, to more than one Insured involved in a single accident, and recommended a substantially identical course of medically unnecessary "treatment" to the Insureds.

242.    For example:

(i)     On January 8, 2013, two Insureds – ED and CJ – were involved in the same minor automobile accident. Thereafter – incredibly – both ED and CJ presented to Hamilton and Kosmorsky for initial medical examinations <u>on the exact same date</u>, January 14, 2013. ED and CJ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. Even so, at the conclusion of the purported initial medical examinations, Hamilton and Kosmorsky provided ED and CJ with

substantially identical neck and back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(ii)     On February 15, 2013, two Insureds – AP and MC – were involved in the same minor automobile accident. Thereafter – incredibly – both AP and MC presented to Hamilton and Pierro for initial chiropractic examinations on the exact same date, March 12, 2013. AP and MC were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. Even so, at the conclusion of the purported initial chiropractic examinations, Hamilton and Pierro provided AP and MC with substantially identical back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(iii)    On May 1, 2013, two Insureds – LO and VS – were involved in the same minor automobile accident. Thereafter LO presented to Fass and Hamilton for an initial medical examination on May 8, 2013, and VS presented to Fass and Hamilton for an initial medical examination on May 1, 2013. LO and VS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. Even so, at the conclusion of the purported initial medical examinations, Hamilton and Fass provided LO and VS with substantially identical neck and back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(iv)     On May 30, 2013, two Insureds – BL and YW – were involved in the same minor automobile accident. Thereafter – incredibly – both BL and YW presented to Pierro and Hamilton for initial chiropractic examinations on the exact same date, July 22, 2013, and to Fass and Hamilton for initial medical examinations on the exact same date, July 26, 2013. BL and YW were different ages, different sexes, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries BL and YW actually did experience in their minor accident would have resolved over the course of almost two months that had elapsed following the accident. Even so, at the conclusion of the purported initial examinations, Hamilton, Fass, and Pierro provided BL and YW with substantially identical neck and back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(v)      On July 12, 2013, two Insureds – IH and ST – were involved in the same minor automobile accident. Thereafter IH presented to Lychock and Hamilton for an initial chiropractic examination on July 16, 2013, and ST presented to Lychock and Hamilton for an initial chiropractic examination on August 3, 2013. IH and ST were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. Even so, at the conclusion of the purported initial chiropractic examinations, Hamilton and Lychock provided IH and ST with

substantially identical neck and back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(vi)     On December 25, 2013, two Insureds – JS and RS – were involved in the same minor automobile accident. Thereafter – incredibly – both JS and RS presented to Fass and Hamilton and Fass for initial medical examinations on the exact same date, December 27, 2013. JS and RS were different ages, different sexes, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. Even so, at the conclusion of the purported initial medical examinations, Hamilton and Fass provided JS and RS with substantially identical neck and knee injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(vii)    On October 20, 2013, two Insureds – CB and VB– were involved in the same minor automobile accident. Thereafter – incredibly – both CB and VB presented to Fass and Hamilton for initial medical examinations on the exact same date, December 20, 2013. In addition, CB presented to Pierro and Hamilton for an initial chiropractic examination on November 7, 2013, and Vanessa CB presented to Pierro and Hamilton for an initial chiropratic examination on November 21, 2013. CB and VB were different ages, different sexes, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. Even so, at the conclusion of the purported initial examinations, Hamilton, Fass, and Pierro provided CB and VB with substantially identical neck and back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(viii)   On February 12, 2014, two Insureds – JF and RH – were involved in the same minor automobile accident. Thereafter – incredibly – both JF and RH presented to Lychock and Hamilton for initial chiropractic examinations on the exact same date, February 19, 2014, and to Fass and Hamilton for initial medical examinations on the exact same date, February 21, 2014. JF and RH were different ages, different sexes, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. Even so, at the conclusion of the purported initial examinations, Hamilton, Fass, and Lychock provided JF and RH with substantially identical neck and back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(ix)     On April 11, 2014, two Insureds – JM and SN – were involved in the same minor automobile accident. Thereafter, JM presented to Pierro and Hamilton for an initial chiropractic examination on April 17, 2014, and SN presented to Pierro and Hamilton for an initial chiropractic examination on April 18, 2014. JM and SN were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the

98

vehicle. Even so, at the conclusion of the purported initial chiropractic examinations, Hamilton and Pierro provided JM and SN with substantially identical neck and back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(x)     On June 28, 2014, two Insureds – ES and JS – were involved in the same minor automobile accident. Thereafter – incredibly – both ES and JS presented to Pierro and Hamilton for initial chiropractic examinations on the exact same date, July 8, 2014. ES and JS were different ages, different sexes, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. Even so, at the conclusion of the purported initial chiropractic examinations, Hamilton and Pierro provided ES and JS with substantially identical neck and back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xi)    On July 8, 2014, two Insureds – JH and AJ – were involved in the same minor automobile accident. Thereafter – incredibly – both JH and AJ presented to Lychock and Hamilton for initial chiropractic examinations on the exact same date, July 11, 2014. JH and AJ were different ages, different sexes, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. Even so, at the conclusion of the purported initial chiropractic examinations, Hamilton and Lychock provided JH and AJ with substantially identical neck and back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xii)   On October 17, 2014, two Insureds – MD and DD – were involved in the same minor automobile accident. Thereafter – incredibly – both MD and DD presented to Fass and Hamilton for initial medical examinations on the exact same date, October 20, 2014, and to Pierro and Hamilton for initial chiropractic examinations on the exact same date, October 22, 2014. MR and DD were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. Even so, at the conclusion of the purported initial examinations, Hamilton, Fass, and Pierro provided MD and DD with substantially identical neck and back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xiii)  On November 9, 2014, two Insureds – RC and SC – were involved in the same minor automobile accident. Thereafter, RC presented to Fass and Hamilton for an initial medical examination on November 13, 2014, and SC presented to Fass and Hamilton for an initial medical examination on November 17, 2014. RC and SC were different ages, different sexes, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. Even so, at the conclusion of the purported initial medical

examinations, Hamilton and Fass provided RC and SC with substantially identical neck and back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xiv)    On November 18, 2014, two Insureds – VC and JS– were involved in the same minor automobile accident. Thereafter, VC presented to Fass and Hamilton for an initial medical examination on March 9, 2015, and JS presented to Fass and Hamilton for an initial medical examination on March 11, 2015. VC and JS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries VC and JS actually did experience in their minor accident would have resolved over the course of almost four months that had elapsed following the accident.  Even so, at the conclusion of the purported initial medical examinations, Hamilton and Fass provided VC and JS with substantially identical neck and back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xv)     On November 20, 2014, two Insureds – SH and EM – were involved in the same minor automobile accident. Thereafter Moore presented to Pierro and Hamilton for an initial chiropractic examination on November 25, 2014, and SH presented to Kishyk and Hamilton for an initial chiropractic examination on November 28, 2014. SH and EM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. Even so, at the conclusion of the purported initial chiropractic examinations, Hamilton, Pierro, and Kishyk provided SH and EM with substantially identical neck and back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xvi)    On January 16, 2015, two Insureds – AH and HM – were involved in the same minor automobile accident. Thereafter – incredibly – both AH and HM presented to Fass and Hamilton for initial medical examinations on the exact same date, February 3, 2015. AH and HM were different ages, difference sexes, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. Even so, at the conclusion of the purported initial medical examinations, Hamilton and Fass provided AH and HM with substantially identical neck, back, and knee injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xvii)   On July 3, 2015, two Insureds – AL and RL – were involved in the same minor automobile accident. Thereafter – incredibly – both AL and RL presented to Lychock and Hamilton for initial chiropractic examinations on the exact same date, July 22, 2015, and to Fass and Hamilton for initial medical examinations on the exact same date, July 24, 2015. AL and RL were different ages, difference sexes, in different physical conditions, located in different positions in the vehicle,

and experienced the minor impact from different positions in the vehicle. Even so, at the conclusion of the purported initial examinations, Hamilton, Fass, and Lychock provided AL and RL with substantially identical neck and back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xviii)   On August 5, 2015, two Insureds – LS and GR – were involved in the same minor automobile accident. Thereafter – incredibly – both LS and GR presented to Fass and Hamilton for initial medical examinations <u>on the exact same date</u>, September 8, 2015. LS and GR were different ages, difference sexes, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries LS and GR actually did experience in their minor accident would have resolved over the course of the month that had elapsed following the accident. Even so, at the conclusion of the purported initial medical examinations, Hamilton and Fass provided LS and GR with substantially identical neck, back, and shoulder injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xix)   On September 2, 2015, two Insureds – JM and JM – were involved in the same minor automobile accident. Thereafter – incredibly – both JM and JM presented to Fass and Hamilton for initial medical examinations <u>on the exact same date</u>, October 26, 2015. JM and JM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries JM and JM actually did experience in their minor accident would have resolved over the course of almost two months that had elapsed following the accident. Even so, at the conclusion of the purported initial medical examinations, Hamilton and Fass provided JM and JM with substantially identical neck and back injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to both of them.

(xx)   On October 11, 2015, three Insureds – SM, NR, and RR – were involved in the same minor automobile accident. Thereafter – incredibly – SM and NR presented to Fass and Hamilton for initial medical examinations <u>on the exact same date</u>, October 16, 2015. Then, RR presented to Fass and Hamilton for an initial medical examination on October 20, 2015. SM, NR, and RR were different ages, different sexes, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. Even so, at the conclusion of the purported initial medical examinations, Hamilton and Fass provided SM, NR, and RR with substantially identical back and neck injury "diagnoses", and recommended a substantially identical course of medically unnecessary treatment to all three of them.

243.    Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro routinely inserted this false information in their initial examination reports in order to create the false impression that the initial examinations required some legitimate medical decision-making, and in order to create a false justification for the other Fraudulent Services that the Defendants purported to provide to the Insureds, including examinations, electrodiagnostic testing, pain management injections, PENS sessions, chiropractic services, physical therapy services, and radiology services.

244.    To the extent that the Insureds in the claims identified in Exhibit "2" ever had any genuine medical problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary sprains or strains of the back and/or neck.

245.    The diagnosis and treatment of these ordinary sprains and strains did not require any "moderately complex" or even "low complexity" medical decision-making on the part of Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro.

246.    To the contrary, and as set forth above, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro did not engage in any legitimate medical decision-making at all in connection with the initial examinatins in the claims identified in Exhibit "2".

247.    In the claims for initial examinations identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, Kishyk, Lychock, and Pierro routinely falsely represented that the initial examinations involved  medical decision-making of moderate or low complexity in order to provide a false basis to bill for the initial examinations under CPT codes 99204 and 99203, because CPT codes 99204 and 99203 are reimbursable at a higher rate than examinations that do not require moderate or low complexity medical decision-making.

**D.    The Fraudulent Charges for Follow-Up Examinations at Hamilton**

248.    In addition to their fraudulent initial examinations, Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro typically purported to subject the Insureds in the claims identified in Exhibit "2" to at least one, and more commonly several, fraudulent follow-up examinations during the course of their fraudulent treatment and billing protocol.

249.    As set forth in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro then billed the follow-up examinations through Hamilton to GEICO under: (i) CPT code 99213, virtually always resulting in charges of $90.00 for each follow-up examination they purported to provide; or (ii) CPT code 99214, virtually always resulting in charges of $125.00 for each follow-up examination they purported to provide.

250.    The charges for the follow-up examinations were fraudulent because they falsely represented that Hamilton was in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore was eligible to collect PIP Benefits, when in fact it was not.

251.    Rather, as set forth above, Hamilton was not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore was not eligible to collect PIP Benefits, because it received illegal kickbacks in exchange for patient referrals to GSMI.

252.    What is more, and as set forth below, Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro's charges for the follow-up examinations identified in Exhibit "2" were fraudulent in that they misrepresented the nature, extent, and reimbursable amount of the initial examinations.

**1.    Misrepresentations Regarding the Severity of the Insureds' Presenting Problems**

253.    Pursuant to the CPT Assistant, the use of CPT code 99214 to bill for a follow-up examination typically requires that the patient present with problems of moderate to high severity.

254.    The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as moderately to highly severe, and thereby justify the use of CPT code 99214 to bill for a follow-up patient examination.

255.    For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99214 to bill for an follow-up patient examination:

(i)     Office visit for a 68-year-old male with stable angina, two months post myocardial infarction, who is not tolerating one of his medications. (Cardiology)

(ii)    Office evaluation of 28-year-old patient with regional enteritis, diarrhea and low-grade fever, established patient. (Family Medicine/Internal Medicine)

(iii)   Weekly office visit for 5FU therapy for an ambulatory established patient with metastatic colon cancer and increasing shortness of breath. (Hematology/Oncology)

(iv)    Office visit with 50-year-old female, established patient, diabetic, blood sugar controlled by diet. She now complains of frequency of urination and weight loss, blood sugar of 320 and negative ketones on dipstick. (Internal Medicine)

(v)     Follow-up visit for a 60-year-old male whose post-traumatic seizures have disappeared on medication, and who now raises the question of stopping the medication. (Neurology)

(vi)    Follow-up office visit for a 45-year-old patient with rheumatoid arthritis on gold, methotrexate, or immunosuppressive therapy. (Rheumatology)

(vii)   Office evaluation on new onset RLQ pain in a 32-year-old woman, established patient. (Urology/General Surgery/Internal Medicine/Family Medicine)

(viii)  Office visit with 63-year-old female, established patient, with familial polyposis, after a previous colectomy and sphincter sparing procedure, now with tenesmus, mucus, and increased stool frequency. (Colon and Rectal Surgery)

256.     Accordingly, pursuant to the CPT Assistant, the moderately to highly severe presenting problems that could support the use of CPT code 99214 to bill for a follow-up patient examination typically are problems that pose a serious threat to the patient's health, or even the patient's life.

257.     Pursuant to the CPT Assistant, the use of CPT code 99213 to bill for a follow-up examination typically requires that the patient present with problems of low to moderate severity.

258.     The CPT Assistant provides various clinical examples of the types of presenting problems that qualify as low to moderate severity, and thereby justify the use of CPT code 99213 to bill for a follow-up patient examination.

259.     For example, the CPT Assistant provides the following clinical examples of presenting problems that might support the use of CPT code 99213 to bill for a follow-up patient examination:

    (i)      Follow-up visit with 55-year-old male for management of hypertension, mild fatigue, on beta blocker/thiazide regimen. (Family Medicine/Internal Medicine)

    (ii)     Follow-up office visit for an established patient with stable cirrhosis of the liver. (Gastroenterology)

    (iii)    Outpatient visit with 37-year-old male, established patient, who is 3 years post total colectomy for chronic ulcerative colitis, presents for increased irritation at his stoma. (General Surgery)

    (iv)    Routine, follow-up office evaluation at a three-month interval for a 77-year-old female with nodular small cleaved-cell lymphoma. (Hematology/Oncology)

    (v)     Follow-up visit for a 70-year-old diabetic hypertensive patient with recent change in insulin requirement. (Internal Medicine/Nephrology)

    (vi)    Quarterly follow-up office visit for a 45-year-old male, with stable chronic asthma, on steroid and bronchodilator therapy. (Pulmonary Medicine)

    (vii)   Office visit with 80-year-old female established patient, for follow-up osteoporosis, status-post compression fractures. (Rheumatology)

260.   Thus, pursuant to the CPT Assistant, the low to moderate severity presenting problems that could support the use of CPT code 99213 to bill for an initial patient examination typically are chronic and relatively serious problems.

261.   By contrast, to the extent that the Insureds in the claims identified in Exhibit "2" had any presenting problems at all as the result of their minor automobile accidents by the time they appeared for their follow-up examinations, the problems virtually always were soft tissue injuries such as sprains and strains. These soft tissue injuries – to the extent that the Insureds experienced them in the first instance – were low severity at the outset, and either had completely resolved or were in the process of resolving and were of minimal severity by the time the Insureds presented at Hamilton for their putative follow-up examinations.

262.   For instance, and as set forth above, virtually all of the Insureds in the claims identified in Exhibit "2" who purportedly received treatment at Hamilton were involved in minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

263.   In keeping with the fact that virtually all of the Insureds in the claims identified in Exhibits "2" were involved in only minor accidents, in most of the claims identified in Exhibit "2" the Insureds did not seek treatment at any hospital as the result of their minor accidents.

264.   To the extent that the Insureds did report to a hospital after their accidents, they virtually always were briefly observed on an outpatient basis and then sent on their way after a few hours with, at most, a minor sprain or strain diagnosis.

265.   Furthermore, in most cases, contemporaneous police reports indicated that the underlying accidents involved low-speed, low-impact collisions, that the Insureds' vehicles were

drivable following the accidents, and that no one was seriously injured in the underlying accidents, or injured at all.

266.    Concomitantly, virtually none of the Insureds who purportedly received treatment at Hamilton suffered from any significant injuries or health problems as a result of the relatively minor accidents they experienced or purported to experience.

267.    To the contrary, and as set forth above, to the extent that the Insureds in the claims identified in Exhibit "2" suffered any injuries at all in their automobile accidents, they virtually always were garden-variety sprains or strains.

268.    Ordinary strains and sprains virtually always resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate why continued treatment is necessary beyond the four-week, eight-week, and 13-week marks.

269.    Even so, in the claims for follow-up examinations identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro routinely billed for their putative follow-up examinations using CPT codes 99214 and 99213, and thereby falsely represented that the Insureds presented during their follow-up examinations with problems of low to moderate severity or moderate to high severity.

270.    What is more, Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro routinely falsely represented that the Insureds in the claims identified in Exhibit "2" presented with problems of either low to moderate severity or moderate to high severity many months after the Insureds' underlying automobile accidents, and long after any of their minor soft tissue injuries – to the extent that they ever had any in the first instance – would have resolved.

271.    For example:

(i)     On October 13, 2012, an Insured named JB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that no one was injured in the accident, and that no one requested medical treatment at the scene of the accident. Nonetheless, two days later, JB traveled on his own to Robert Wood CJ University Hospital, where he was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. To the extent that JB experienced any health problems at all as the result of his minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following purported follow-up examinations of JB by Fass on December 10, 2012, January 2, 2013, January 23, 2013, February 11, 2013, and April 1, 2013, Hamilton and Fass billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that JB presented with problems of moderate to high severity. What is more, following purported follow-up examinations of JB by Pierro on November 20, 2012, December 17, 2012, January 21, 2013, and March 26, 2013 and by Lychock on February 20, 2013, Hamilton, Fass, Pierro, and Lychock billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that JB presented with problems of low to moderate severity.

(ii)    On December 18, 2012, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that no one was injured in the accident, and that no one sought medical treatment at the scene of the accident. In keeping with the fact that AG was not injured in the minor accident, AG did not go to the hospital following the accident. To the extent that AG experienced any health problems at all as the result of his minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following purported follow-up examinations of AG by Fass on March 1, 2013, April 15, 2013, June 3, 2013, July 10, 2013, and August 13, 2013, and by J. Mahoney on July 23, 2013, Hamilton, Fass, and J. Mahoney billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that AG presented with problems of moderate to high severity. What is more, following purported follow-up examinations of AG by Pierro on February 4, 2013, March 12, 2013, May 14, 2013, and June 19, 2013, by Kosmorsky on February 12, 2013 and September 10, 2013, by Lychock on April 16, 2013 and July 16, 2013, and by Smith on April 30, 2013 and May 21, 2013, Hamilton, Fass, Pierro, Smith, Kosmorsky, and Lychock billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that AG presented with problems of low to moderate severity.

(iii)   On January 21, 2013, an Insured named KG was involved in an automobile accident. The contemporaneous police report indicated that the accident occurred when a smaller vehicle rear-ended a bus KG was traveling on, causing only a

108

small dent to the bus's rear bumper, and that no one was injured in the accident. Nonetheless, the next day KG traveled on her own to Robert Wood CJ University Hospital, where she was briefly observed on an outpatient basis and discharged with a minor soft tissue injury diagnosis. In keeping with the fact that KG was not seriously injured in the minor accident, she returned to work and did not seek any further treatment for a month, at which point she presented at Hamilton for treatment. To the extent that KG experienced any health problems at all as the result of her minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following purported follow-up examinations of KG by Fass on March 21, 2013, April 4, 2013, April 19, 2013, May 3, 2013, May 31, 2013, September 16, 2013, November 6, 2013, January 20, 2014, February 17, 2014, March 17, 2014, and April 14, 2014, Hamilton and Fass billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that KG presented with problems of moderate to high severity. What is more, following purported follow-up examinations of KG by Pierro on March 20, 2013 and July 9, 2013, by Lychock on April 22, 2013, and by Smith on October 3, 2013, Hamilton, Fass, Pierro, Smith, and Lychock billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that KG presented with problems of low to moderate severity.

(iv)     On November 22, 2013, an Insured named AP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision that caused only minor damage to AP's vehicle, that AP's vehicle was drivable following the accident, that AP drove his vehicle away from the scene of the accident, and no one was injured in the accident or complained of any pain at the scene of the accident. Nonetheless, AP traveled on his own to Robert Wood CJ University Hospital the next day, where he was briefly evaluated on an outpatient basis and discharged with a minor neck strain diagnosis. To the extent that AP experienced any health problems at all as the result of his minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following purported follow-up examinations of AP by Fass on March 6, 2014, March 25, 2014, April 8, 2014, April 22, 2014, May 6, 2014, May 20, 2014, June 3, 2014, June 17, 2014, July 1, 2014, and July 31, 2014, and by J. Mahoney on May 15, 2014, Hamilton, Fass, and J. Mahoney billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that AP presented with problems of moderate to high severity. What is more, following purported follow-up examinations of AP by Kosmorsky on January 28, 2014, by Pierro on February 4, 2014 and April 16, 2014, by Smith on February 20, 2014, by Lychock on March  3, 2014 and March 31, 2014, and by J. Mahoney on April 17, 2014, Hamilton, Fass, Pierro, Smith, Lychock, and Kosmorsky billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that AP presented with problems of low to moderate severity.

109

(v)   On December 19, 2013, an Insured named DO was involved in an automobile accident. The contemporaneous police report indicated that DO's vehicle was drivable following the accident, that DO drove his vehicle away from the scene of the accident, and that no one was injured in the accident or complained of any pain. In keeping with the fact that DO was not injured in the minor accident, DO did not go to the hospital following the accident. To the extent that DO experienced any health problems at all as the result of his minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following a purported follow-up examination of DO by Fass on March 12, 2014, Hamilton and Fass billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that DO presented with problems of moderate to high severity. What is more, following purported a follow-up examination of DO by Kosmorsky on February 25, 2014, Hamilton, Fass, and Kosmorsky billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that DO presented with problems of low to moderate severity.

(vi)  On January 24, 2014 an Insured named RS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that RS's vehicle was drivable following the accident, that RS drove his vehicle away from the scene of the accident, and that no one was injured in the accident or complained of any pain. In keeping with the fact that RS was not injured in the minor accident, the police report stated that RS "stated he was not injured, and refused medical treatment." Nonetheless, RS traveled on his own to Capital Health Regional Medical Center, where he was briefly evaluated on an outpatient basis and discharged with a minor back strain diagnosis. To the extent that RS experienced any health problems at all as the result of his minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following purported follow-up examinations of RS by Fass on March 20, 2014, April 4, 2014, April 25, 2014, June 25, 2014, August 3, 2014, September 9, 2014, October 15, 2014, and November 12, 2014, Hamilton and Fass  billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that RS presented with problems of moderate to high severity. What is more, following purported follow-up examinations of RS by Lychock on March 26, 2014, and by Pierro on April 22, 2014 and August 19, 2014, Hamilton, Fass, Lychock, and Pierro billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that RS presented with problems of low to moderate severity.

(vii) On February 14, 2014, an Insured named YD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that YD's vehicle was drivable following the accident, that YD drove her vehicle away from the scene of the accident, and no one was injured in the accident or complained of any pain. In keeping with the fact that YD was not seriously injured in the minor accident, YD went to work

110

following the accident. Nonetheless, later that day YD traveled on her own to Robert Wood CJ University Hospital, where she was briefly evaluated on an outpatient basis and discharged with a minor neck strain diagnosis. To the extent that YD experienced any health problems at all as the result of her minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following purported follow-up examinations of YD by Fass on April 9, 2014, April 23, 2014, May 6, 2014, May 19, 2014, June 2, 2014, June 16, 2014, June 30, 2014, July 14, 2014, August 29, 2014, October 6, 2014, October 20, 2014, and December 18, 2014, and by N. Mahoney on November 19, 2014, Hamilton, Fass, and N. Mahoney billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that YD presented with problems of moderate to high severity. What is more, following purported follow-up examinations of YD by Pierro on April 29, 2014, May 22, 2014, June 24, 2014, July 23, 2014, September 25, 2014, and October 14, 2014, by Kishyk on August 28, 2014, and by Smith on November 6, 2014 and November 20, 2014, Hamilton, Fass, Kishyk, Smith, and Pierro billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that YD presented with problems of low to moderate severity.

(viii)   On April 11, 2014, an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that no one was injured in the accident or complained of any pain at the scene of the accident. Nonetheless, later that day JM traveled on her own to Robert Wood CJ University Hospital, where she was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. To the extent that JM experienced any health problems at all as the result of her minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following purported follow-up examinations of JM by Fass on June 12, 2014, July 10, 2014, August 12, 2014, October 9, 2014, October 23, 2014, November 17, 2014, December 2, 2014, December 16, 2014, January 2, 2015, January 15, 2015, and February 12, 2015, Hamilton and Fass billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that JM presented with problems of moderate to high severity. What is more, following purported follow-up examinations of JM by Kosmorsky on May 14, 2014, and by Lychock on May 19, 2014, June 18, 2014, and July 16, 2014, Hamilton, Fass, Kosmorsky,and Lychock billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that JM presented with problems of low to moderate severity.

(ix)   On April 18, 2014, an Insured named GA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and no one was injured as a result of the accident.  In keeping with the fact that GA was not injured in the minor accident, GA did not visit any hospital as the result of the accident, or seek any treatment at all for the minor accident until almost a month later, on May 13, 2014, when he first presented at Hamilton. To the extent that GA experienced any health problems at

all as the result of her minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following purported follow-up examinations of GA by Fass on June 10, 2014, August 19, 2014, and September 23, 2014,  Hamilton and Fass billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that GA presented with problems of moderate to high severity. What is more, following purported follow-up examinations of GA by Pierro on June 17, 2014, July 8, 2014, August 6, 2014, and October 1, 2014, and by Kishyk on September 4, 2014, Hamilton, Fass, Pierro, and Kishyk billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that GA presented with problems of low to moderate severity.

(x)     On June 4, 2014, an Insured named DO was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that DO's vehicle was drivable following the accident, that DO drove her vehicle away from the scene of the accident, and that no one was injured in the accident or complained of any pain at the scene of the accident. In keeping with the fact that DO was not injured in the minor accident, DO did not go to the hospital following the accident. To the extent that DO experienced any health problems at all as the result of her minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following a purported follow-up examination of DO by Fass on August 22, 2014, Hamilton and Fass billed GEICO for the follow-up examination using CPT code 99214, and thereby falsely represented that DO presented with problems of moderate to high severity. What is more, following a purported follow-up examination of DO by Pierro on August 20, 2014, Hamilton, Fass, and Pierro billed GEICO for the follow-up examination using CPT code 99213, and thereby falsely represented that DO presented with problems of low to moderate severity.

(xi)    On January 16, 2015 an Insured named AH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision that occurred while both vehicles were backing out of parking spaces, that AH's vehicle was drivable following the accident, and that no one was injured in the accident or complained of any pain. Nonetheless, AH traveled on her own to Capital Health Regional Medical Center, where she was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. To the extent that AH experienced any health problems at all as the result of her minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following purported follow-up examinations of AH by Fass on March 24, 2015, April 14, 2015, May 21, 2015, June 4, 2015, June 25, 2015, July 16, 2015, September 1, 2015, and October 8, 2015, Hamilton and Fass billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that AH presented with problems of moderate to high severity. What is more, following purported follow-up examinations of AH by Pierro on April 2, 2015, by Kishyk

on April 30, 2015 and June 3, 2015, and by Smith on May 7, 2015, August 6, 2015, and August 20, 2015, Hamilton, Fass, Pierro, Kishyk, and Smith billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that AH presented with problems of low to moderate severity.

(xii)   On February 3, 2015 an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that AS was not injured in the minor accident, AS refused medical treatment and did not go to the hospital following the accident. To the extent that AS experienced any health problems at all as the result of her minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following purported follow-up examinations of AS by Fass on March 31, 2015, April 14, 2015, April 28, 2015, May 19, 2015, June 2, 2015, June 23, 2015, July 14, 2015, August 4, 2015, September 8, 2015, October 6, 2015, and December 29, 2015, by N. Mahoney on August 5, 2015 and December 16, 2015, and by J. Mahoney on October 15, 2015, Hamilton, Fass, N. Mahoney, and J. Mahoney billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that AS presented with problems of moderate to high severity. What is more, following purported follow-up examinations of AS by Lychock on March 30, 2015, by Kishyk on April 30, 2015, by Pierro on May 27, 2015 and June 25, 2015, and by J. Mahoney on September 17, 2015, Hamilton, Fass, Lychock, Kishyk, Pierro, and J. Mahoney billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that AS presented with problems of low to moderate severity.

(xiii)   On February 17, 2015, an Insured named PS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that PS's vehicle was drivable following the accident, that PS drove his vehicle away from the scene of the accident, and that no one was injured in the accident. In keeping with the fact that PS was not injured in the minor accident, PS did not go to the hospital following the accident. To the extent that PS experienced any health problems at all as the result of his minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following purported follow-up examinations of PS by Fass on April 28, 2015, May 12, 2015, June 2, 2015, July 2, 2015, July 30, 2015, September 8, 2015, and September 24, 2015, Hamilton and Fass billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that PS presented with problems of moderate to high severity. What is more, following purported follow-up examinations of PS by Pierro on April 20, 2015, by Lychock on May 18, 2015 and June 22, 2015, and by Kishyk on July 21, 2015, Hamilton, Fass, Lychock, Kishyk, and Pierro billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that PS presented with problems of low to moderate severity.

(xiv)    On June 14, 2015, an Insured named TK was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that TK's vehicle was drivable following the accident, and no one was injured as a result of the accident.  In keeping with the fact that TK was not injured in the minor accident, TK did not visit any hospital as the result of the accident. To the extent that TK experienced any health problems at all as the result of her minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following purported follow-up examinations of TK by Fass on April 28, 2015, May 12, 2015, June 2, 2015, July 2, 2015, July 30, 2015, September 8, 2015, and September 24, 2015, Hamilton and Fass billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that TK presented with problems of moderate to high severity. What is more, following purported follow-up examinations of TK by Pierro on April 20, 2015, by Lychock on May 18, 2015 and June 22, 2015, and by Kishyk on July 21, 2015, Hamilton, Fass, Lychock, Kishyk, and Pierro billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that TK presented with problems of low to moderate severity.

(xv)    On July 9, 2015 an Insured named BA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that BA's vehicle was drivable following the accident, that BA drove his vehicle away from the scene of the accident, and that that no one was injured in the accident. Nonetheless, BA traveled on his own to Robert Wood CJ University Hospital, where he was briefly evaluated on an outpatient basis and discharged with a minor neck/back strain diagnosis. To the extent that BA experienced any health problems at all as the result of his minor accident, they were of low severity at the outset, and had completely resolved within two months of the accident. Even so, following purported follow-up examinations of BA by Fass on September 10, 2015, September 28, 2015, October 15, 2015, November 24, 2015, December 28, 2015, February 2, 2016, and April 26, 2016, and by J. Mahoney on November 19, 2015, Hamilton, Fass, and J. Mahoney billed GEICO for the follow-up examinations using CPT code 99214, and thereby falsely represented that BA presented with problems of moderate to high severity. What is more, following purported follow-up examinations of BA by Kishyk on September 1, 2015, October 27, 2015, by Lychock on September 30, 2015 and November 25, 2015, and by Smith on November 5, 2015, Hamilton, Fass, Lychock, Kishyk, and Smith billed GEICO for the follow-up examinations using CPT code 99213, and thereby falsely represented that BA presented with problems of low to moderate severity.

272.    These are only representative examples. In all of the claims for follow-up examinations identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N.

Mahoney, Kishyk, Lychock, and Pierro falsely represented that the Insureds presented with problems of moderate to high severity or low to moderate severity, when in fact the Insureds either did not have any genuine presenting problems at all as the result of their minor automobile accidents at the time of the follow-up examinations, or else their presenting problems were minimal.

273.    In the claims for follow-up examinations identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro routinely falsely represented that the Insureds presented with problems of moderate to high severity (when billed under CPT code 99214), or low to moderate severity (when billed under CPT code 99213), in order to create a false basis for their charges for the examinations under CPT codes 99214 and 99213, because follow-up examinations billable under CPT codes 99214 and 99213 are reimbursable at higher rates than examinations involving presenting problems of minimal severity, or no severity.

274.    In the claims for follow-up examinations identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro also routinely falsely represented that the Insureds presented with problems of moderate to high severity or low to moderate severity in order to create a false basis for the laundry list of other Fraudulent Services that the Defendants purported to provide to the Insureds, including additional follow-up examinations, electrodiagnostic testing, pain management injections, PENS sessions, chiropractic services, physical therapy services, and radiology services.

**2.      Misrepresentations Regarding the Results of the Follow-Up Examinations**

275.    Furthermore, pursuant to the Fee Schedule and CPT Assistant, when Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro billed for their putative follow-up examinations under CPT code 99214, they represented that Fass, Kosmorsky,

Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, Pierro, or some other physician or chiropractor associated with Hamilton, performed at least two of the following three components:  (i) took a "detailed" patient history; (ii) conducted a "detailed" physical examination; and (iii) engaged in medical decision-making of "moderate complexity".

276.     Similarly, pursuant to the Fee Schedule and CPT Assistant, when Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro billed for their putative follow-up examinations under CPT code 99213, they represented that Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, Pierro, or some other physician or chiropractor associated with Hamilton, performed at least two of the following three components: (i) took an "expanded problem focused" patient history; (ii) conducted an "expanded problem focused physical examination"; and (iii) engaged in medical decision-making of "low complexity".

277.     In actuality, however, in the claims for follow-up examinations identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro did not take any legitimate patient histories, conduct any legitimate physical examinations, or engage in any legitimate medical decision-making at all.

278.     Rather, following each of their purported follow-up examinations, Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro simply: (i) reiterated the false, boilerplate "diagnoses" from the Insureds' initial examinations; (ii) recommended that the Insureds return to Hamilton for even more chiropractic and/or physical therapy services, despite the fact that the Insureds already had received extensive chiropractic and/or physical therapy services that supposedly had not been successful in remediating their purported pain symptoms; (iii) in many cases, recommended that the Insureds return to Hamilton

116

for additional, medically unnecessary follow-up examinations, as well as medically unnecessary electrodiagnostic testing, pain management injections, and PENS sessions; and (iv) in many cases, referred the Insureds to GSMI for medically unnecessary radiology services, pursuant to the kickbacks that GSMI, Zuberi, Khan, Din, and F. Zuberi provided to Hamilton and Fass.

279.    To the limited extent that the Insureds in the claims identified in Exhibit "2" experienced any injuries at all as the result of their automobile accidents, the injuries were garden-variety soft tissue injuries such as sprains and strains.

280.    As set forth above,  the vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to demonstrate at regular intervals why continued treatment is necessary beyond the four-week mark.

281.    Even so, and as set forth above, following the putative follow-up examinations identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro routinely falsely purported to diagnose continuing back pain, neck pain, or other pain symptoms in the Insureds long after the minor underlying automobile accidents occurred, and long after any back pain, neck pain, or other symptoms attendant to the minor automobile accidents would have resolved.

282.    For example:

(i)     On October 13, 2012, an Insured named JB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that no one was injured in the accident, and that no one requested medical treatment at the scene of the accident. Nonetheless, two days later, JB traveled on his own to Robert Wood CJ University Hospital, where he was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. JB's minor soft tissue injury did not cause him to experience any serious pain or other symptoms at all, much less symptoms that would persist many months after his minor accident. Even so, following a purported follow-up examination by Fass on January 23, 2013 – more than three

117

months after JB's minor accident – Fass and Hamilton: (a) falsely reported that JB continued to suffer from pain and range of motion deficits; (b) recommended that JB receive continued, medically unnecessary chiropractic and physical therapy services at Hamilton, despite the fact that JB already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms; and (c) referred JB to GSMI for medically unnecessary radiology services, pursuant to the kickbacks that GSMI, Zuberi, Khan, Din, and F. Zuberi provided to Hamilton and Fass.

(ii)     On December 18, 2012, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that no one was injured in the accident, and that no one sought medical treatment at the scene of the accident. In keeping with the fact that AG was not injured in the minor accident, AG did not go to the hospital following the accident. AG did not suffer any serious injury at all in his minor accident, much less any injury that would cause symptoms that would persist many months after his minor accident. Even so, following a purported follow-up examination by Fass on April 15, 2013 – almost four months after AG's minor accident – Fass and Hamilton: (a) falsely reported that AG continued to suffer from high levels of pain and serious range of motion deficits; (b) recommended that AG receive continued, medically unnecessary chiropractic and physical therapy services at Hamilton, despite the fact that AG already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms; and (c) recommended that AG receive medically unnecessary pain management injections and electrodiagnostic testing at Hamilton. Similarly, following a purported follow-up examination by Smith on April 30, 2013, Smith and Hamilton: (a) falsely reported that AG continued to suffer from high levels of pain and serious range of motion deficits; (b) recommended that AG receive continued, medically unnecessary chiropractic and physical therapy services at Hamilton, despite the fact that AG already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms; and (c) recommended that AG receive medically unnecessary pain management injections at Hamilton.

(iii)    On January 21, 2013, an Insured named KG was involved in an automobile accident. The contemporaneous police report indicated that the accident occurred when a smaller vehicle rear-ended a bus KG was traveling on, causing only a small dent to the bus's rear bumper, and that no one was injured in the accident. Nonetheless, the next day KG traveled on her own to Robert Wood CJ University Hospital, where she was briefly observed on an outpatient basis and discharged with a minor soft tissue injury diagnosis. In keeping with the fact that KG was not seriously injured in the minor accident, she returned to work and did not seek any further treatment for a month, at which point she presented at Hamilton for treatment. KG's minor soft tissue injury did not cause her to experience any serious pain or other symptoms at all, much less symptoms that would persist many months after her minor accident. Even so, following a purported follow-up

examination by Fass on May 31, 2013 – more than four months after KG's minor accident – Fass and Hamilton: (a) falsely reported that KG continued to suffer from pain and range of motion deficits; (b) recommended that KG receive continued, medically unnecessary chiropractic and physical therapy services at Hamilton, despite the fact that KG already had been receiving those services at Hamilton for months, and they supposedly had not resolved her purported symptoms; and (c) recommended that KG receive medically unnecessary pain management injections and electrodiagnostic testing at Hamilton.

(iv)     On November 22, 2013, an Insured named AP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision that caused only minor damage to AP's vehicle, that AP's vehicle was drivable following the accident, that AP drove his vehicle away from the scene of the accident, and no one was injured in the accident or complained of any pain at the scene of the accident. Nonetheless, AP traveled on his own to Robert Wood CJ University Hospital the next day, where he was briefly evaluated on an outpatient basis and discharged with a minor neck strain diagnosis. AP's minor soft tissue injury did not cause him to experience any serious pain or other symptoms at all, much less symptoms that would persist many months after his minor accident. Even so, following a purported follow-up examination by Fass on April 8, 2014 – more than four and a half months after AP's minor accident – Fass and Hamilton: (a) falsely reported that AP continued to suffer from pain and range of motion deficits; (b) recommended that AP receive continued, medically unnecessary chiropractic and physical therapy services at Hamilton, despite the fact that AP already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms; and (c) recommended that AP receive medically unnecessary pain management injections at Hamilton. Similarly, following a purported follow-up examination by J. Mahoney on April 17, 2014, J. Mahoney and Hamilton: (a) falsely reported that AP continued to suffer from pain; (b) recommended that AP receive continued, medically unnecessary physical therapy services at Hamilton, despite the fact that AP already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms; and (c) recommended that AP receive medically unnecessary pain management injections at Hamilton.

(v)     On December 19, 2013, an Insured named DO was involved in an automobile accident. The contemporaneous police report indicated that DO's vehicle was drivable following the accident, that DO drove his vehicle away from the scene of the accident, and that no one was injured in the accident or complained of any pain. In keeping with the fact that DO was not injured in the minor accident, DO did not go to the hospital following the accident. DO did not suffer any serious injury at all in his minor accident, much less any injury that would cause symptoms that would persist many months after his minor accident. Even so, following a purported follow-up examination by Fass on March 12, 2014 – almost three months after DO's minor accident – Fass and Hamilton: (a) falsely reported

that DO continued to suffer from pain and range of motion deficits; (b) recommended that DO receive continued, medically unnecessary chiropractic and physical therapy services at Hamilton, despite the fact that DO already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms; and (c) recommended that DO receive medically unnecessary pain management injections and electrodiagnostic testing at Hamilton. Similarly, following a purported follow-up examination by Smith on April 30, 2013, Smith and Hamilton: (a) falsely reported that DO continued to suffer from high levels of pain and serious range of motion deficits; (b) recommended that DO receive continued, medically unnecessary chiropractic and physical therapy services at Hamilton, despite the fact that DO already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms; and (c) recommended that DO receive medically unnecessary pain management injections at Hamilton.

(vi)     On January 24, 2014 an Insured named RS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that RS's vehicle was drivable following the accident, that RS drove his vehicle away from the scene of the accident, and that no one was injured in the accident or complained of any pain. In keeping with the fact that RS was not injured in the minor accident, the police report stated that RS "stated he was not injured, and refused medical treatment." Nonetheless, RS traveled on his own to Capital Health Regional Medical Center, where he was briefly evaluated on an outpatient basis and discharged with a minor back strain diagnosis. RS's minor soft tissue injury did not cause him to experience any serious pain or other symptoms at all, much less symptoms that would persist many months after his minor accident. Even so, following a purported follow-up examination by Fass on August 13, 2014 – more than six and a half months after RS's minor accident – Fass and Hamilton: (a) falsely reported that RS continued to suffer from pain and range of motion deficits; (b) recommended that RS receive continued, medically unnecessary chiropractic and physical therapy services at Hamilton, despite the fact that RS already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms; and (c) recommended that RS receive medically unnecessary PENS sessions at Hamilton.

(vii)    On February 14, 2014, an Insured named YD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that YD's vehicle was drivable following the accident, that YD drove her vehicle away from the scene of the accident, and no one was injured in the accident or complained of any pain. In keeping with the fact that YD was not seriously injured in the minor accident, YD went to work following the accident. Nonetheless, later that day YD traveled on her own to Robert Wood CJ University Hospital, where she was briefly evaluated on an outpatient basis and discharged with a minor neck strain diagnosis. YD's minor soft tissue injury did not cause her to experience any serious pain or other

symptoms at all, much less symptoms that would persist many months after her minor accident. Even so, following a purported follow-up examination by Pierro on July 23, 2014 – more than five months after YD's minor accident – Pierro and Hamilton: (a) falsely reported that YD continued to suffer from pain and range of motion deficits; and (b) recommended that YD receive continued, medically unnecessary chiropractic and physical therapy services at Hamilton, despite the fact that YD already had been receiving those services at Hamilton for months, and they supposedly had not resolved her purported symptoms. Similarly, following a purported follow-up examination by Kishyk on August 28, 2014, Kishyk and Hamilton: (a) falsely reported that YD continued to suffer from pain and range of motion deficits; and (b) recommended that YD receive continued, medically unnecessary chiropractic and physical therapy services at Hamilton, despite the fact that YD already had been receiving those services at Hamilton for months, and they supposedly had not resolved her purported symptoms.

(viii)   On April 11, 2014, an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that no one was injured in the accident or complained of any pain at the scene of the accident. Nonetheless, later that day JM traveled on her own to Robert Wood CJ University Hospital, where she was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. JM's minor soft tissue injury did not cause her to experience any serious pain or other symptoms at all, much less symptoms that would persist many months after her minor accident. Even so, following a purported follow-up examination by Fass on July 10, 2014 – three months after JM's minor accident – Fass and Hamilton: (a) falsely reported that JM continued to suffer from pain and range of motion deficits; and (b) recommended that JM receive continued, medically unnecessary chiropractic services at Hamilton, despite the fact that JM already had been receiving those services at Hamilton for months, and they supposedly had not resolved her purported symptoms. Similarly, following a purported follow-up examination by Lychock on July 16, 2014, Lychock and Hamilton: (a) falsely reported that JM continued to suffer from pain and range of motion deficits; and (b) recommended that JM receive continued, medically unnecessary chiropractic services at Hamilton, despite the fact that JM already had been receiving those services at Hamilton for months, and they supposedly had not resolved her purported symptoms.

(ix)   On April 18, 2014, an Insured named GA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and no one was injured as a result of the accident.   In keeping with the fact that GA was not injured in the minor accident, GA did not visit any hospital as the result of the accident, or seek any treatment at all for the minor accident until almost a month later, on May 13, 2014, when he first presented at Hamilton. GA did not suffer any serious injury at all in his minor accident, much less any injury that would cause symptoms that would persist many months after his minor accident. Even so, following a purported follow-up examination by Fass on August 19, 2014 – four months after GA's minor accident

– Fass and Hamilton: (a) falsely reported that GA continued to suffer from pain and range of motion deficits; (b) recommended that GA receive continued, medically unnecessary chiropractic and physical therapy services at Hamilton, despite the fact that GA already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms; and (c) recommended that GA receive medically unnecessary pain management injections and electrodiagnostic testing at Hamilton. Similarly, following a purported follow-up examination by Smith on April 30, 2013, Smith and Hamilton: (a) falsely reported that GA continued to suffer from high levels of pain and serious range of motion deficits; (b) recommended that GA receive continued, medically unnecessary chiropractic and physical therapy services at Hamilton, despite the fact that GA already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms; and (c) recommended that GA receive medically unnecessary pain management injections and PENS sessions at Hamilton. Similarly, following a purported follow-up examination by Lychock on July 16, 2014, Lychock and Hamilton: (a) falsely reported that GA continued to suffer from pain and range of motion deficits; and (b) recommended that GA receive continued, medically unnecessary chiropractic services at Hamilton, despite the fact that GA already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms.

(x)    On January 16, 2015 an Insured named AH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision that occurred while both vehicles were backing out of parking spaces, that AH's vehicle was drivable following the accident, and that no one was injured in the accident or complained of any pain. Nonetheless, AH traveled on her own to Capital Health Regional Medical Center, where she was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. AH's minor soft tissue injury did not cause her to experience any serious pain or other symptoms at all, much less symptoms that would persist many months after her minor accident. Even so, following a purported follow-up examination by Smith on May 7, 2015 – more than three and a half months after AH's minor accident – Smith and Hamilton: (a) falsely reported that AH continued to suffer from pain and range of motion deficits; and (b) recommended that AH receive continued, medically unnecessary chiropractic services at Hamilton, despite the fact that AH already had been receiving those services at Hamilton for months, and they supposedly had not resolved her purported symptoms. Similarly, following a purported follow-up examination by Kishyk on June 3, 2015, Kishyk and Hamilton: (a) falsely reported that AH continued to suffer from pain and range of motion deficits; and (b) recommended that AH receive continued, medically unnecessary chiropractic services at Hamilton, despite the fact that AH already had been receiving those services at Hamilton for months, and they supposedly had not resolved her purported symptoms.

(xi)     On February 3, 2015 an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that AS was not injured in the minor accident, AS refused medical treatment and did not go to the hospital following the accident. AS did not suffer any serious injury at all in her minor accident, much less any injury that would cause symptoms that would persist many months after her minor accident. Even so, following a purported follow-up examination by Fass on June 2, 2015 – four months after AS's minor accident – Fass and Hamilton: (a) falsely reported that AS continued to suffer from pain and range of motion deficits; (b) recommended that AS receive continued, medically unnecessary chiropractic and physical therapy services at Hamilton, despite the fact that AS already had been receiving those services at Hamilton for months, and they supposedly had not resolved her purported symptoms; and (c) referred AS to GSMI for medically unnecessary radiology services, pursuant to the kickbacks that GSMI, Zuberi, Khan, Din, and F. Zuberi provided to Hamilton and Fass. Similarly, following a purported follow-up examination by N. Mahoney on August 5, 2015, N. Mahoney and Hamilton: (a) falsely reported that AS continued to suffer from high levels of pain and range of motion deficits; and (b) recommended that AS receive medically unnecessary pain management injections at Hamilton. What is more, following a purported follow-up examination by J. Mahoney on September 17, 2015, J. Mahoney and Hamilton: (a) falsely reported that AS continued to suffer from symptoms as the result of her minor, seven and a half month old accident; and (b) recommended that AS continue to receive medically unnecessary pain management injections at Hamilton.

(xii)    On February 17, 2015, an Insured named PS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that PS's vehicle was drivable following the accident, that PS drove his vehicle away from the scene of the accident, and that no one was injured in the accident. In keeping with the fact that PS was not injured in the minor accident, PS did not go to the hospital following the accident. PS did not suffer any serious injury at all in his minor accident, much less any injury that would cause symptoms that would persist many months after his minor accident. Even so, following a purported follow-up examination by Lychock on June 22, 2015 – four months after PS's minor accident – Lychock and Hamilton: (a) falsely reported that PS continued to suffer from pain and range of motion deficits; and (b) recommended that PS receive continued, medically unnecessary chiropractic services at Hamilton, despite the fact that PS already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms. Similarly, following a purported follow-up examination by Fass on July 2, 2015 – four and a half months after PS's minor accident – Fass and Hamilton: (a) falsely reported that PS continued to suffer from pain and range of motion deficits; and (b) recommended that PS receive continued, medically unnecessary physical therapy services at Hamilton, despite

the fact that PS already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms.

(xiii)   On July 9, 2015 an Insured named BA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that BA's vehicle was drivable following the accident, that BA drove his vehicle away from the scene of the accident, and that that no one was injured in the accident. Nonetheless, BA traveled on his own to Robert Wood CJ University Hospital, where he was briefly evaluated on an outpatient basis and discharged with a minor neck/back strain diagnosis. BA's minor soft tissue injury did not cause him to experience any serious pain or other symptoms at all, much less symptoms that would persist many months after his minor accident. Even so, following a purported follow-up examination by Smith on November 5, 2015 – almost four months after BA's minor accident –  Smith and Hamilton: (a) falsely reported that BA continued to suffer from pain and range of motion deficits; (b) recommended that BA receive continued, medically unnecessary chiropractic services at Hamilton, despite the fact that BA already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms; and (c) recommended that BA receive medically unnecessary pain management injections at Hamilton. Similarly, following a purported follow-up examination by J. Mahoney on November 19, 2015,  J. Mahoney and Hamilton: (a) falsely reported that BA continued to suffer from pain and range of motion deficits; and (b) recommended that BA receive medically unnecessary pain management injections at Hamilton.

(xiv)   On September 10, 2015, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that MS's vehicle was drivable following the accident, that MS drove his vehicle away from the scene of the accident, and that MS was not injured in the accident. In keeping with the fact that MS was not injured in the minor accident, MS did not go to the hospital following the accident. MS did not suffer any serious injury at all in his minor accident, much less any injury that would cause symptoms that would persist many months after his minor accident. Even so, following a purported follow-up examination by N. Mahoney on February 3, 2016 – almost five  months after MS's minor accident – N. Mahoney and Hamilton: (a) falsely reported that MS continued to suffer from pain and range of motion deficits; and (b) recommended that MS receive continued, medically unnecessary chiropractic services at Hamilton, despite the fact that MS already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms. Similarly, following a purported follow-up examination by Kishyk on February 9, 2016, Kishyk and Hamilton: (a) falsely reported that MS continued to suffer from pain and range of motion deficits; and (b) recommended that MS receive continued, medically unnecessary chiropractic services at Hamilton, despite the fact that MS already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms.

(xv)   On October 11, 2015, an Insured named NR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that NR's vehicle was drivable following the accident, that NR drove his vehicle away from the scene of the accident, and that no one was injured in the accident or complained of any pain at the scene of the accident. In keeping with the fact that NR was not injured in the minor accident, NR did not seek treatment at any hospital following the accident. NR did not suffer any serious injury at all in his minor accident, much less any injury that would cause symptoms that would persist many months after his minor accident. Even so, following a purported follow-up examination by Smith on December 28, 2015 – two and a half months after NR's minor accident – Smith and Hamilton: (a) falsely reported that NR continued to suffer from pain and range of motion deficits; and (b) recommended that NR receive continued, medically unnecessary chiropractic services at Hamilton, despite the fact that NR already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms. Similarly, following a purported follow-up examination by Pierro on January 6, 2016, Pierro and Hamilton: (a) falsely reported that NR continued to suffer from pain and range of motion deficits; and (b) recommended that NR receive continued, medically unnecessary chiropractic services at Hamilton, despite the fact that NR already had been receiving those services at Hamilton for months, and they supposedly had not resolved his purported symptoms.

283.   These are only representative examples. In the vast majority of the claims for follow-up examinations identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro falsely represented that the Insureds continued to suffer from pain and other symptoms as the result of their automobile accidents, often long after the underlying accidents occurred.

284.   In the claims for follow-up examinations identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro routinely falsely represented that the Insureds continued to suffer pain as the result of minor soft tissue injuries long after the underlying accidents occurred, because these phony diagnoses provided a false basis for the Defendants to provide additional medically unnecessary follow-up

examinations, electrodiagnostic testing, pain management injections, PENS sessions, chiropractic services, physical therapy services, and radiology services.

**3.      Misrepresentations Regarding the Reimbursability of the Follow-Up Examinations**

285.    As set forth above, the No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

286.    Not only did Hamilton, Fass, Kishyk, Lychock, and Pierro routinely falsely represent that their putative follow-up examinations involved presenting problems of low to moderate or moderate to high severity, and not only did they misrepresent the results of the follow-up examinations, but they also routinely misrepresented the reimbursability of the follow-up examinations.

287.    The No-Fault Laws provide that follow-up examinations may be billed contemporaneously with chiropractic and physical therapy treatments no more than twice in any 30-day period and, in any case, only if one of the following four circumstances is present:

(i)      there is a definite measurable change in the patient's condition requiring significant change in the treatment plan;

(ii)     the patient fails to respond to treatment, requiring a change in the treatment plan;

(iii)    the patient's condition becomes permanent and stationary, or the patient is ready for discharge; or

(iv)     it is medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

See N.J.A.C. 11:3-29.4(n); N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6..

288.    Even so, Hamilton, Fass, Kishyk, Lychock, and Pierro routinely billed for follow-up examinations contemporaneously with chiropractic and physical therapy treatments, despite: (i) the absence of a definite measurable change in the patient's condition requiring significant

change in the treatment plan; (ii) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patient's condition became permanent, or a situation in which the patient was ready for discharge; or (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

289.   For example:

(i)   Hamilton, Fass, and Pierro billed for follow-up examinations they purported to provide to an Insured named AJ on December 26, 2012, March 4, 2013, and April 2, 2013 contemporaneously with chiropractic and physical therapy treatments, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Hamilton, Fass, and Pierro were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(ii)   Hamilton, Fass, and Pierro billed for follow-up examinations they purported to provide to an Insured named LM on January 14, 2013 and February 18, 2013 contemporaneously with chiropractic and physical therapy treatments, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Hamilton, Fass, and Pierro were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(iii)   Hamilton, Fass, and Lychock billed for follow-up examinations they purported to provide to an Insured named WJ on April 8, 2013, June 4, 2013, and July 9, 2013 contemporaneously with chiropractic and physical therapy treatments, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Hamilton, Fass, and Lychock were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide

evaluation services over and above those normally provided during the therapeutic services.

(iv)    Hamilton, Fass, and Pierro billed for follow-up examinations they purported to provide to an Insured named SA on September 17, 2013 and October 16, 2013 contemporaneously with chiropractic and physical therapy treatments, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Hamilton, Fass, and Pierro were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(v)    Hamilton, Fass, and Lychock billed for follow-up examinations they purported to provide to an Insured named WM on December 2, 2013, January 2, 2014, and February 6, 2014 contemporaneously with chiropractic and physical therapy treatments, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Hamilton, Fass, and Lychock were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(vi)    Hamilton, Fass, and Pierro billed for follow-up examinations they purported to provide to an Insured named MH on March 17, 2014 and April 17, 2014 contemporaneously with chiropractic and physical therapy treatments, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Hamilton, Fass, and Pierro were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(vii)    Hamilton, Fass, and Pierro billed for follow-up examinations they purported to provide to an Insured named RH on March 18, 2014, June 18, 2014, and July 18, 2014 contemporaneously with chiropractic and physical therapy treatments, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became

permanent, or a situation in which Hamilton, Fass, and Pierro were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(viii)   Hamilton, Fass, and Pierro billed for follow-up examinations they purported to provide to an Insured named YD on April 29, 2014 and May 22, 2014 contemporaneously with chiropractic and physical therapy treatments, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Hamilton, Fass, and Pierro were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(ix)   Hamilton, Fass, and Kishyk billed for follow-up examinations they purported to provide to an Insured named SN on July 15, 2014 and August 12, 2014 contemporaneously with chiropractic and physical therapy treatments, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Hamilton, Fass, and Kishyk were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(x)   Hamilton, Fass, and Kishyk billed for follow-up examinations they purported to provide to an Insured named ES on August 5, 2014, September 2, 2014, and October 2, 2014 contemporaneously with chiropractic and physical therapy treatments, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Hamilton, Fass, and Kishyk were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xi)   Hamilton, Fass, and Kishyk billed for follow-up examinations they purported to provide to an Insured named MD on December 16, 2014 and January 15, 2015 contemporaneously with chiropractic and physical therapy treatments, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to

respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Hamilton, Fass, and Kishyk were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xii)   Hamilton, Fass, and Kishyk billed for follow-up examinations they purported to provide to an Insured named RL on August 18, 2015 and November 12, 2015 contemporaneously with chiropractic and physical therapy treatments, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Hamilton, Fass, and Kishyk were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xiii)   Hamilton, Fass, and Kishyk billed for follow-up examinations they purported to provide to an Insured named BA on September 1, 2015 and October 27, 2015 contemporaneously with chiropractic and physical therapy treatments, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Hamilton, Fass, and Kishyk were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xiv)   Hamilton, Fass, and Kishyk billed for follow-up examinations they purported to provide to an Insured named JG on December 15, 2015 and February 25, 2016 contemporaneously with chiropractic and physical therapy treatments, despite: (a) the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Hamilton, Fass, and Kishyk were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

(xv)   Hamilton, Fass, and Pierro billed for follow-up examinations they purported to provide to an Insured named MS on December 15, 2015 and January 14, 2016 contemporaneously with chiropractic and physical therapy treatments, despite: (a)

the absence of any definite measurable change in the patient's condition requiring significant change in the treatment plan; (b) the absence of the patient's failure to respond to treatment, requiring a change in the treatment plan; (c) the absence of any situation in which the patient's condition became permanent, or a situation in which Hamilton, Fass, and Pierro were preparing to discharge the patient; and (d) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

290.    These are only representative examples. In the claims for follow-up examinations identified in Exhibit "2", Hamilton, Fass, Kishyk, Lychock, and Pierro almost always billed for follow-up examinations that they purported to provide contemporaneously with chiropractic and physical therapy services, despite: (i) the absence of any definite measurable change in the patients' condition requiring significant change in the treatment plan; (ii) the absence of the patients' failure to respond to treatment, requiring a change in the treatment plan; (iii) the absence of any situation in which the patients' conditions became permanent, or a situation in which Hamilton, Fass, Kishyk, Lychock, and Pierro were preparing to discharge the patients; and (iv) the absence of any situation in which it was medically necessary to provide evaluation services over and above those normally provided during the therapeutic services.

291.    In the claims for follow-up examinations identified in Exhibit "2", Hamilton, Fass, Kishyk, Lychock, and Pierro's charges for follow-up examinations routinely violated N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

**E.      The Fraudulent Charges for Electrodiagnostic Testing at Hamilton**

292.    Based upon the fraudulent, pre-determined "diagnoses" provided during the initial examinations and follow-up examinations, Hamilton, Fass, Smith, and Kosmorsky purported to subject many of the Insureds in the claims identified in Exhibit "2" to a series of medically unnecessary nerve conduction velocity ("NCV") tests and electromyography ("EMG") tests (collectively the "electrodiagnostic" or "EDX" tests).

293.    Fass, Smith, and Kosmorsky purported to perform virtually all of the EDX tests that were billed to GEICO through Hamilton.

294.    As set forth in Exhibit "2", Hamilton, Fass, Smith, and Kosmorsky then billed the purported EDX tests through Hamilton to GEICO as multiple charges under CPT codes 95886, 95909, 95910, and 95911, generally resulting in thousands of dollars in charges for each Insured on whom the EDX testing purportedly was performed.

295.    Like all of the other charges for the Fraudulent Services that were billed through Hamilton to GEICO, the charges for the EDX tests were fraudulent because they falsely represented that Hamilton was in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore was eligible to collect PIP Benefits, when in fact it was not.

296.    Rather, as set forth above, Hamilton was not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore was not eligible to collect PIP Benefits, because it received illegal kickbacks in exchange for patient referrals to GSMI.

297.    What is more, in the claims for EDX tests identified in Exhibit "2", the charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the phony "diagnoses" that Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro provided to the Insureds at the conclusion of the putative initial and follow-up examinations.

**1.      The Human Nervous System and Electrodiagnostic Testing**

298.    The human nervous system is composed of the brain, spinal cord and peripheral nerves that extend throughout the body, including through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory

information through the nerve pathways into the spinal cord and up to the brain, and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

299.   The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves.  Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, originating from the spinal cord and extending, for example, into the hands and feet through the arms and legs. The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots.

300.   A "pinched" nerve root is called a radiculopathy, and can cause various symptoms including pain, altered sensation and loss of muscle control.

301.   EMG tests and NCV tests both are forms of electrodiagnostic tests, and purportedly were provided by Hamilton, Fass, Smith, and Kosmorsky because they were medically necessary to determine whether the Insureds had radiculopathies.

302.   The American Association of Neuromuscular Electrodiagnostic Medicine ("AANEM"), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies.

303.   The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional

medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

**2.      The Fraudulent NCV Tests**

304.    NCV tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured, and recorded with electrodes attached to the surface of the skin. An EMG machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance from one stimulus to another (the "conduction velocity").

305.    In addition, the EMG machine displays the changes in amplitude over time as a "waveform." The amplitude, latency, velocity, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

306.    There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCV tests. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCV tests.

307.    F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV tests. F-wave and H-reflex studies generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. The motor and sensory nerve NCV tests are designed to evaluate nerve conduction in nerves within a limb.

308.    According to the Recommended Policy, the maximum number of NCV tests necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCV tests of three motor nerves; (ii) NCV tests of two sensory nerves; and (iii) two H-reflex studies.

309.    Even so, in an attempt to extract the maximum billing out of each Insured who supposedly received NCV tests, Hamilton, Fass, Smith, and Kosmorsky routinely purported to test far more nerves than recommended by the Recommended Policy.

310.    Specifically, to maximize the fraudulent charges they could submit to GEICO and other insurers, Hamilton, Fass, Smith, and Kosmorsky routinely purported to perform and/or provide: (i) NCV tests of 6-8 motor nerves; (ii) NCV tests of 8-10 sensory nerves; (iii) multiple F-wave studies; and (iv) at least two H-reflex studies.

311.    For example:

(i)    On February 12, 2013 and May 21, 2013, Hamilton, Fass, Smith, and Kosmorsky purported to subject an Insured named AG to six motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether AG suffered from a radiculopathy.

(ii)    On June 20, 2013 and July 11, 2013, Hamilton, Fass, and Smith purported to subject an Insured named VS to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether VS suffered from a radiculopathy.

(iii)    On July 23, 2013 and October 31, 2013, Hamilton, Fass, Smith, and Kosmorsky purported to subject an Insured named LO to six motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether LO suffered from a radiculopathy.

(iv)    On July 23, 2013 and August 14, 2013, Hamilton, Fass, and Kosmorsky purported to subject an Insured named PS to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether VS suffered from a radiculopathy.

(v)    On August 15, 2013 and September 12, 2013, Hamilton, Fass, and Smith purported to subject an Insured named IH to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether IH suffered from a radiculopathy.

(vi)     On October 1, 2013 and October 13, 2013, Hamilton, Fass, and Kosmorsky purported to subject an Insured named ST to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether ST suffered from a radiculopathy.

(vii)    On October 3, 2013 and January 20, 2014, Hamilton, Fass, and Smith purported to subject an Insured named KG to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether KG suffered from a radiculopathy.

(viii)   On November 21, 2013 and January 14, 2014, Hamilton, Fass, Smith, and Kosmorsky purported to subject an Insured named SA to eight motor nerve NCV tests, 10 sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether SA suffered from a radiculopathy.

(ix)     On February 20, 2014 and March 17, 2014, Hamilton, Fass, and Smith purported to subject an Insured named AP to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether AP suffered from a radiculopathy.

(x)      On February 20, 2014 and March 25, 2014, Hamilton, Fass, and Smith purported to subject an Insured named AP to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether AP suffered from a radiculopathy.

(xi)     On May 19, 2014 and November 6, 2014, Hamilton, Fass, and Smith purported to subject an Insured named YD to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether YD suffered from a radiculopathy.

(xii)    On May 29, 2014 and July 17, 2014, Hamilton, Fass, and Smith purported to subject an Insured named SN to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether SN suffered from a radiculopathy.

(xiii)   On January 28, 2015 and February 12, 2015, Hamilton, Fass, and Smith purported to subject an Insured named SH to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether SH suffered from a radiculopathy.

(xiv)    On May 7, 2015 and August 20, 2015, Hamilton, Fass, and Smith purported to subject an Insured named AH to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether AH suffered from a radiculopathy.

(xv)     On May 7, 2015 and August 6, 2015, Hamilton, Fass, and Smith purported to subject an Insured named HM to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether HM suffered from a radiculopathy.

(xvi)    On July 16, 2015 and July 30, 2015, Hamilton, Fass, and Smith purported to subject an Insured named VC to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether VC suffered from a radiculopathy.

(xvii)   On November 5, 2015 and December 7, 2015, Hamilton, Fass, and Smith purported to subject an Insured named LS to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether LS suffered from a radiculopathy.

(xviii)  On November 16, 2015 and December 10, 2015, Hamilton, Fass, and Smith purported to subject an Insured named DS to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether DS suffered from a radiculopathy.

(xix)    On December 10, 2015 and January 21, 2016, Hamilton, Fass, and Smith purported to subject an Insured named JG to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether JG suffered from a radiculopathy.

(xx)     On January 21, 2016 and March 24, 2016, Hamilton, Fass, and Smith purported to subject an Insured named RD to eight motor nerve NCV tests, eight sensory nerve NCV tests, multiple F-wave studies, and two H-reflex studies, supposedly to determine whether RD suffered from a radiculopathy.

312.   These are only representative examples. In most of the claims for NCV tests identified in Exhibit "2", Hamilton, Fass, Smith, and Kosmorsky routinely purported to perform and/or provide a grossly-excessive number of NCV tests to the Insureds, ostensibly to determine whether the Insureds suffered from radiculopathies.

313.   Assuming that all other conditions of coverage are satisfied, the Fee Schedule permitted lawfully licensed healthcare services providers in the southern New Jersey area to submit maximum charges of: (i) $166.99 for each motor nerve in any limb on which an NCV test

was performed; and (ii) $127.92 for each sensory nerve in any limb on which an NCV test was performed.

314.    Hamilton, Fass, Smith, and Kosmorsky routinely purported to provide and/or perform NCV tests on far more nerves than recommended by the Recommended Policy in order to maximize the fraudulent charges that they could submit to GEICO and other insurers, not because the NCV tests were medically necessary to determine whether the Insureds had radiculopathies.

315.    What is more, the decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances.

316.    In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCV tests are performed on particular peripheral nerves and their sensory and/or motor fibers.

317.    As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCV tests should vary from patient-to-patient.

318.    This concept is emphasized in the Recommended Policy, which states that:

EDX studies [such as NCV tests] are individually designed by the electrodiagnostic consultant for each patient.  The examination design is dynamic and often changes during the course of the study in response to new information obtained.

319.    This concept also is emphasized in the CPT Assistant, which states that "Pre-set protocols automatically testing a large number of nerves are not appropriate."

320.    Even so, Hamilton, Fass, Smith, and Kosmorsky did not tailor the NCVs they purported to perform and/or provide to the unique circumstances of each individual Insured.

321.    Instead, they applied a fraudulent "protocol" and purported to perform and/or provide NCVs on the same peripheral nerves and nerve fibers for virtually every Insured that received NCVs.

322.    Specifically, in the claims identified in Exhibit "2", Hamilton, Fass, Smith, and Kosmorsky purported to test some combination of the following peripheral nerves and nerve fibers – and, in most cases, all of them – in virtually every Insured to whom they purported to provide NCV tests:

(i)      left and right sural sensory nerves;

(ii)     left and right median sensory nerves;

(iii)    left and right radial sensory nerves;

(iv)     left and right ulnar sensory nerves;

(v)      left and right median motor nerves;

(vi)     left and right ulnar motor nerves;

(vii)    left and right peroneal motor nerves; and

(viii)   left and right tibial motor nerves.

323.    For example, Hamilton, Fass, Smith, and Kosmorsky purported to test these identical peripheral nerves and nerve fibers on – among many others – the following Insureds:

(i)      AG , on February 12, 2013 and May 21, 2013;

(ii)     VS, on June 20, 2013 and July 11, 2013;

(iii)    LO, on July 23, 2013 and October 31, 2013;

(iv)     PS, on July 23, 2013 and August 14, 2013;

(v)      IH, on August 15, 2013 and September 12, 2013;

(vi)     ST, on October 1, 2013 and October 13, 2013;

(vii)     KG, on October 3, 2013 and January 20, 2014;

(viii)    SA, on November 21, 2013 and January 14, 2014;

(ix)      AP, on February 20, 2014 and March 17, 2014;

(x)       AP, on February 20, 2014 and March 25, 2014;

(xi)      YD, on May 19, 2014 and November 6, 2014;

(xii)     SN, on May 29, 2014 and July 17, 2014;

(xiii)    SH, on January 28, 2015 and February 12, 2015;

(xiv)     AH, on May 7, 2015 and August 20, 2015;

(xv)      HM, on May 7, 2015 and August 6, 2015;

(xvi)     VC, on July 16, 2015 and July 30, 2015;

(xvii)    LS, on On November 5, 2015 and December 7, 2015;

(xviii)   DS, on November 16, 2015 and December 10, 2015;

(xix)     JG, on December 10, 2015 and January 21, 2016; and

(xx)      RD, on January 21, 2016 and March 24, 2016.

324.    Hamilton, Fass, Smith, and Kosmorsky purported to test these identical peripheral nerves and nerve fibers in virtually all of the NCV claims identified in Exhibit "2", despite the fact that the Insureds were differently situated, because their objective was to charge for as many NCV tests as possible, and not to treat or otherwise benefit the Insureds.

325.    As set forth above, there are a substantial number of variables that can affect whether, how, and to what extent an individual is injured in a given automobile accident.

326.    An individual's age, height, weight, general physical condition, location within the vehicle, and the location of the impact all will affect whether, how, and to what extent an individual is injured in a given automobile accident.

327.   As set forth above, in the claims identified in Exhibit "2", virtually all of the Insureds whom the Defendants purported to treat were involved in relatively minor, "fender-bender" or other low-impact types of accidents, to the extent that they were involved in any actual accidents at all.

328.   It is extremely improbable that any more than one Insured involved in any one of the minor automobile accidents in the claims identified in Exhibit "2" would suffer substantially identical injuries as the result of their accidents, or require a substantially identical course of treatment.

329.   By extension, it is extremely improbably that any two or more Insureds involved in any one of the minor automobile accidents in the claims identified in Exhibit "2" would require substantially identical NCV tests.

330.   Even so, in the NCV test claims identified in Exhibit "2", Hamilton, Fass, Smith, and Kosmorsky often purported to perform and/or provide substantially identical NCV tests to more than one Insured involved in a single accident.

331.   For example:

(i)   On January 8, 2013, two Insureds – ED and CJ – were involved in the same minor automobile accident. ED and CJ were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries ED and CJ actually did experience in their minor accident would have resolved, and resolved differently, in the months following the accident. To the extent that ED and CJ required NCV tests in the first instance, the NCV tests should have been tailored to their individual circumstances, which were different. Even so, Hamilton, Fass, and Smith purported to provide NCV tests to CJ on March 14, 2013 and April 11, 2013, and to ED on March 28, 2014 and May 9, 2013, in which they purported to test identical peripheral nerves and nerve fibers for both of them.

(ii)   On May 1, 2013, two Insureds – LO and VS – were involved in the same minor automobile accident. LO and VS were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor

impact from different positions in the vehicle. What is more, any injuries LO and VS actually did experience in their minor accident would have resolved, and resolved differently, in the months following the accident. To the extent that LO and VS required NCV tests in the first instance, the NCV tests should have been tailored to their individual circumstances, which were different. Even so, Hamilton, Fass, and Smith purported to provide NCV tests to VS on June 20, 2013 and July 11,2013, and Hamilton, Fass, Smith, and Kosmorsky purported to provide NCV tests to LO on July 23, 2013 and October 31, 2013, in which they purported to test identical peripheral nerves and nerve fibers for both of them.

(iii)   On July 12, 2013, two Insureds – IH and ST – were involved in the same minor automobile accident. IH and ST were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries IH and ST actually did experience in their minor accident would have resolved, and resolved differently, in the months following the accident. To the extent that IH and ST required NCV tests in the first instance, the NCV tests should have been tailored to their individual circumstances, which were different. Even so, Hamilton, Fass, and Smith purported to provide NCV tests to IH on August 15, 2013 and September 12, 2013, and Hamilton, Fass, and Kosmorsky purported to provide NCV tests to ST on October 1, 2013 and October 15, 2013, in which they purported to test identical peripheral nerves and nerve fibers for both of them.

(iv)   On November 20, 2014, two Insureds – SH and EM – were involved in the same minor automobile accident. SH and EM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries SH and EM actually did experience in their minor accident would have resolved, and resolved differently, in the months following the accident. To the extent that SH and EM required NCV tests in the first instance, the NCV tests should have been tailored to their individual circumstances, which were different. Even so, Hamilton, Fass, and Smith purported to provide NCV tests to SH on January 28, 2015 and February 12, 2015, and to EM on February 5, 2015 and February 19, 2015, in which they purported to test identical peripheral nerves and nerve fibers for both of them.

(v)   On January 16, 2015, two Insureds – AH and HM – were involved in the same minor automobile accident. AH and HM were different ages, in different physical conditions, located in different positions in the vehicle, and experienced the minor impact from different positions in the vehicle. What is more, any injuries AH and HM actually did experience in their minor accident would have resolved, and resolved differently, in the months following the accident. To the extent that AH and HM required NCV tests in the first instance, the NCV tests should have been tailored to their individual circumstances, which were different. Even so, Hamilton, Fass, and Smith purported to provide NCV tests to HM on May 7, 2015 and August 6, 2015, and to AH on May 7, 2015 and August 20, 2015, in which

they purported to test identical peripheral nerves and nerve fibers for both of them.

332.    The cookie-cutter approach to the NCV tests that Hamilton, Fass, Smith, and Kosmorsky purported to provide to Insureds clearly was not based on medical necessity. Instead, the cookie-cutter approach to the NCVs was designed solely to maximize the charges that the Hamilton, Fass, Smith, and Kosmorsky could submit to GEICO and other insurers, and to maximize their ill-gotten profits.

**3.    The Fraudulent EMG Tests**

333.    EMG tests involve insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The electrical activity in each muscle tested is compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the muscles, peripheral nerves, and nerve roots.

334.    There are many different muscles in the arms and legs that can be tested using EMG tests. The decision of how many limbs and which muscles to test in each limb should be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is based upon a history and physical examination of each individual patient, as well as the real-time results obtained from the EMG tests as they are performed on each specific muscle.

335.    As a result, the number of limbs as well as the nature and number of the muscles tested through EMG tests should vary from patient-to-patient.

336.    Hamilton, Fass, Smith, and Kosmorsky did not tailor the EMG tests they purported to provide and/or perform to the unique circumstances of each patient. Instead, they routinely tested the same muscles in the same limbs repeatedly, without regard for individual patient presentment.

337.     Furthermore, even if there were any need for any of these EMG tests, the nature and number of the EMG tests that Hamilton, Fass, Smith, and Kosmorsky purported to provide and/or perform frequently grossly exceeded the maximum number of such tests – i.e., EMG tests of two limbs – that should have been necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

338.     In almost all of the claims for EMG tests identified in Exhibit "2", Hamilton, Fass, Smith, and Kosmorsky purported to provide and/or perform EMG tests on four limbs, in contravention of the Recommended Policy, in order to maximize the fraudulent billing that they could submit to GEICO.

339.     For example:

(i)     Hamilton, Fass, and Kosmorsky purported to provide a four-limb EMG to an Insured named MR on January 10, 2013 and January 28, 2013, supposedly to determine whether MR suffered from a radiculopathy.

(ii)     Hamilton, Fass, Smith, and Kosmorsky purported to provide a four-limb EMG to an Insured named AJ on January 29, 2013 and February 14, 2013, supposedly to determine whether Jackson suffered from a radiculopathy.

(iii)     Hamilton, Fass, Smith, and Kosmorsky purported to provide a four-limb EMG to an Insured named AG on February 12, 2013 and May 21, 2013, supposedly to determine whether AG suffered from a radiculopathy.

(iv)     Hamilton, Fass, and Smith purported to provide a four-limb EMG to an Insured named RD on July 9, 2013 and October 3, 2013, supposedly to determine whether RD suffered from a radiculopathy.

(v)     Hamilton, Fass, Smith, and Kosmorsky purported to provide a four-limb EMG to an Insured named LO on July 23, 2013 and October 31, 2013, supposedly to determine whether LO suffered from a radiculopathy.

(vi)     Hamilton, Fass, and Kosmorsky purported to provide a four-limb EMG to an Insured named PS on July 23, 2013 and August 14, 2013, supposedly to determine whether VS suffered from a radiculopathy.

(vii)   Hamilton, Fass, Smith, and Kosmorsky purported to provide a four-limb EMG to an Insured named LC on January 23, 2014 and March 4, 2014, supposedly to determine whether LC suffered from a radiculopathy.

(viii)  Hamilton, Fass, and Smith purported to provide a four-limb EMG to an Insured named AP on February 20, 2014 and March 25, 2014, supposedly to determine whether AP suffered from a radiculopathy.

(ix)    Hamilton, Fass, Smith, and Kosmorsky purported to provide a four-limb EMG to an Insured named MK on March 11, 2014 and March 27, 2014, supposedly to determine whether MK suffered from a radiculopathy.

(x)     Hamilton, Fass, and Smith purported to provide a four-limb EMG to an Insured named SN on May 29, 2014 and July 17, 2014, supposedly to determine whether SN suffered from a radiculopathy.

(xi)    Hamilton, Fass, and Smith purported to provide a four-limb EMG to an Insured named EM on September 25, 2014 and January 14, 2015, supposedly to determine whether EM suffered from a radiculopathy.

(xii)   Hamilton, Fass, and Smith purported to provide a four-limb EMG to an Insured named RT on December 18, 2014 and January 5, 2015, supposedly to determine whether RT suffered from a radiculopathy.

(xiii)  Hamilton, Fass, and Smith purported to provide a four-limb EMG to an Insured named LB on January 5, 2015 and January 21, 2015, supposedly to determine whether LB suffered from a radiculopathy.

(xiv)   Hamilton, Fass, and Smith purported to provide a four-limb EMG to an Insured named MO on January 14, 2015 and January 29, 2015, supposedly to determine whether MO suffered from a radiculopathy.

(xv)    Hamilton, Fass, and Smith purported to provide a four-limb EMG to an Insured named GB on March 12, 2015 and March 26, 2015, supposedly to determine whether GB suffered from a radiculopathy.

(xvi)   Hamilton, Fass, and Smith purported to provide a four-limb EMG to an Insured named VC on July 16, 2015 and July 30, 2015, supposedly to determine whether VC suffered from a radiculopathy.

(xvii)  Hamilton, Fass, and Smith purported to provide a four-limb EMG to an Insured named BA on September 28, 2015 and November 5, 2015, supposedly to determine whether BA suffered from a radiculopathy.

145

(xviii)  Hamilton, Fass, and Smith purported to provide a four-limb EMG to an Insured named LS on November 5, 2015 and December 7, 2015, supposedly to determine whether LS suffered from a radiculopathy.

(xix)  Hamilton, Fass, and Smith purported to provide a four-limb EMG to an Insured named DS on November 16, 2015 and December 10, 2015, supposedly to determine whether DS suffered from a radiculopathy.

(xx)  Hamilton, Fass, and Smith purported to provide a four-limb EMG to an Insured named NS on November 17, 2015 and December 28, 2015, supposedly to determine whether NS suffered from a radiculopathy.

340.    These are only representative examples. In most of the claims for EMG tests identified in Exhibit "2", Hamilton, Fass, Smith, and Kosmorsky routinely purported to perform and/or provide a grossly-excessive number of EMG tests to the Insureds, ostensibly to determine whether the Insureds suffered from radiculopathies.

341.    Assuming that all other conditions of coverage are satisfied, the Fee Schedule permitted lawfully licensed healthcare services providers in the southern New Jersey area to submit maximum charges of: (i) $215.44 under CPT code 95860 if an EMG was performed on at least five muscles of one limb; (ii) $311.61 under CPT code 95861 if an EMG was performed on at least five muscles in each of two limbs; (iii) $376.08 under CPT code 95863 if an EMG was performed on at least five muscles in each of three limbs; and (iv) $413.69 under CPT code 95864 if an EMG was performed on at least five muscles in each of four limbs.

342.    In most of the claims for EMG tests identified in Exhibit "2", Hamilton, Fass, Smith, and Kosmorsky purported to provide and/or perform EMGs on muscles in all four limbs of the Insureds solely to maximize the profits that they could reap from each such Insured, not because the four-limb EMG tests were medically necessary.

4.     **The Concealment of Excessive and Unnecessary EDX Testing, and the Unbundling of EMG Test Charges**

343.     Not only did Hamilton, Fass, Smith, and Kosmorsky routinely bill for an excessive and medically unnecessary number of EDX tests, but Hamilton, Fass, Smith, and Kosmorsky frequently acted to conceal the excessive number of EDX tests that they purported to provide, and also to unbundle their charges for EMG tests.

344.     EDX tests, and particularly EMG tests, are uncomfortable for most patients, and even painful. As a result, there generally is no legitimate reason why a patient should be subjected to multiple rounds of EDX tests within a short period of time.

345.     Rather, to the extent that a patient requires EDX tests in the first instance, the EDX tests generally should be performed, collectively, on a single date.

346.     Even so, in order to conceal the fact that they routinely billed for a grossly-excessive number of EMG and NCV tests, Hamilton, Fass, Smith, and Kosmorsky routinely required the Insureds in the claims identified in Exhibit "2" to return to Hamilton for EDX tests on two separate dates of service, and then split their charges for the EDX tests onto two separate bills.

347.     For example:

(i)     Hamilton, Fass, Smith, and Kosmorsky purported to provide an excessive and medically unnecessary 14 nerve NCV test and four-limb EMG to an Insured named AG over the course of two separate dates of service – February 12, 2013 and May 21, 2013  – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(ii)    Hamilton, Fass, and Smith purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named VS over the course of two separate dates of service – June 20, 2013 and July 11, 2013  – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(iii)    Hamilton, Fass, Smith, and Kosmorsky purported to provide an excessive and medically unnecessary 14 nerve NCV test and four-limb EMG to an Insured named LO over the course of two separate dates of service – July 23, 2013 and October 31, 2013  – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(iv)    Hamilton, Fass, and Kosmorsky purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named PS over the course of two separate dates of service – July 23, 2013 and August 14, 2013 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(v)    Hamilton, Fass, and Smith purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named IH over the course of two separate dates of service – August 15, 2013 and September 12, 2013  – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(vi)    Hamilton, Fass, and Kosmorsky purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named ST over the course of two separate dates of service – October 1, 2013 and October 13, 2013 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(vii)    Hamilton, Fass, and Smith purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named KG over the course of two separate dates of service – October 3, 2013 and January 20, 2014  – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(viii)    Hamilton, Fass, Smith, and Kosmorsky purported to provide an excessive and medically unnecessary 18 nerve NCV test and four-limb EMG to an Insured named SA over the course of two separate dates of service – November 21, 2013 and January 14, 2014  – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(ix)    Hamilton, Fass, and Smith purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named AP over the course of two separate dates of service – February 20, 2014 and March 17, 2014  – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(x)    Hamilton, Fass, and Smith purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named AP over

the course of two separate dates of service – February 20, 2014 and March 25, 2014  – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xi)     Hamilton, Fass, and Smith purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named YD over the course of two separate dates of service – May 19, 2014 and November 6, 2014 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xii)    Hamilton, Fass, and Smith purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named SN over the course of two separate dates of service – May 29, 2014 and July 17, 2014  – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xiii)   Hamilton, Fass, and Smith purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named SH over the course of two separate dates of service – January 28, 2015 and February 12, 2015 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xiv)    Hamilton, Fass, and Smith purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named AH over the course of two separate dates of service – May 7, 2015 and August 20, 2015 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xv)     Hamilton, Fass, and Smith purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named HM over the course of two separate dates of service – May 7, 2015 and August 6, 2015 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xvi)    Hamilton, Fass, and Smith purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named VC over the course of two separate dates of service – July 16, 2015 and July 30, 2015 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xvii)   Hamilton, Fass, and Smith purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named LS over the course of two separate dates of service – November 5, 2015 and December 7, 2015 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xviii) Hamilton, Fass, and Smith purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named DS over the course of two separate dates of service – November 16, 2015 and December 10, 2015 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xix) Hamilton, Fass, and Smith purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named JG over the course of two separate dates of service – December 10, 2015 and January 21, 2016 – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

(xx) Hamilton, Fass, and Smith purported to provide an excessive and medically unnecessary 16 nerve NCV test and four-limb EMG to an Insured named RD over the course of two separate dates of service – January 21, 2016 and March 24, 2016  – and then split the charges for the NCV and EMG tests onto two separate bills in order to conceal the excessive, medically unnecessary testing.

348.    These are only representative examples. In most of the claims for EDX tests that are identified in Exhibit "2", Hamilton, Fass, Smith, and Kosmorsky required the Insureds to return to Hamilton for EDX tests on two separate dates of service, and then split their charges for the EDX tests onto two separate bills, in order to conceal their excessive, medically unnecessary testing.

349.    Not only did Hamilton, Fass, Smith, and Kosmorsky routinely require Insureds to return to Hamilton for EDX tests on two separate dates of service to conceal their excessive, medically unnecessary testing, they also did so in order to unbundle their charges for the EMG tests.

350.    As set forth above, the Fee Schedule permitted healthcare providers in southern New Jersey to recover a maximum of $311.61 for a two-limb EMG, and a maximum of $413.69 for a four-limb EMG.

150

351.     As set forth above, Hamilton, Fass, Smith, and Kosmorsky routinely purported to provide medically unnecessary four-limb EMG tests to Insureds over the course of two separate dates of service, in order to conceal the excessive, medically unnecessary testing.

352.     However, in the claims identified in Exhibit "2", Hamilton, Fass, Smith, and Kosmorsky almost never billed for a single, four-limb EMG test for any individual Insured. Rather, in almost every case, they unbundled their billing into two separate two-limb EMG test charges, rather than a single four-limb EMG test charge.

353.     By submitting their four-limb EMG test charges as two separate, two-limb EMG test charges, Hamilton, Fass, Smith, and Kosmorsky routinely increased their already fraudulent EMG test billing by more than $275.00 per Insured.

354.     For example:

(i)     Hamilton, Fass, Smith, and Kosmorsky unbundled a four-limb EMG test they purportedly provided to an Insured named AG over the course of February 12, 2013 and May 21, 2013 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(ii)     Hamilton, Fass, and Smith unbundled a four-limb EMG test they purportedly provided to an Insured named VS over the course of June 20, 2013 and July 11, 2013 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(iii)     Hamilton, Fass, Smith, and Kosmorsky unbundled a four-limb EMG test they purportedly provided to an Insured named LO over the course of July 23, 2013 and October 31, 2013 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(iv)     Hamilton, Fass, and Kosmorsky unbundled a four-limb EMG test they purportedly provided to an Insured named PS over the course of July 23, 2013 and August 14, 2013 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(v)     Hamilton, Fass, and Smith unbundled a four-limb EMG test they purportedly provided to an Insured named IH over the course of August 15, 2013 and September 12, 2013 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(vi)    Hamilton, Fass, and Kosmorsky unbundled a four-limb EMG test they purportedly provided to an Insured named ST over the course of October 1, 2013 and October 13, 2013 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(vii)   Hamilton, Fass, and Smith unbundled a four-limb EMG test they purportedly provided to an Insured named KG over the course of October 3, 2013 and January 20, 2014 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(viii)  Hamilton, Fass, Smith, and Kosmorsky unbundled a four-limb EMG test they purportedly provided to an Insured named SA over the course of November 21, 2013 and January 14, 2014 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(ix)    Hamilton, Fass, and Smith unbundled a four-limb EMG test they purportedly provided to an Insured named AP over the course of February 20, 2014 and March 17, 2014 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(x)     Hamilton, Fass, and Smith unbundled a four-limb EMG test they purportedly provided to an Insured named AP over the course of February 20, 2014 and March 25, 2014 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(xi)    Hamilton, Fass, and Smith unbundled a four-limb EMG test they purportedly provided to an Insured named YD over the course of May 19, 2014 and November 6, 2014 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(xii)   Hamilton, Fass, and Smith unbundled a four-limb EMG test they purportedly provided to an Insured named SN over the course of May 29, 2014 and July 17, 2014 into two separate, two-limb EMG test charges submitted on two separate

bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(xiii)   Hamilton, Fass, and Smith unbundled a four-limb EMG test they purportedly provided to an Insured named SH over the course of January 28, 2015 and February 12, 2015 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(xiv)   Hamilton, Fass, and Smith unbundled a four-limb EMG test they purportedly provided to an Insured named AH over the course of May 7, 2015 and August 20, 2015 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(xv)   Hamilton, Fass, and Smith unbundled a four-limb EMG test they purportedly provided to an Insured named HM over the course of May 7, 2015 and August 6, 2015 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(xvi)   Hamilton, Fass, and Smith unbundled a four-limb EMG test they purportedly provided to an Insured named VC over the course of July 16, 2015 and July 30, 2015 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(xvii)   Hamilton, Fass, and Smith unbundled a four-limb EMG test they purportedly provided to an Insured named LS over the course of November 5, 2015 and December 7, 2015 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(xviii)   Hamilton, Fass, and Smith unbundled a four-limb EMG test they purportedly provided to an Insured named DS over the course of November 16, 2015 and December 10, 2015 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(xix)   Hamilton, Fass, and Smith unbundled a four-limb EMG test they purportedly provided to an Insured named JG over the course of December 10, 2015 and January 21, 2016 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

(xx)    Hamilton, Fass, and Smith unbundled a four-limb EMG test they purportedly provided to an Insured named RD over the course of January 21, 2016 and March 24, 2016 into two separate, two-limb EMG test charges submitted on two separate bills, and thereby increased their already fraudulent billing for the EMG test by more than $275.00.

355.    These are only representative examples. In most of the claims for EDX tests that are identified in Exhibit "2", Hamilton, Fass, Smith, and Kosmorsky unbundled their EMG test charges in order to maximize their fraudulent billing for the EMG tests.

**5.      The Fraudulent Radiculopathy "Diagnoses"**

356.    Radiculopathies are relatively rare in motor vehicle accident victims, occurring in – at most – only 19 percent of accident victims according to a large-scale, peer-reviewed 2009 study conducted by Randall Braddom, M.D., Michael H. Rivner, M.D., and Lawrence Spitz, M.D. and published in Muscle & Nerve, the official journal of the AANEM.

357.    Furthermore, the cohort of accident victims considered in the study by Drs. Braddom, Rivner, and Spitz had been referred to a tertiary electrodiagnostic testing laboratory at a major university teaching hospital, and therefore represented a more severely injured group of patients than the Insureds whom the EMG/NCV Defendants purportedly treated.

358.    As a result, the frequency of radiculopathy in all motor vehicle accident victims is significantly lower than 19 percent.

359.    Virtually none of the Insureds whom the Defendants purported to treat suffered any serious medical problems as the result of any automobile accident, much less any radiculopathies.

360.    Even so, in the EDX test claims identified in Exhibit "2", Hamilton, Fass, Smith, and Kosmorsky falsely purported to identify radiculopathies in more than 90 percent of the Insureds to whom they purported to provide EMG and NCV testing.

361.    Hamilton, Fass, Smith, and Kosmorsky purported to arrive at their phony, pre-determined radiculopathy diagnoses in order to create the appearance of severe injuries and thereby provide a false justification for the laundry-list of medically unnecessary Fraudulent Services that the Defendants purported to provide.

**F.    The Fraudulent Charges for Pain Management Injections at Hamilton**

362.    As set forth in Exhibit "2", based upon the phony, boilerplate "diagnoses" that Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro provided during their fraudulent examinations, and the phony radiculopathy "diagnoses" that Hamilton, Fass, Smith, and Kosmorsky provided at the conclusion of their ersatz EDX tests, Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney purported to subject many Insureds to a series of medically unnecessary pain management injections, including but not limited to trigger point injections, epidural injections, transforaminal injections, and facet injections.

363.    In most cases, either Fass, Kosmorsky, Smith, or J. Mahoney purported to perform the injections, which then were billed through Hamilton to GEICO under CPT codes 20552, 20553, 62310, 62311, 64483, 64484, 64490, 64491, 64492, 64493, 64494, and 64495, resulting in charges of several hundred to over a thousand dollars per injection.

364.    Like all of the other charges for the Fraudulent Services that were billed through Hamilton to GEICO, the charges for the pain management injections were fraudulent because they falsely represented that Hamilton was in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore was eligible to collect PIP Benefits, when in fact it was not.

365.    Rather, as set forth above, Hamilton was not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore was not eligible to

collect PIP Benefits, because it received illegal kickbacks in exchange for patient referrals to GSMI.

366.    What is more, in the claims for pain management injections identified in Exhibit "2", the charges for the injections were fraudulent in that the injections were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the phony "diagnoses" that Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro provided to the Insureds at the conclusion of the putative initial and follow-up examinations, and the phony radiculopathy "diagnoses" that Hamilton, Fass, Smith, and Kosmorsky provided at the conclusion of their ersatz EDX tests.

**1.      Basic, Legitimate Use of Pain Management Injections**

367.    Generally, when a patient presents with a soft tissue injury, such as a sprain or strain, secondary to an automobile accident, the initial standard of care is conservative treatment comprised of rest, ice, compression, and – if applicable – elevation of the affected body part.

368.    If that sort of conservative treatment does not resolve the patient's symptoms, the standard of care can include other conservative treatment modalities such as chiropractic treatment, physical therapy, and the use of pain management medication.

369.    The substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through this sort of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to begin demonstrating at regular intervals why continued treatment is necessary beyond the four-week mark.

370.   In a legitimate clinical setting, pain management injections should not be administered until a patient has failed more conservative treatments, including chiropractic treatment, physical therapy, and pain management medication.

371.   This is because the substantial majority of soft tissue injuries such as sprains and strains will resolve over a period of weeks through conservative treatment, or no treatment at all, and invasive pain management injections entail a degree of risk to the patient that is absent in more conservative forms of treatment.

372.   In a legitimate clinical setting, pain management injections should not be administered more than once every two months, and multiple varieties of pain management injections should not be administered contemporaneously.

373.   This is because: (i) properly administered pain management injections should provide pain relief lasting for at least two months; (ii) a proper interval between pain management injections, and different types of pain management injections, is necessary to determine whether or not the initial pain management injections were effective; and (iii) if a patient's pain is not relieved through the injections, the pain may be caused by something more serious than a soft tissue injury caused by an automobile accident, and the perpetuating factors of the pain must be identified and managed.

## 2.   The Fraudulent Pain Management Injections

374.   As set forth above, virtually all of the Insureds in the claims identified in Exhibit "2" were involved in relatively minor, "fender-bender" accidents, to the extent that they were involved in any actual accidents at all.

375.    To the limited extent that the Insureds in the claims identified in Exhibit "2" experienced any injuries at all in their minor accidents, the injuries were minor soft tissue injuries such as sprains and strains.

376.    By the time the Insureds in the claims identified in Exhibit "2" presented to Hamilton for treatment, they either had no presenting problems at all, or their presenting problems consisted of trivial sprains and strains that could be and were in the process of being resolved through conservative treatment.

377.    Even so, in the claims for pain management injections identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney:

(i)      routinely administered pain management injections to Insureds who did not have any serious pain symptoms secondary to any automobile accident that legitimately would warrant the injections;

(ii)     routinely referred the Insureds for pain management injections before the Insureds had tried and failed any course of legitimate, conservative treatment; and/or

(iii)    routinely purported to administer multiple pain management injections to the Insureds within a span of weeks, despite the fact that such an regimen not only was medically unnecessary, but also placed the Insureds at risk.

378.    For example

(i)      On December 18, 2012, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that no one was injured in the accident, and that no one sought medical treatment at the scene of the accident. In keeping with the fact that AG was not injured in the minor accident, AG did not go to the hospital following the accident. To the extent that AG experienced any health problems at all as the result of his minor accident, the injuries were minor soft tissue injuries that had resolved within five months of the minor accident. Even so, Hamilton, Fass, and Smith purported to provide AG with multiple trigger point injections on April 15, 2013, as well as multiple trigger point injections just two weeks later, on April 30, 2013, none of which was medically necessary. What is more, and in keeping with the fact that AG had not tried and failed any course of legitimate conservative treatment before Hamilton, Fass, and Smith purported to provide the trigger point injections, AG purportedly continued to receive conservative

chiropractic and physical therapy treatments at Hamilton for months after he purportedly received the trigger point injections.

(ii)     On January 8, 2013, an Insured named ED was involved in an automobile accident. Though ED could not have tried and failed any legitimate course of conservative treatment within just two months of her accident, Hamilton and Fass purported to provide multiple trigger point injections to ED on February 26, 2013. Thereafter, just two weeks later on March 12, 2013, Hamilton and Fass again purported to provide multiple trigger point injections to ED. Hamilton and Fass also purported to provide multiple trigger point injections to ED on March 12, 2013, April 15, 2016, May 23, 2013, June 6, 2013, June 20, 2013, July 2, 2013, July 16, 2013, August 8, 2013, August 22, 2013, and September 19, 2013. ED had not tried and failed any legitimate course of conservative treatment prior to these injections, and the injections were medically unnecessary, considering that she purportedly received conservative physical therapy treatment throughout the period when she purportedly was receiving the injections, and conservative chiropractic treatment for much of the period when she purportedly was receiving the injections. What is more, the repeated provision of multiple pain management injections to ED within a short period constituted a serious deviation from the standard of care.

(iii)    On January 8, 2013, an Insured named CJ was involved in an automobile accident. Thereafter, CJ had received less than three months of chiropractic and physical therapy treatments when, on March 28, 2013, Hamilton and Fass purported to provide her with multiple trigger point injections. Less than three weeks later, on April 10, 2013, Hamilton, Fass, and J. Mahoney purported to provide an epidural injection to CJ. Less than a month after that, on May 9, 2013, Hamilton and Fass purported to provide CJ with still more trigger point injections. Just two weeks thereafter, on May 23, 2013, Hamilton, Fass, and Smith purported to provide CJ with still more trigger point injections. Then, Hamilton and Fass continued to purport to provide CJ with a massive number of trigger point injections in short intervals on June 10, 2013, July 22, 2013, August 26, 2013, and September 16, 2013, as well as yet another epidural injection on September 25, 2013. CJ had not tried and failed any legitimate course of conservative treatment prior to these injections, and the injections were medically unnecessary, considering that she purportedly received conservative physical therapy treatment throughout the period when she purportedly was receiving the injections, and conservative chiropractic treatment for much of the period when she purportedly was receiving the injections. What is more, the repeated provision of multiple pain management injections to CJ within a short period constituted a serious deviation from the standard of care.

(iv)    On February 7, 2013, an Insured named CM was involved in an automobile accident. Thereafter, CM traveled on his own to University Medical Center of Princeton, where he was briefly observed on an outpatient basis and discharged with a minor back sprain diagnosis. The contemporaneous hospital records

indicated that CM was fully ambulatory, able to drive, and that his condition had improved by the time he was discharged from the hospital. CM's minor soft tissue injury had completely resolved within two and a half months of the accident. Even so, Hamilton and Fass purported to provide CM with multiple trigger point injections on April 30, 2013 and again, just two weeks later, on May 14, 2013. CM had not tried and failed any legitimate course of conservative treatment prior to these injections, and the injections were medically unnecessary, considering that he purportedly received conservative chiropractic and physical therapy treatment throughout the period when he purportedly was receiving the injections. What is more, the repeated provision of multiple pain management injections to CM within a short period constituted a serious deviation from the standard of care.

(v)     On February 14, 2013, an Insured named ST was involved in an automobile accident. Thereafter, ST had received just two months of chiropractic and physical therapy treatments when, on April 18, 2013, Hamilton and Fass purported to provide her with multiple trigger point injections. Less than a month later, on May 16, 2013, Hamilton and Fass purported to provide ST with still more trigger point injections. Just two weeks later, on May 30, 2013, Hamilton and Fass purported to provide ST with still more trigger point injections. Only two weeks after that, on June 13, 2013, they purported to provide ST with even more trigger point injections. Just two weeks thereafter, on July 1, 2013, Hamilton and Fass purported to provide ST with still more trigger point injections. Then, just six weeks later on August 14, 2013, Hamilton and Fass purported to provide ST with multiple facet injections. Less than a month thereafter, on September 11, 2013, Hamilton and Fass purported to provide ST with an epidural injection, and they purported to provide her with still another epidural injection on October 9, 2013, less than a month later. ST had not tried and failed any legitimate course of conservative treatment prior to these injections, and the injections were medically unnecessary, considering that she purportedly received conservative physical therapy treatment throughout the period when she purportedly was receiving the injections, and conservative chiropractic treatment for much of the period when she purportedly was receiving the injections. What is more, the repeated provision of multiple pain management injections to ST within a short period constituted a serious deviation from the standard of care.

(vi)    On May 1, 2013, an Insured named VS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that VS's vehicle was drivable following the accident, that VS drove her vehicle away from the scene of the accident, and – though VS complained of "minor" back pain at the scene of the accident – VS refused medical attention at the scene of the accident. In keeping with the fact that VS was not seriously injured in the minor accident, she did not seek treatment at any hospital following the accident. Even so, on May 7, 2013, VS sought treatment at Hamilton. Though VS could not have tried and failed any legitimate course of conservative treatment within just a month of her minor accident, Hamilton and

Fass nonetheless purported to provide VS with multiple trigger point injections on June 6, 2013. Then, on August 23, 2013, Hamilton and Fass purported to provide VS with still more trigger point injections. Less than two weeks later, on September 4, 2013, Hamilton, Fass, and J. Mahoney purported to provide VS with an epidural injection. Just a month later, on October 4, 2013, Hamilton and Fass purported to provide VS with still more trigger point injections. Less than two weeks after that, on October 16, 2013, Hamilton, Fass, and J. Mahoney purported to provide VS with yet another epidural injection. Then, just two months later, on December 18, 2013, Hamilton and Fass purported to provide VS with multiple facet injections. VS had not tried and failed any legitimate course of conservative treatment prior to these injections, and the injections were medically unnecessary, considering that she purportedly received conservative physical therapy treatment throughout the period when she purportedly was receiving the injections, and conservative chiropractic treatment for much of the period when she purportedly was receiving the injections. What is more, the repeated provision of multiple pain management injections to VS within a short period constituted a serious deviation from the standard of care.

(vii)  On July 9, 2013, an Insured named DJ was involved in an automobile accident. Thereafter, DJ had received less than two months of conservative treatment when, on November 14, 2013, Hamilton and Fass purported to provide her with multiple trigger point injections. Just two weeks later, on November 26, 2013, Hamilton, Fass, and Kosmorsky purported to provide DJ with still more trigger point injections. Three weeks later, on December 16, 2013, Hamilton and Fass purported to provide DJ with even more trigger point injections. Then, just two weeks later on December 31, 2013, Hamilton and Fass purported to provide DJ with still more trigger point injections. Two weeks after that, on January 15, 2014, Hamilton and Fass purported to provide DJ with an epidural injection. Just five days later, on January 20, 2014, they once again purported to provide DJ with even more trigger point injections. Then, two weeks later, on February 4, 2014, Hamilton and Fass once again purported to provide DJ with multiple trigger point injections. Just a week later, on February 12, 2014, Hamilton and Fass again purported to provide DJ with an epidural injection. Less than a month later, on March 11, 2014, Hamilton, Fass, and Kosmorsky once again purported to subject DJ to multiple trigger point injections. Then, just over a week later, on March 19, 2014, Hamilton and Fass purported to subject DJ to facet injections. DJ had not tried and failed any legitimate course of conservative treatment prior to these injections, and the injections were medically unnecessary, considering that she purportedly received conservative chiropractic and physical therapy treatment throughout the period when she purportedly was receiving the injection. What is more, the repeated provision of multiple pain management injections to DJ within a short period constituted a serious deviation from the standard of care.

(viii)  On November 22, 2013, an Insured named AP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision that caused only minor damage to AP's vehicle,

that AP's vehicle was drivable following the accident, that AP drove his vehicle away from the scene of the accident, and no one was injured in the accident or complained of any pain at the scene of the accident. Nonetheless, AP traveled on his own to Robert Wood CJ University Hospital the next day, where he was briefly evaluated on an outpatient basis and discharged with a minor neck strain diagnosis. To the extent that AP experienced any health problems at all as the result of his minor accident, the injuries were minor soft tissue injuries that had resolved within five months of the minor accident. Even so, Hamilton and Fass purported to provide AP with multiple trigger point injections on March 6, 2014, March 25, 2014, and April 22, 2014. In addition, Hamilton, Fass, and J. Mahoney purported to provide AP with an epidural injection on April 9, 2014. None of these injections was medically necessary. What is more, and in keeping with the fact that AP had not tried and failed any course of legitimate conservative treatment before Hamilton, Fass, and J. Mahoney purported to provide the injections, AP purportedly continued to receive conservative physical therapy treatments at Hamilton for months after he purportedly received the injections.

(ix)    On December 19, 2013, an Insured named DO was involved in an automobile accident. The contemporaneous police report indicated that DO's vehicle was drivable following the accident, that DO drove his vehicle away from the scene of the accident, and that no one was injured in the accident or complained of any pain. In keeping with the fact that DO was not injured in the minor accident, DO did not go to the hospital following the accident. To the extent that DO experienced any health problems at all as the result of his minor accident, the injuries were minor soft tissue injuries. DO could not have tried and failed any legitimate course of conservative treatment within just five or six weeks of the minor accident, and had he actually received a legitimate course of conservative treatment, any minor soft tissue injuries he actually sustained would have resolved within three months of the minor accident. Even so, Hamilton, Fass, and Kosmorsky purported to provide DO with multiple trigger point injections on January 28, 2014 – less than six weeks after the minor accident – and again on March 12, 2014, by which point any minor soft tissue injuries he actually sustained would have resolved.  What is more, and in keeping with the fact that DO had not tried and failed any course of legitimate conservative treatment before Hamilton, Fass, and Kosmorsky purported to provide the injections, DO purportedly continued to receive conservative chiropractic and physical therapy treatments at Hamilton for weeks after he purportedly received the injections.

(x)     On June 29, 2014, an Insured named EM was involved in an automobile accident. Thereafter, EM had received only about two months of chiropractic and physical therapy treatments when, on September 8, 2014, Hamilton and Fass purported to provide her with multiple trigger point injections. Two months later, on November 12, 2014, Hamilton and Fass purported to provide EM with additional trigger point injections. One month thereafter, on December 11, 2014, they purported to provide EM with still more trigger point injections. Three weeks after that, on December 31, 2014, Hamilton, Fass, and J. Mahoney purported to

162

provide EM with an epidural injection. One month thereafter, On January 29, 2015, Hamilton and Fass again purported to provide EM with multiple trigger point injections. Then, on April 15, 2015, Hamilton, Fass, and J. Mahoney purported to provide EM with another epidural injection. Less than a month later, on May 11, 2015, Hamilton and Fass again purported to provide EM with multiple trigger point injections. Then, less than a month after that, on June 8, 2015, Hamilton and Fass purported to provide EM with even more trigger point injections. EM had not tried and failed any legitimate course of conservative treatment prior to these injections, and the injections were medically unnecessary, considering that she purportedly received conservative physical therapy treatment throughout the period when she purportedly was receiving the injections, and conservative chiropractic treatment for much of the period when she purportedly was receiving the injections. What is more, the repeated provision of multiple pain management injections to EM within a short period constituted a serious deviation from the standard of care.

(xi)     On February 3, 2015 an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that AS was not injured in the minor accident, AS refused medical treatment and did not go to the hospital following the accident. To the extent that AS experienced any health problems at all as the result of her minor accident, the injuries were minor soft tissue injuries that had resolved within four months of the minor accident. Even so, Hamilton and Fass purported to provide AP with multiple trigger point injections on June 2, 2015. In addition, Hamilton, Fass, and J. Mahoney purported to provide AS with an epidural injection on September 2, 2015, as well as multiple facet injections on November 11, 2015. None of these injections was medically necessary. What is more, and in keeping with the fact that AS had not tried and failed any course of legitimate conservative treatment before Hamilton, Fass, and J. Mahoney purported to provide the injections, AS purportedly continued to receive conservative physical therapy treatments at Hamilton for months after she purportedly received the trigger point injections, and for weeks after she purportedly received the epidural injections.

(xii)    On February 17, 2015, an Insured named PS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that PS's vehicle was drivable following the accident, that PS drove his vehicle away from the scene of the accident, and that no one was injured in the accident. In keeping with the fact that PS was not injured in the minor accident, PS did not go to the hospital following the accident. To the extent that PS experienced any health problems at all as the result of his minor accident, the injuries were minor soft tissue injuries. PS could not have tried and failed any legitimate course of conservative treatment within less than two months of the minor accident. Even so, Hamilton and Fass purported to provide PS with multiple trigger point injections on April 10, 2015 – less than two months after the minor accident.  What is more, and in keeping with the fact that

163

PS had not tried and failed any course of legitimate conservative treatment before Hamilton and Fass purported to provide the injections, PS purportedly continued to receive conservative chiropractic and physical therapy treatments at Hamilton for months after he purportedly received the injections.

(xiii)    On July 9, 2015 an Insured named BA was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that BA's vehicle was drivable following the accident, that BA drove his vehicle away from the scene of the accident, and that that no one was injured in the accident. Nonetheless, BA traveled on his own to Robert Wood CJ University Hospital, where he was briefly evaluated on an outpatient basis and discharged with a minor neck/back strain diagnosis. To the extent that BA experienced any health problems at all as the result of his minor accident, the injuries were minor soft tissue injuries that had resolved within three months of the minor accident. Even so, Hamilton and Fass purported to provide BA with multiple trigger point injections on October 15,2015, and Hamilton, Fass, and J. Mahoney purported to provide BA with an epidural injection on November 11, 2015. None of these injections was medically necessary. What is more, and in keeping with the fact that BA had not tried and failed any course of legitimate conservative treatment before Hamilton, Fass, and J. Mahoney purported to provide the injections, BA purportedly continued to receive conservative physical therapy treatments at Hamilton for months after he purportedly received the injections, and conservative chiropractic treatments at Hamilton for weeks after he purportedly received the injections.

(xiv)    On September 10, 2015, an Insured named MS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that MS's vehicle was drivable following the accident, that MS drove his vehicle away from the scene of the accident, and that MS was not injured in the accident. In keeping with the fact that MS was not injured in the minor accident, MS did not go to the hospital following the accident. MS did not begin to receive any conservative treatment at all until September 22, 2015, almost two weeks after his minor accident. To the extent that MS experienced any health problems at all as the result of his minor accident, the injuries were minor soft tissue injuries. MS could not have tried and failed any legitimate course of conservative treatment within less than two months of the minor accident and, had he actually received a legitimate course of conservative treatment, any minor soft tissue injuries he actually sustained would have resolved within four months of the minor accident. Even so, Hamilton and Fass purported to provide MS with multiple trigger point injections on November 20, 2015 – less than two months after MS first received conservative treatment. Then, Hamilton, Fass, and J. Mahoney purported to provide MS with multiple transforaminal injections on January 27, 2016. None of these injections was medically necessary. What is more, and in keeping with the fact that MS had not tried and failed any course of legitimate conservative treatment before Hamilton, Fass, and J. Mahoney purported to provide the injections, MS purportedly continued to

receive conservative chiropractic and physical therapy treatments at Hamilton for months after he purportedly received the trigger point injections, and for weeks after he purportedly received the transforaminal injections.

(xv)    On October 11, 2015, an Insured named NR was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that NR's vehicle was drivable following the accident, that NR drove his vehicle away from the scene of the accident, and that no one was injured in the accident or complained of any pain at the scene of the accident. In keeping with the fact that NR was not injured in the minor accident, NR did not seek treatment at any hospital following the accident. To the extent that NR experienced any health problems at all as the result of his minor accident, the injuries were minor soft tissue injuries that had completely resolved within two months of the minor accident. Even so, Hamilton and Fass purported to provide NR with multiple trigger point injections on December 14, 2015, and again on February 29, 2016. None of these injections was medically necessary. What is more, and in keeping with the fact that NR had not tried and failed any course of legitimate conservative treatment before Hamilton and Fass purported to provide the injections, NR purportedly continued to receive conservative chiropractic and physical therapy treatments at Hamilton for weeks after he purportedly received the trigger point injections.

379.    These are only representative examples. In the claims for pain management injections identified in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney:

(i)     routinely administered pain management injections to Insureds who did not have any serious pain symptoms secondary to any automobile accident that legitimately would warrant the injections;

(ii)    routinely referred the Insureds for pain management injections before the Insureds had tried and failed any course of legitimate, conservative treatment; and/or

(iii)   routinely purported to administer multiple pain management injections to the Insureds within a span of weeks, despite the fact that such an regimen not only was medically unnecessary, but also placed the Insureds at risk.

380.    By way of additional examples:

(i)     Hamilton and Fass purported to provide an Insured named JS with multiple trigger point injections on five separate occasions during a one month period between July 18, 2014 and August 22, 2014, as well as multiple transforaminal injections on two separate occasions during a one month period between October 8, 2014 and November 5, 2014, despite the fact that: (a) JS continued to receive physical therapy treatments throughout this period, and chiropractic treatments for much of this period, indicating that he had not failed conservative treatment at the

165

time of the injections; and (b) the repeated provision of multiple pain management injections to JS within a short period constituted a serious deviation from the standard of care.

(ii)   Hamilton, Fass, and J. Mahoney purported to provide an Insured named LA with two epidural injections on two separate occasions during a three week period between September 24, 2014 and October 15, 2014, despite the fact that: (a) LA continued to receive physical therapy treatments throughout this period, indicating that she had not failed conservative treatment at the time of the injections; and (b) the repeated provision of multiple pain management injections to LA within a short period constituted a serious deviation from the standard of care.

(iii)   Hamilton and Fass purported to provide an Insured named GS with multiple trigger point injections on four separate occasions during a four week period between September 26, 2014 and October 14, 2014, despite the fact that: (a) GS continued to receive physical therapy and chiropractic treatments throughout this period, indicating that she had not failed conservative treatment at the time of the injections; and (b) the repeated provision of multiple pain management injections to GS within a short period constituted a serious deviation from the standard of care.

(iv)   Hamilton and Fass purported to provide an Insured named TG with multiple trigger point injections on seven separate occasions during a less than two month period between May 18, 2015 and July 13, 2015, as well as an epidural injection and multiple facet injections on two separate occasions during a five week period between August 12, 2015 and September 16, 2015, despite the fact that: (a) TG continued to receive physical therapy treatments throughout this period, indicating that he had not failed conservative treatment at the time of the injections; and (b) the repeated provision of multiple pain management injections to TG within a short period constituted a serious deviation from the standard of care.

(v)   Hamilton, Fass, and J. Mahoney purported to provide an Insured named JH with three epidural injections on three separate occasions during a two month period between January 27, 2016 and March 16, 2016, despite the fact that: (a) JH continued to receive chiropractic and physical therapy treatments throughout this period, indicating that he had not failed conservative treatment at the time of the injections; and (b) the repeated provision of multiple pain management injections to JH within a short period constituted a serious deviation from the standard of care.

381.   Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney's pre-determined treatment protocol, including subjecting patients to a large amount of medically unnecessary pain management injections over the course of a few weeks, before the Insureds had failed any

legitimate course of conservative treatment, was designed and employed by Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney solely to maximize the potential charges that they could submit, and cause to be submitted, to GEICO, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them.

### 3.    Misrepresentations Regarding the Reimbursable Amounts for the Pain Management Injections

382.    As set forth above, the No-Fault Laws specifically prohibit healthcare services providers from charging for services in amounts exceeding the amounts set forth in the Fee Schedule. See N.J.S.A. § 39:6A-4.6; N.J.A.C. 11:3-29.6.

383.    Not only did Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney routinely bill GEICO for medically unnecessary pain management injections, they also routinely misrepresented the reimbursable amount for the pain management injections.

384.    Specifically, and as set forth above and in Exhibit "2", Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney billed virtually all of their purported pain management injections under CPT codes 20552, 20553, 62310, 62311, 64483, 64484, 64490, 64491, 64492, 64493, 64494, and 64495.

385.    The following chart sets forth the maximum reimbursable amounts under the Fee Schedule for pain management injections under those CPT codes in southern New Jersey, as well as the unlawfully inflated charges that Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney routinely submitted under those codes through Hamilton to GEICO:

| CPT Code | Procedure Description | Fee Schedule Amount | Hamilton Billed Amount |
|---|---|---|---|
| 20552 | INJECT TRIGGER POINT, 1/2 MUSCLE | $123.83 | $250.00 |
| 20553 | INJECT TRIGGER POINTS, =/> 3 | 244.86 | $350.00 |
| 62310 | INJECT SPINE C/T | $967.17 | $1,050.00 |
| 62311 | INJECT SPINE L/S (CD) | $831.58 | $1,000.00 |
| 64483 | INJECT FORAMEN EPIDURAL L/S | $578.07 | $830.00 |
| 64484 | INJECT FORAMEN EPIDURAL, ADDED | $254.31 | $675.00 |
| 64490 | INJECT PARAVERT F JOINT C/T 1 | $469.59 | $880.00 - $1,580.00 |
| 64491 | INJECT PARAVERT F JOINT C/T 2 | $230.50 | $880.00 - $1,580.00 |
| 64492 | INJECT PARAVERT F JOINT C/T 3 | $233.01 | $880.00 - $1,580.00 |
| 64493 | INJECT PARAVERT F JNT L/S 1 LEV | $419.26 | $825.00 - $1,525.00 |
| 64494 | INJECT PARAVERT F JNT L/S 2 LEV | $208.33 | $825.00 - $1,525.00 |
| 64495 | INJECT PARAVERT F JNT L/S 3 LEV | $211.68 | $825.00 - $1,525.00 |

386.    Each and every one of Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney's inflated charges for pain management injections constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

387.    Hamilton, Fass, Kosmorsky, Smith, and J. Mahoney knowingly submitted charges through Hamilton in gross excess of the amounts allowed under the Fee Schedule in order to maximize the amount of fraudulent billing they could submit to GEICO.

**G.    The Fraudulent Charges for PENS Sessions at Hamilton**

388.    As set forth in Exhibit "2", based upon the phony, boilerplate "diagnoses" that Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro provided during their fraudulent examinations, and the phony radiculopathy "diagnoses" that Hamilton, Fass, Smith, and Kosmorsky provided at the conclusion of their ersatz EDX tests, Hamilton and Fass purported to subject many Insureds to a series of medically unnecessary PENS sessions.

389.     In most cases, physician assistants at Hamilton purported to perform the PENS sessions.

390.     As set forth in Exhibit "2", Fass and Hamilton then billed the PENS sessions to GEICO under CPT code 64999, virtually always resulting in charges of $400.00 for each PENS session they purported to provide.

391.     Like all of the other charges for the Fraudulent Services that were billed through Hamilton to GEICO, the charges for the PENS sessions were fraudulent because they falsely represented that Hamilton was in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore was eligible to collect PIP Benefits, when in fact it was not.

392.     Rather, as set forth above, Hamilton was not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore was not eligible to collect PIP Benefits, because it received illegal kickbacks in exchange for patient referrals to GSMI.

393.     What is more, in the claims for PENS sessions identified in Exhibit "2", the charges for the PENS sessions were fraudulent in that the PENS sessions were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the phony "diagnoses" that Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro provided to the Insureds at the conclusion of the putative initial and follow-up examinations, and the phony radiculopathy "diagnoses" that Hamilton, Fass, Smith, and Kosmorsky provided at the conclusion of their ersatz EDX tests.

394.    In the claims for PENS sessions identified in Exhibit "2", the charges for the PENS sessions also were fraudulent because they misrepresented the reimbursable amount for the PENS sessions.

395.    In a legitimate clinical setting, PENS is a procedure that combines the features of electroacupuncture and transcutaneous electrical nerve stimulation, whereby electrical current is applied through the skin to provide patients with pain control. PENS is administered through fine needle-like electrodes that are placed in close proximity to the painful area and stimulate peripheral sensory nerves in the soft tissue.

396.    There is no CPT code assigned to PENS sessions, and the Fee Schedule does not set forth any specific reimbursable amount for PENS sessions.

397.    As a result, and as set forth above, Hamilton and Fass billed for the PENS sessions using CPT code 64999, which is the CPT code used to bill for an unlisted neurological procedure.

398.    Pursuant to the Fee Schedule, when submitting bills using CPT code 64999 a healthcare provider is required to base its charges on a comparable procedure.

399.    As set forth above, in a legitimate clinical setting, PENS is a procedure that combines the features of electroacupuncture and transcutaneous electrical nerve stimulation.

399.    Pursuant to the Fee Schedule, the maximum reimbursable amount for electroacupuncture in the southern New Jersey area is $35.12.

400.    Pursuant to the Fee Schedule, the maximum reimbursable amount for electrical stimulation in the southern New Jersey area is $19.25.

401.   To the extent that Hamilton and Fass provided any legitimate PENS sessions in the first instance, they were not entitled to recover more than either $19.25 or – at most – $35.12 for the PENS sessions.

402.   Even so, in all of the claims for purported PENS treatments that are identified in Exhibit "2", Hamilton and Fass falsely represented that they were entitled to recover $400.00 for the PENS sessions.

403.   Each and every one of Hamilton and Fass' inflated charges for PENS sessions constituted a separate violation of N.J.S.A. § 39:6A-4.6 and N.J.A.C. 11:3-29.6.

**H.   The Fraudulent Charges for Chiropractic and Physical Therapy Services at Hamilton**

404.   The Defendants' fraudulent scheme also included the submission through Hamilton of a massive amount of fraudulent billing for medically unnecessary chiropractic and physical therapy services.

405.   In most cases, Pierro, Lychock, or Kishyk purported to provide the chiropractic services, which then were billed through Hamilton to GEICO under CPT codes 98940 and 98941.

406.   The physical therapy services purportedly were provided by Fass, Pierro, Lychock, Kishyk, or by physical therapists at Hamilton who worked under the ultimate supervision of Fass, and were billed to GEICO under CPT codes 97001, 97002, 97018, 97035, 97110, 97124, and 97140.

407.   Like all of the other charges for the Fraudulent Services that were billed through Hamilton to GEICO, the charges for the chiropractic and physical therapy services were fraudulent because they falsely represented that Hamilton was in compliance with all relevant

laws and regulations governing healthcare practice in New Jersey, and therefore was eligible to collect PIP Benefits, when in fact it was not.

408.    Rather, as set forth above, Hamilton was not in compliance with all relevant laws and regulations governing healthcare practice in New Jersey, and therefore was not eligible to collect PIP Benefits, because it received illegal kickbacks in exchange for patient referrals to GSMI.

409.    As set forth above, to the extent that the Insureds in the claims identified in Exhibit "2" suffered any healthcare problems at all as the result of their minor automobile accidents, the problems virtually always were limited to ordinary soft tissue injuries such as sprains and strains.

410.    The vast majority of soft tissue injuries such as sprains and strains resolve after a short course of conservative treatment, or no treatment at all, which is why the Care Paths generally require healthcare services providers to begin demonstrating at regular intervals why continued treatment is necessary beyond the four-week mark.

411.    The Care Paths are designed to avoid the continuation of treatment and therapy, week after week, over many months, without any observable improvement. See 30 N.J.R. 4401(a).

412.    Hamilton, Fass, Pierro, Lychock, and Kishyk knew that – unless they could create a false basis to provide long-term, medically unnecessary chiropractic and physical therapy treatments to the Insureds in the claims identified in Exhibit "2" – their ability to provide such long-term, medically unnecessary treatments would be limited by the Care Paths.

413.    Accordingly, Hamilton, Fass, Pierro, Lychock, and Kishyk used the phony "diagnoses" that Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk,

Lychock, and Pierro provided to the Insureds at the conclusion of the putative initial and follow-up examinations, and the phony radiculopathy "diagnoses" that Hamilton, Fass, Smith, and Kosmorsky provided at the conclusion of their ersatz EDX tests, as a false basis to bill for months and months of medically unnecessary chiropractic and physical therapy treatment in gross deviation from the Care Paths.

414.    Toward that end, at the conclusion of virtually every purported follow-up examination and EDX test in the claims identified in Exhibit "2", the examining physician or chiropractor, or the testing physician, would refer the Insureds back to Hamilton for additional, medically unnecessary chiropractic and/or physical therapy "treatments".

415.    In keeping with the fact that these referrals for continued chiropractic and/or physical therapy "treatments" were not predicated on medical necessity, Hamilton's own records frequently indicated that the previous, extensive chiropractic and physical therapy treatments that the Insureds had received had not been effective in resolving their purported complaints.

416.    For example:

(i)      On October 13, 2012, an Insured named JB was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that no one was injured in the accident, and that no one requested medical treatment at the scene of the accident. Nonetheless, two days later, JB traveled on his own to Robert Wood CJ University Hospital, where he was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. To the extent that JB was injured at all in his minor accident, his injuries were minor soft tissue injuries that did not require five and a half months of chiropractic and physical therapy treatment. Even so, following purported follow-up examinations of JB by Fass on December 10, 2012, January 2, 2013, January 23, 2013, February 11, 2013, and April 1, 2013, by Pierro on December 17, 2012, January 21, 2013, and March 26, 2013, and by Lychock on February 20, 2013, Fass, Pierro, and Lychock routinely directed that JB continue to receive chiropractic and physical therapy treatment at Hamilton, despite the fact that the large amount of physical therapy and chiropractic services JB previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives

by Fass, Pierro, and Lychock, JB received five and a half months of purported chiropractic and/or physical therapy "treatments" at Hamilton.

(ii)     On December 18, 2012, an Insured named AG was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that no one was injured in the accident, and that no one sought medical treatment at the scene of the accident. In keeping with the fact that AG was not injured in the minor accident, AG did not go to the hospital following the accident. To the extent that AG experienced any health problems at all as the result of his minor accident, his injuries were minor soft tissue injuries that did not require eight months of chiropractic and physical therapy treatment. Even so, following purported follow-up examinations of AG by Fass on March 1, 2013, April 15, 2013, June 3, 2013, July 10, 2013, and August 13, 2013, by J. Mahoney on July 23, 2013, by Pierro on February 4, 2013, March 12, 2013, May 14, 2013, and June 19, 2013, by Kosmorsky on February 12, 2013 and September 10, 2013, by Lychock on April 16, 2013 and July 16, 2013, and by Smith on April 30, 2013 and May 21, 2013, Fass, J. Mahoney, Pierro, Smith, Kosmorsky, and Lychock routinely directed that AG continue to receive chiropractic and physical therapy treatment at Hamilton, despite the fact that the large amount of physical therapy and chiropractic services AG previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Fass, J. Mahoney, Pierro, Smith, Kosmorsky, and Lychock, AG received eight months of purported chiropractic and/or physical therapy "treatments" at Hamilton.

(iii)    On January 21, 2013, an Insured named KG was involved in an automobile accident. The contemporaneous police report indicated that the accident occurred when a smaller vehicle rear-ended a bus KG was traveling on, causing only a small dent to the bus's rear bumper, and that no one was injured in the accident. Nonetheless, the next day KG traveled on her own to Robert Wood CJ University Hospital, where she was briefly observed on an outpatient basis and discharged with a minor soft tissue injury diagnosis. In keeping with the fact that KG was not seriously injured in the minor accident, she returned to work and did not seek any further treatment for a month, at which point she presented at Hamilton for treatment. To the extent that KG experienced any health problems at all as the result of her minor accident, her injuries were minor soft tissue injuries that did not require 12 months of chiropractic and physical therapy treatment.. Even so, following purported follow-up examinations of KG by Fass on March 21, 2013, April 4, 2013, April 19, 2013, May 3, 2013, May 31, 2013, September 16, 2013, November 6, 2013, January 20, 2014, February 17, 2014, March 17, 2014, and April 14, 2014, by Pierro on March 20, 2013 and July 9, 2013, by Lychock on April 22, 2013, and by Smith on October 3, 2013, Fass, Pierro, Smith, and Lychock routinely directed that KG continue to receive chiropractic and physical therapy treatment at Hamilton, despite the fact that the large amount of physical therapy and chiropractic services KG previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary

chiropractic and physical therapy directives by Fass, Pierro, Smith, and Lychock, KG received 12 months of purported chiropractic and/or physical therapy "treatments" at Hamilton.

(iv)    On November 22, 2013, an Insured named AP was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision that caused only minor damage to AP's vehicle, that AP's vehicle was drivable following the accident, that AP drove his vehicle away from the scene of the accident, and no one was injured in the accident or complained of any pain at the scene of the accident. Nonetheless, AP traveled on his own to Robert Wood CJ University Hospital the next day, where he was briefly evaluated on an outpatient basis and discharged with a minor neck strain diagnosis. To the extent that AP experienced any health problems at all as the result of his minor accident, his injuries were minor soft tissue injuries that did not require eight months of chiropractic and physical therapy treatment. Even so, following purported follow-up examinations of AP by Fass on March 6, 2014, March 25, 2014, April 8, 2014, April 22, 2014, May 6, 2014, May 20, 2014, June 3, 2014, June 17, 2014, July 1, 2014, and July 31, 2014, by J. Mahoney on May 15, 2014, by Kosmorsky on January 28, 2014, by Pierro on February 4, 2014 and April 16, 2014, by Smith on February 20, 2014, and by Lychock on March 3, 2014 and March 31, 2014, Fass, Pierro, Smith, Lychock, J. Mahoney, and Kosmorsky routinely directed that AP continue to receive chiropractic and physical therapy treatment at Hamilton, despite the fact that the large amount of physical therapy and chiropractic services AP previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Fass, Pierro, Smith, Lychock, J. Mahoney, and Kosmorsky, AP received eight months of purported chiropractic and/or physical therapy "treatments" at Hamilton.

(v)    On January 24, 2014 an Insured named RS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that RS's vehicle was drivable following the accident, that RS drove his vehicle away from the scene of the accident, and that no one was injured in the accident or complained of any pain. In keeping with the fact that RS was not injured in the minor accident, the police report stated that RS "stated he was not injured, and refused medical treatment." Nonetheless, RS traveled on his own to Capital Health Regional Medical Center, where he was briefly evaluated on an outpatient basis and discharged with a minor back strain diagnosis. To the extent that RS experienced any health problems at all as the result of his minor accident, his injuries were minor soft tissue injuries that did not require seven months of chiropractic and physical therapy treatment. Even so, following purported follow-up examinations of RS by Fass on March 20, 2014, April 4, 2014, April 25, 2014, June 25, 2014, August 3, 2014, September 9, 2014, October 15, 2014, and November 12, 2014, by Lychock on March 26, 2014, and by Pierro on April 22, 2014 and August 19, 2014, Fass, Lychock, and Pierro routinely directed that RS continue to receive chiropractic and physical therapy

treatment at Hamilton, despite the fact that the large amount of physical therapy and chiropractic services RS previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Fass, Lychock, and Pierro, RS received seven months of purported chiropractic and/or physical therapy "treatments" at Hamilton.

(vi)     On February 14, 2014, an Insured named YD was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that YD's vehicle was drivable following the accident, that YD drove her vehicle away from the scene of the accident, and no one was injured in the accident or complained of any pain. In keeping with the fact that YD was not seriously injured in the minor accident, YD went to work following the accident. Nonetheless, later that day YD traveled on her own to Robert Wood CJ University Hospital, where she was briefly evaluated on an outpatient basis and discharged with a minor neck strain diagnosis. To the extent that YD experienced any health problems at all as the result of her minor accident, her injuries were minor soft tissue injuries that did not require nine months of chiropractic and physical therapy treatment. Even so, following purported follow-up examinations of YD by Fass on April 9, 2014, April 23, 2014, May 6, 2014, May 19, 2014, June 2, 2014, June 16, 2014, June 30, 2014, July 14, 2014, August 29, 2014, October 6, 2014, October 20, 2014, and December 18, 2014, by N. Mahoney on November 19, 2014, by Pierro on April 29, 2014, May 22, 2014, June 24, 2014, July 23, 2014, September 25, 2014, and October 14, 2014, by Kishyk on August 28, 2014, and by Smith on November 6, 2014 and November 20, 2014, Fass, N. Mahoney, Kishyk, Smith, and Pierro routinely directed that YD continue to receive chiropractic and physical therapy treatment at Hamilton, despite the fact that the large amount of physical therapy and chiropractic services YD previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Fass, N. Mahoney, Kishyk, Smith, and Pierro, YD received nine months of purported chiropractic and/or physical therapy "treatments" at Hamilton.

(vii)    On April 11, 2014, an Insured named JM was involved in an automobile accident. The contemporaneous police report indicated that no one was injured in the accident or complained of any pain at the scene of the accident. Nonetheless, later that day JM traveled on her own to Robert Wood CJ University Hospital, where she was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. To the extent that JM experienced any health problems at all as the result of her minor accident, her injuries were minor soft tissue injuries that did not require 11 months of chiropractic and physical therapy treatment. Even so, following purported follow-up examinations of JM by Fass on June 12, 2014, July 10, 2014, August 12, 2014, October 9, 2014, October 23, 2014, November 17, 2014, December 2, 2014, December 16, 2014, January 2, 2015, January 15, 2015, and February 12, 2015, by Kosmorsky on May 14, 2014, and

by Lychock on May 19, 2014, June 18, 2014, and July 16, 2014, Fass, Kosmorsky, and Lychock routinely directed that JM continue to receive chiropractic and physical therapy treatment at Hamilton, despite the fact that the large amount of physical therapy and chiropractic services JM previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Fass, Kosmorsky, and Lychock, YD received 11 months of purported chiropractic and/or physical therapy "treatments" at Hamilton.

(viii)   On January 16, 2015 an Insured named AH was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision that occurred while both vehicles were backing out of parking spaces, that AH's vehicle was drivable following the accident, and that no one was injured in the accident or complained of any pain. Nonetheless, AH traveled on her own to Capital Health Regional Medical Center, where she was briefly evaluated on an outpatient basis and discharged with a minor soft tissue injury diagnosis. To the extent that AH experienced any health problems at all as the result of her minor accident, her injuries were minor soft tissue injuries that did not require seven months of chiropractic and physical therapy treatment. Even so, following purported follow-up examinations of AH by Fass on March 24, 2015, April 14, 2015, May 21, 2015, June 4, 2015, June 25, 2015, July 16, 2015, September 1, 2015, and October 8, 2015, by Pierro on April 2, 2015, by Kishyk on April 30, 2015 and June 3, 2015, and by Smith on May 7, 2015, August 6, 2015, and August 20, 2015, Fass, Pierro, Kishyk, and Smith routinely directed that AH continue to receive chiropractic and physical therapy treatment at Hamilton, despite the fact that the large amount of physical therapy and chiropractic services AH previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Fass, Pierro, Kishyk, and Smith, AH received seven months of purported chiropractic and/or physical therapy "treatments" at Hamilton.

(ix)   On February 3, 2015 an Insured named AS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, and that no one was injured in the accident. In keeping with the fact that AS was not injured in the minor accident, AS refused medical treatment and did not go to the hospital following the accident. To the extent that AS experienced any health problems at all as the result of her minor accident, her injuries were minor soft tissue injuries that did not require eight months of chiropractic and physical therapy treatment. Even so, following purported follow-up examinations of AS by Fass on March 31, 2015, April 14, 2015, April 28, 2015, May 19, 2015, June 2, 2015, June 23, 2015, July 14, 2015, August 4, 2015, September 8, 2015, October 6, 2015, and December 29, 2015, by N. Mahoney on August 5, 2015 and December 16, 2015, by J. Mahoney on October 15, 2015, by Lychock on March 30, 2015, by Kishyk on April 30, 2015, by Pierro on May 27, 2015 and June 25, 2015, and by J. Mahoney on September

17, 2015, Fass, N. Mahoney, Lychock, Kishyk, Pierro, and J. Mahoney routinely directed that AS continue to receive chiropractic and physical therapy treatment at Hamilton, despite the fact that the large amount of physical therapy and chiropractic services AS previously had received supposedly had not resolved her purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Fass, N. Mahoney, Lychock, Kishyk, Pierro, and J. Mahoney, AS received eight months of purported chiropractic and/or physical therapy "treatments" at Hamilton.

(x)    On February 17, 2015, an Insured named PS was involved in an automobile accident. The contemporaneous police report indicated that the accident was a low-speed, low-impact collision, that PS's vehicle was drivable following the accident, that PS drove his vehicle away from the scene of the accident, and that no one was injured in the accident. In keeping with the fact that PS was not injured in the minor accident, PS did not go to the hospital following the accident. To the extent that PS experienced any health problems at all as the result of his minor accident, his injuries were minor soft tissue injuries that did not require six months of chiropractic and physical therapy treatment. Even so, following purported follow-up examinations of PS by Fass on April 28, 2015, May 12, 2015, June 2, 2015, July 2, 2015, July 30, 2015, September 8, 2015, and September 24, 2015, by Pierro on April 20, 2015, by Lychock on May 18, 2015 and June 22, 2015, and by Kishyk on July 21, 2015, Fass, Lychock, Kishyk, and Pierro routinely directed that PS continue to receive chiropractic and physical therapy treatment at Hamilton, despite the fact that the large amount of physical therapy and chiropractic services PS previously had received supposedly had not resolved his purported symptoms. As a result of the medically unnecessary chiropractic and physical therapy directives by Fass, Lychock, Kishyk, and Pierro, PS received eight months of purported chiropractic and/or physical therapy "treatments" at Hamilton.

417.   These are only representative examples. In virtually all of the claims for chiropractic and physical therapy services that are identified in Exhibit "2", Hamilton, Fass, Pierro, Lychock, and Kishyk used the phony "diagnoses" that Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro provided to the Insureds at the conclusion of the putative initial and follow-up examinations, and the phony radiculopathy "diagnoses" that Hamilton, Fass, Smith, and Kosmorsky provided at the conclusion of their ersatz EDX tests, as a false basis to bill for months and months of medically unnecessary chiropractic and physical therapy treatment in gross deviation from the Care Paths.

418.    As set forth above, the Care Paths – which generally require healthcare providers to provide some objective justification for the medical necessity of continued healthcare services at the four-week, eight-week, and 13-week mark – designed to avoid the continuation of treatment and therapy, week after week, over many months and years, without any observable improvement. See 30 N.J.R. 4401(a).

419.    Hamilton, Fass, Kosmorsky, Smith, J. Mahoney, N. Mahoney, Kishyk, Lychock, and Pierro's fraudulent scheme enabled them to bill for months of medically unnecessary chiropractic and physical therapy services per Insured, without regard for the Insureds' true circumstances or presentment.

## III.    The Fraudulent Billing Submitted to GEICO

420.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted hundreds of HCFA-1500 forms and treatment reports through Hamilton and GSMI to GEICO, containing thousands of fraudulent charges, seeking payment for the Fraudulent Services for which they were not entitled to receive payment.

421.    The HCFA-1500 forms and treatment reports were false and misleading, and in violation of the Insurance Fraud Prevention Act, in the following material respects:

(i)      The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that Hamilton and GSMI were in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, GSMI was not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore was not eligible to receive PIP reimbursement, because: (a) it paid unlawful kickbacks in exchange for patient referrals; and (b) it was illegally owned, managed, and operated by Zuberi. Similarly, Hamilton was not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore was not eligible to receive PIP reimbursement, because: (a) it received unlawful kickbacks in exchange for patient referrals; (b) it purported to provide, and billed for, the medically unnecessary and in many cases illusory Fraudulent Services.

(ii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were not eligible to receive PIP reimbursement, because: (a) they were provided, to the extent that they were provided at all, pursuant to an illegal kickback scheme; and (b) they were medically unnecessary, and in many cases illusory.

(iii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants uniformly misrepresented to GEICO that the Fraudulent Services billed through Hamilton were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services billed through Hamilton actually were performed. In fact, the Fraudulent Services billed through Hamilton frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to it.

(iv)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted through Hamilton misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

## IV.   GEICO's Justifiable Reliance

422.    The Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submit, or cause to be submitted, to GEICO.

423.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically concealed their fraud and went to great lengths to accomplish this concealment.

424.    For instance, the Defendants  knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to a fraudulent, pre-

determined protocol designed to maximize the charges that could be submitted, not to benefit the Insureds who supposedly were subjected to it.

425.    Likewise, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services frequently never were performed in the first instance.

426.    In addition, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were performed, to the extent that they are performed at all, pursuant to an illegal kickback scheme between and among the Defendants.

427.    Moreover, GSMI, Zuberi, F. Zuberi, Khan, and Din knowingly misrepresented and concealed facts to prevent GEICO from discovering that GSMI illegally was owned, managed, and operated by Zuberi, and thefrefore never was eligible to collect PIP Benefits in the first instance.

428.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming collections proceedings against GEICO and other insurers if the charges are not promptly paid in full.

429.    GEICO is under statutory and contractual obligations to promptly and fairly process claims.  The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and omissions described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $3,300,000.00 based upon the fraudulent charges representing payments made by GEICO to Hamilton and GSMI.

430. Based upon the Defendants' material misrepresentations, omissions, and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against Hamilton and GSMI
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

431. GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 430 above.

432. There is an actual case in controversy between GEICO and Hamilton and GSMI regarding more than $300,000.00 in pending fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

433. Hamilton and GSMI have no right to receive payment for any pending bills submitted to GEICO because they were not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey

434. Hamilton and GSMI have no right to receive payment for any pending bills submitted to GEICO because the underlying services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey

435. Hamilton has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were not medically necessary, and were performed – to the extent that they were performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants.

436. Hamilton has no right to receive payment for any pending bills submitted to GEICO because the Fraudulent Services were medically unnecessary.

437.     Hamilton has no right to receive payment for any pending bills submitted to GEICO because the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

438.     Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Hamilton and GSMI have no right to receive payment for any pending bills submitted to GEICO.

## SECOND CAUSE OF ACTION
### Against GSMI, Zuberi, Khan, Din, F. Zuberi, Hamilton, and Fass
### (Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))

439.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 438 above.

440.     In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "1", GSMI, Zuberi, Khan, Din, F. Zuberi, Hamilton, and Fass knowingly submitted or caused to be submitted HCFA-1500 forms and treatment reports through GSMI to GEICO that were false and misleading in the following material respects:

(i)      The HCFA-1500 forms and treatment reports submitted or caused to be submitted through GSMI by GSMI, Zuberi, Khan, Din, F. Zuberi, Hamilton, and Fass uniformly misrepresented to GEICO that GSMI was in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore was eligible to receive PIP reimbursement. In fact, GSMI was not in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore was not eligible to receive PIP reimbursement, because: (a) it paid unlawful kickbacks in exchange for patient referrals; and (b) it was illegally owned, managed, and operated by Zuberi.

(ii)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted through GSMI by GSMI, Zuberi, Khan, Din, F. Zuberi, Hamilton, and Fass uniformly misrepresented to GEICO that the Fraudulent Services billed through GSMI were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were

eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were not eligible to receive PIP reimbursement, because: (a) they were provided, to the extent that they were provided at all, pursuant to an illegal kickback scheme; and (b) they were provided through an entity that illegally was owned, operated, and managed by Zuberi.

441.    The Defendants' systematic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33-A-7.

442.    As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $600,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

### THIRD CAUSE OF ACTION
**Against Hamilton, Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk**
**(Violation of New Jersey Insurance Fraud Prevention Act – (N.J.S.A.17:33A-1 et seq.))**

443.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 442 above.

444.    In connection with the billing that they submitted or caused to be submitted to GEICO for the Fraudulent Services in the claims identified in Exhibit "2", Hamilton, Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk knowingly submitted or caused to be submitted HCFA-1500 forms and treatment reports through Hamilton to GEICO that were false and misleading in the following material respects:

(i)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants through Hamilton uniformly misrepresented to GEICO that Hamilton was in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore was eligible to receive PIP reimbursement. In fact, Hamilton was not in compliance

with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore was not eligible to receive PIP reimbursement, because: (a) it received unlawful kickbacks in exchange for patient referrals; (b) it purported to provide, and billed for, the medically unnecessary and in many cases illusory Fraudulent Services.

(ii)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants through Hamilton uniformly misrepresented to GEICO that the Fraudulent Services were provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were eligible to receive PIP reimbursement. In fact, the Fraudulent Services were not provided in compliance with all applicable statutory and regulatory requirements governing healthcare practice in New Jersey, and therefore were not eligible to receive PIP reimbursement, because they were medically unnecessary, and in many cases illusory.

(iii)    The HCFA-1500 forms and treatment reports submitted or caused to be submitted by the Defendants through Hamilton uniformly misrepresented to GEICO that the Fraudulent Services billed through Hamilton were medically necessary and, in many cases, misrepresented to GEICO that the Fraudulent Services billed through Hamilton actually were performed. In fact, the Fraudulent Services billed through Hamilton frequently were not performed at all and, to the extent that they were performed, they were not medically necessary and were performed as part of a pre-determined fraudulent treatment, referral, and billing protocol designed solely to financially enrich the Defendants, not to benefit the Insureds who supposedly were subjected to it.

(iv)     The HCFA-1500 forms and treatment reports submitted or caused to be submitted through Hamilton misrepresented and exaggerated the level of the Fraudulent Services, the nature of the Fraudulent Services that purportedly were provided, and the reimbursable amounts for the Fraudulent Services.

445.    The Defendants' systemic violation of the New Jersey Insurance Fraud Prevention Act constitutes a "pattern" of violations under the Act. See N.J.S.A. 17:33-A-7.

446.    As a result, GEICO is entitled to not only damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $2,700,000.00, but is also entitled to: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; as well as (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation.

185

## FOURTH CAUSE OF ACTION
### Against Zuberi, Khan, Din, and F. Zuberi
### (Violation of RICO, 18 U.S.C. § 1962(c))

447.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 446 above.

448.    GSMI is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

449.    Zuberi, Khan, Din, and F. Zuberi knowingly conducted and/or participated, directly or indirectly, in the conduct of GSMI's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over three years seeking payments that GSMI was not eligible to receive under the No-Fault Laws because neither GSMI nor the underlying services were in compliance with New Jersey law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

450.    GSMI's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Zuberi, Khan, Din, and F. Zuberi operate GSMI, inasmuch as GSMI is not engaged in a legitimate ambulatory care practice and acts of mail fraud therefore are essential in order for  GSMI to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Zuberi, Khan, Din, and F. Zuberi continue to attempt collection on the fraudulent billing submitted through GSMI to the present day.

451.   GSMI is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by GSMI in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent PIP billing.

452.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $600,000.00 based upon the fraudulent charges representing payments made by GEICO to GSMI.

453.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Zuberi, Khan, Din, F. Zuberi, Fass, and Hamilton
### (Violation of RICO, 18 U.S.C. § 1962(d))

454.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 453 above.

455.   GSMI is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

456.   Zuberi, Khan, Din, F. Zuberi, Fass, and Hamilton are employed by and/or associated with the GSMI enterprise.

457.   Zuberi, Khan, Din, F. Zuberi, Fass, and Hamilton knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of GSMI's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent charges on a continuous basis for over three years seeking payments that GSMI was not entitled to receive under the No-Fault Laws

187

because neither GSMI nor the underlying services were in compliance with New Jersey law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

458.     Zuberi, Khan, Din, F. Zuberi, Fass, and Hamilton knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

459.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $600,000.00 based upon the fraudulent charges representing payments made by GEICO to GSMI.

460.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(d), and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Against GSMI, Zuberi, Khan, Din, and F. Zuberi
### (Common Law Fraud)

461.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 453 above.

462.     GSMI, Zuberi, Khan, Din, and F. Zuberi intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent charges through GSMI seeking payment for the Fraudulent Services.

463.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that GSMI was eligible to receive PIP

Benefits, when in fact it was not; (ii) in every claim, the representation that the Fraudulent Services billed through GSMI were eligible for PIP reimbursement, when in fact they were not; and (iii) in every claim, concealment of the fact that neither GSMI nor the Fraudulent Services billed through GSMI were eligible to receive PIP reimbursement.

464.    GSMI, Zuberi, Khan, Din, and F. Zuberi intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through GSMI that were not compensable under New Jersey's No-Fault Laws.

465.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least  $600,000.00 pursuant to the fraudulent bills submitted by GSMI, Zuberi, Khan, Din, and F. Zuberi through GSMI.

466.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

467.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**SEVENTH CAUSE OF ACTION**
**Against Fass and Hamilton**
**(Aiding and Abetting Fraud)**

468.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 467 above.

469.    Fass and Hamilton knowingly aided and abetted the fraudulent scheme that was perpetrated on GEICO by GSMI, Zuberi, Khan, Din, and F. Zuberi. The acts of Fass and

Hamilton in furtherance of the fraudulent scheme include knowingly referring Insureds to GSMI for treatment in exchange for kickbacks from GSMI, Zuberi, Khan, Din, and F. Zuberi.

470.    The conduct of Fass and Hamilton in furtherance of the fraudulent scheme is significant and material. The conduct of Fass and Hamilton is a necessary part of and is critical to the success of the fraudulent scheme because without their actions, there would be no opportunity for GSMI, Zuberi, Khan, Din, and F. Zuberi to obtain payments from GEICO and from other insurers.

471.    Fass and Hamilton aided and abetted the fraudulent scheme in a calculated effort to induce GEICO into paying charges to GSMI for Fraudulent Services that were not compensable under New Jersey's No-Fault Laws, because they sought to continue profiting through the fraudulent scheme.

472.    The conduct of Fass and Hamilton caused GEICO to pay more than $600,000.00 pursuant to the fraudulent bills submitted by GSMI, Zuberi, Khan, Din, and F. Zuberi through GSMI.

473.    Fass and Hamilton's extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

474.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against GSMI, Zuberi, Khan, Din, F. Zuberi, Fass, and Hamilton**
**(Unjust Enrichment)**

475.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 474 above.

476.     As set forth above, GSMI, Zuberi, Khan, Din, F. Zuberi, Fass, and Hamilton have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

477.     When GEICO paid the bills and charges submitted or caused to be submitted by the Defendants through GSMI for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on GSMI, Zuberi, Khan, Din, F. Zuberi, Fass, and Hamilton's improper, unlawful, and/or unjust acts.

478.     GSMI, Zuberi, Khan, Din, F. Zuberi, Fass, and Hamilton have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

479.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

480.     By reason of the above, GSMI, Zuberi, Khan, Din, F. Zuberi, Fass, and Hamilton have been unjustly enriched in an amount to be determined at trial, but in no event less than $600,000.00.

## NINTH CAUSE OF ACTION
### Against Fass
### (Violation of RICO, 18 U.S.C. § 1962(c))

481.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 480 above.

482.     Hamilton is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

483.     Fass knowingly conducted and/or participated, directly or indirectly, in the conduct of Hamilton's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous

basis for over three years seeking payments that Hamilton was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (v) neither Hamilton nor the underlying services were in compliance with New Jersey law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

484.    Hamilton's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Fass operates Hamilton, inasmuch as Hamilton is not engaged in a legitimate healthcare practice and acts of mail fraud therefore are essential in order for Hamilton to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that Fass continues to attempt collection on the fraudulent billing submitted through Hamilton to the present day.

485.    Hamilton is engaged in inherently unlawful acts, inasmuch as it continues to submit and attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Hamilton in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent PIP billing.

486.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,700,000.00 based upon the fraudulent charges representing payments made by GEICO to GSMI.

487.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TENTH CAUSE OF ACTION
### Against Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk (Violation of RICO, 18 U.S.C. § 1962(d))

488.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 487 above.

489.    Hamilton is an ongoing "enterprise" as that term is defined in 18 U.S.C. § 1961(4), that engages in activities that affect interstate commerce.

490.    Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk are employed by and/or associated with the Hamilton enterprise.

491.    Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of Hamilton's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over three years seeking payments that Hamilton was not eligible to receive under the No-Fault Laws because: (i) the billed-for-services were not medically necessary; (ii) the billed-for-services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; (iii) the billed-for-services, in many cases, were not performed at all; (iv) the billing codes used

for the services misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges that could be submitted; and (v) neither Hamilton nor the underlying services were in compliance with New Jersey law. The fraudulent charges and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

492.    Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

493.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $2,700,000.00 based upon the fraudulent charges representing payments made by GEICO to Hamilton.

494.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(d), and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
**Against Hamilton, Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk**
**(Common Law Fraud)**

495.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 494 above.

496.    Hamilton, Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk intentionally and knowingly made false and fraudulent statements of material fact to

GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges through Hamilton seeking payment for the Fraudulent Services.

497.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the Fraudulent Services were medically necessary, when in fact they were not; (ii) in many claims, the representation that the Fraudulent Services were provided in the first instance, when in fact they were not; (iii) in every claim, the representation that Hamilton was in compliance with the laws and regulations governing healthcare practice in New Jersey, and was eligible to receive PIP Benefits; (v) in every claim, the representation that the Fraudulent Services were provided in compliance with the laws and regulations governing healthcare practice in New Jersey, and were eligible for PIP reimbursement.

498.    Hamilton, Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Hamilton that were not compensable under New Jersey's No-Fault Laws.

499.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above-described conduct in that it has paid at least  $2,700,000.00 pursuant to the fraudulent bills submitted or caused to be submitted by Hamilton, Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk through Hamilton.

500.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

501.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## TWELFTH CAUSE OF ACTION
### Against Hamilton, Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk
### (Unjust Enrichment)

502.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 501 above.

503.     As set forth above, Hamilton, Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

504.     When GEICO paid the bills and charges submitted or caused to be submitted by the Defendants through Hamilton for PIP Benefits, it reasonably believed that it was legally obligated to make such payments based on Hamilton, Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk's improper, unlawful, and/or unjust acts.

505.     Hamilton, Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

506.     The Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

507.     By reason of the above, Hamilton, Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk have been unjustly enriched in an amount to be determined at trial, but in no event less than $2,700,000.00.

## JURY DEMAND

508.     Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a judgment be entered in their favor:

A.     On the First Cause of Action against Hamilton and GSMI, for a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Hamilton and GSMI have no right to receive payment for any pending bills submitted to GEICO;

B.     On the Second Cause of Action against GSMI, Zuberi, Khan, Din, F. Zuberi, Hamilton, and Fass, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $600,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

C.     On the Third Cause of Action against Hamilton, Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk, damages in the form of disgorgement of the PIP benefits paid in an amount to be established at trial, but exceeding $2,700,000.00, as well as: (i) treble damages; (ii) the costs and counsel fees incurred in connection with the investigation conducted by GEICO; and (iii) reimbursement of the costs and counsel fees associated with the prosecution of this litigation pursuant to N.J.S.A. 17:33A-7;

D.     On the Fourth Cause of Action against Zuberi, Khan, Din, and F. Zuberi, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of

$600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

E.       On the Fifth Cause of Action against Zuberi, Khan, Din, F. Zuberi, Fass, and Hamilton, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $600,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.       On the Sixth Cause of Action against GSMI, Zuberi, Khan, Din, and F. Zuberi, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $600,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

G.       On the Seventh Cause of Action against Fass and Hamilton, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $600,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.       On the Eighth Cause of Action against GSMI, Zuberi, Khan, Din, F. Zuberi, Fass, and Hamilton, more than $600,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

I.       On the Ninth Cause of Action against Fass, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of  $2,700,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.       On the Tenth Cause of Action against Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk, compensatory damages in favor of GEICO an amount to

be determined at trial but in excess of $2,700,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

       K.     On the Eleventh Cause of Action against Hamilton, Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk, compensatory damages in favor of GEICO an amount to be determined at trial but in excess of $2,700,000.00, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper; and

       L.     On the Twelfth Cause of Action against Hamilton, Fass, Smith, Kosmorsky, N. Mahoney, J. Mahoney, Pierro, Lychock, and Kishyk, more than $2,700,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated:      Hackensack, New Jersey
              January 31, 2017

                         RIVKIN RADLER LLP

                         By: _____
                             John Robertelli, Esq.
                             Gene Kang, Esq.
                             Barry I. Levy, Esq. (to be admitted *pro hac vice*)
                             Max Gershenoff, Esq. (to be  admitted *pro hac vice*)
                             21 Main Street, Suite 158
                             Court Plaza South, West Wing
                             Hackensack, New Jersey 07601
                             (201) 287-2460